THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABDUR RAZAKAH<br>(a/k/a/ Abdul Razzak),<br>　　Detainee, Camp I,<br>　　Guantanamo Bay Naval Station<br>　　Guantanamo Bay, Cuba; | ) ) ) ) | |
| AHMAD DOE<br>(a/k/a/ Amdad),<br>　　Detainee, Camp I,<br>　　Guantanamo Bay Naval Station<br>　　Guantanamo Bay, Cuba; | ) ) ) ) ) ) | |
| USAMA HASAN ABU KABIR,<br>　　as Next Friend of Abdur Razakah and<br>　　Ahmad Doe; | ) ) ) ) | **PETITION FOR WRIT OF**<br>**HABEAS CORPUS** |
| *Petitioners*, | ) ) ) | |
| v. | ) ) | No. _____ |
| GEORGE W. BUSH,<br>　　President of the United States<br>　　The White House<br>　　1600 Pennsylvania Ave., N.W.<br>　　Washington, D.C. 20500, | ) ) ) ) ) ) | |
| DONALD RUMSFELD,<br>　　Secretary, United States<br>　　Department of Defense<br>　　1000 Defense Pentagon<br>　　Washington, D.C. 20301-1000; | ) ) ) ) ) | |
| ARMY BRIG. GEN. JAY HOOD,<br>　　Commander, Joint Task Force – GTMO<br>　　JTF-GTMO<br>　　APO AE 09360; and | ) ) ) ) | |
| ARMY COL., MIKE BUMGARNER<br>　　Commander, Joint Detention<br>　　Operations Group - JTF-GTMO,<br>　　JTF-GTMO<br>　　APO AE 09360, | ) ) ) ) ) ) | |
| *Respondents*. | ) ) ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS AND
## COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF

Petitioners Abdur Razakah and Ahmad Doe (hereinafter "Petitioners") seek the Great Writ.  On information and belief, Petitioners are citizens of the People's Republic of China. Petitioners are civilians who have been wrongly classified as "enemy combatants" by the President of the United States and who are being held virtually *incommunicado* in military custody at the United States Naval Station at Guantanamo Bay, Cuba ("Guantánamo") in Camp I, without basis, without charge, without access to counsel and without being afforded any fair process by which they might challenge their detention.  They act on their own behalf and through their Next Friend, Usama Hasan Abu Kabir, who is also detained at Guantánamo.  Petitioners are being held by color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as customary international law.  Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioners or to establish in this Court a lawful basis for their detention.  This Court should also order injunctive and declaratory relief.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or under the November 13, 2001 Executive Order, Respondents George W. Bush, President of the United States; Donald H. Rumsfeld, U.S. Secretary of Defense; Army Brigadier General Jay Hood, Commander of Joint Task Force-GTMO; and Army Colonel Mike Bumgarner, Commander, Joint Detention Operations Group, Joint Task Force-GTMO, are either ultimately responsible for, or have been charged with the responsibility of maintaining, the custody and control of the detained Petitioners at Guantánamo.

KL3:2483281.1

# I.
# JURISDICTION

1.      Respondents are detaining Petitioners "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States." Petitioners bring this action under 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3), and 2242. Petitioners further invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; Articles I and II of, and the Fifth and Sixth Amendments to the United States Constitution. Because they seek declaratory relief, Petitioners also rely upon Fed. R. Civ. P. 57.

2.      This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of *Habeas Corpus*, and to entertain the Petition filed by Usama Hasan Abu Kabir, the Next Friend of Petitioners Abdur Razakah and Ahmad Doe, under 28 U.S.C. § 2242. This Court is further empowered to declare the rights and other legal relations of the parties in this matter by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

# II.
# VENUE

3.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because at least one of the Respondents resides in the District, a substantial part of the events giving rise to the claims occurred in the District, at least one Respondent may be found in the District, and all Respondents are either officers or employees of the United States, or agencies thereof, and acting in their official capacities.

KL3:2483281.1

2

## III.
## PARTIES

4.      On information and belief, Petitioners Abdur Razakah and Ahmad Doe are citizens of the Xinjiang Autonomous Region, a western province of the People's Republic of China, also commonly referred to as "East Turkistan." Petitioner Abdur Razakah is also known as Abdul Razzak and has been assigned the internment serial number ("ISN") 219 by Respondents. Petitioner Ahmad Doe is also known as Amdad and has been assigned the ISN 201. Petitioners are presently incarcerated at Guantánamo and held in Respondents' unlawful custody and control. Petitioners are Uighurs (pronounced "WEE-ghurs"), a Turkic Muslim minority group that has been brutally oppressed by the communist Chinese government. Upon information and belief, Petitioners desire undersigned counsel to file this Petition on their behalf. *See* Exhibit A, Authorization of Usama Hasan Abu Kabir.

5.      Petitioners' Next Friend is Petitioner Usama Hasan Abu Kabir, a detainee familiar with Petitioners Abdur Razakah and Ahmad Doe for the duration of their incarceration in Guantánamo. *See Id.* He is a citizen of Jordan. Because his friends and co-detainees have been denied access to legal counsel and to the courts of the United States, Usama Hasan Abu Kabir acts as Next Friend to Petitioners Abdur Razakah and Ahmad Doe. *Id.* Petitioner Usama Hasan Abu Kabir acts as next friend in order to assist Petitioners Abdur Razakah and Ahmad Doe in seeking redress for these grievances.

6.      The United States is currently incarcerating a total of approximately 22 Uighurs at Guantánamo Bay. According to a March 16, 2005 press report, "The Pentagon determined last year that half of the two dozen Uighur Chinese captured in the war on terrorism have no intelligence value and should be released." "*Uighurs Face Return from Guantanamo,*" FIN. TIMES (March 16, 2005); *See e.g.,* Demetri Sevastopulo, "*Cheney Backs Guantanamo Bay*

*Prison Amid Growing Unease*," FIN. TIMES (June 14, 2005) ("The U.S. is holding about 550 detainees at Guantanamo, including about a dozen Uighur Chinese whom the U.S. has determined are no longer 'enemy combatants'."); Carol Rosenberg, "*Guantanamo Bay: Closing Prison Would Be Tricky Easy*," MIAMI HERALD (June 12, 2005) ("Navy Secretary Gordon England confirmed in March that Guantanamo captives include Chinese Muslims – reportedly about two dozen – who are no longer classified as 'enemy combatants,' the Bush administration term for terrorism suspects."); Editorial, WASH. POST (May 3, 2005) ("[T]he military has determined that about 15 of [the Uighurs at Guantanamo] are not 'enemy combatants'...The Pentagon has, consequently, cleared them for release."). Despite having determined that each Petitioner is not a threat to the security of the United States, Respondents have nevertheless failed to release them from prison.

7.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States Military. Petitioners are being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (November 13, 2001) ("Executive Order"). President Bush is responsible for Petitioners' unlawful detention and is sued in his official capacity.

8.    Respondent Donald Rumsfeld is the Secretary of the United States Department of Defense. Pursuant to the President's authority as Commander-in-Chief, under the laws and usages of war or, alternatively pursuant to the Executive Order, Respondent Rumsfeld has been charged with the responsibility of maintaining the custody and control of Petitioners. He is sued in his official capacity.

4

9.      Respondent Brigadier General Jay Hood is the Commander of Joint Task Force-GTMO, the task force charged with administering the detention operation at Guantánamo Bay. He has supervisory responsibility for Petitioners and is sued in his official capacity.

10.     Respondent Army Colonel Mike Bumgarner is the Commander of the Joint Detention Operations Group and the JTF-GTMO detention camps, including the U.S. facility where Petitioners are presently held.  He is the immediate custodian responsible for Petitioners' detention and is sued in his official capacity.

11.     Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or of agents or employees of private contractors with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo.  All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents or employees or contractor employees.

## IV.
## STATEMENT OF FACTS

12.     Upon information and belief, Petitioners are not, nor have they ever been, enemy aliens, lawful or unlawful belligerents, or combatants of any kind under any definition adopted by the government in any civil or military proceeding.

13.     Upon information and belief, Petitioners are not, nor have they ever been, "enemy combatant[s]" who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2639 (2004).

14.     Petitioners seek to enforce their right to a judicial determination by an appropriate and lawful authority as to whether there is a lawful and factual basis for Respondents'

KL3:2483281.1

determination that they are either "enemy combatants" as defined by the United States Supreme Court in *Hamdi* or "enemy combatants" as that term is defined and used by the Executive in the Combatant Status Review Tribunals.

15.    Upon information and belief, Petitioner Abdur Razakah was present in Afghanistan after the United States began military operations in that country in October 2001. Upon information and belief, Petitioner Abdur Razakah did not take up arms against United States forces, and did not support forces hostile to or engaged in armed conflict with the United States. Petitioner Abdur Razakah fled Afghanistan, eventually making his way to Pakistan with a large number of other refugees. In Pakistan, Petitioner Abdur Razakah was detained by Pakistani authorities and eventually turned over to the U.S. military. Upon information and belief, the United States paid a $5,000 bounty for Petitioner Abdur Razakah. *See also* Michelle Faul, "*Guantanamo Detainees Say Arabs, Muslims Sold for U.S. Bounties*," ASSOC. PRESS, May 31, 2005.

16.    Upon information and belief, Petitioner Ahmad Doe was present in Afghanistan after the United States began military operations in that country in October 2001. Upon information and belief, Petitioner Ahmad Doe did not take up arms against United States forces, and did not support forces hostile to or engaged in armed conflict with the United States. Upon information and belief, Petitioner Ahmad Doe was detained by members of the Afghan Northern Alliance in Mazar-e-Sharif and eventually turned over to the U.S. military.

17.    Upon information and belief, at the time of their seizure and detention, Petitioners Abdur Razakah and Ahmad Doe were not members of the Taliban Government's armed forces or Al Qaeda. Prior to their detention, they did not commit any violent act against any American person or property. They had no involvement, direct or indirect, in the terrorist attacks on the

United States on September 11, 2001, the ensuing international armed conflict, or any act of international terrorism attributed by the United States to Al Qaeda. Petitioners seek to enforce their rights to a judicial determination of the lawfulness of their detention.

18.    Upon information and belief, Petitioners Abdur Razakah and Ahmad Doe are among a group of 15 Uighurs held in Guantánamo who have twice been cleared for release from Guantánamo – once after a Pentagon review in late 2003 and again in March 2005. *See* Robin Wright, "*Chinese Detainees are Men Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantanamo With Nowhere to Go*," WASH. POST, Aug. 24, 2005, at A1 ("15 Uighurs have actually been cleared for release from Guantanamo Bay twice, once after a Pentagon review in late 2003 and again last March, U.S. officials said.").

19.    Petitioners Abdur Razakah and Ahmad Doe nevertheless remain incarcerated at the U.S. Naval base at Guantánamo, Cuba, a territory over which the United States exercises exclusive jurisdiction and control.

20.    Petitioners Abdur Razakah and Ahmad Doe have not been afforded any procedures that would satisfy their rights under the most fundamental common law notions of due process, the U.S. Constitution, the laws and treaties of the United States, or customary international law.

21.    Upon information and belief, Petitioners Abdur Razakah and Ahmad Doe desire to pursue in United States courts every available legal challenge to the lawfulness of their detention.

**The Joint Resolution**

22.    In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban

7

government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("Joint Resolution").

23.    As Petitioners Abdur Razakah and Ahmad Doe did not participate in the armed conflict at any point in time, they are not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or the Joint Resolution.

### The Executive Order

24.    On November 13, 2001, Respondent Bush issued an Executive Order authorizing Respondent Rumsfeld to detain indefinitely anyone Respondent Bush has "reason to believe":

(i)     is or was a member of the organization known as al Qaeda;

(ii)    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii)   has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

See Executive Order, 66 Fed. Reg. 57,833, §2 (November 13, 2001). President Bush must make this determination in writing. The Executive Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution of September 18, 2001.

25.    The Executive Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Executive Order contains no provision for that person to be notified of the charges he may face. The Executive Order

8

authorizes detainees to be confined indefinitely without charges. It contains no provision for a detainee to be notified of his rights under domestic and international law, and provides neither the right to counsel, nor rights to notice of consular protection or to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the basis for or the legality of a detainee's continued detention and contains no provision for recourse to an Article III court. In fact, the Executive Order expressly bars review by any court. The Executive Order authorizes indefinite and unreviewable detention, based on nothing more than President Bush's written determination that an individual is subject to its terms.

26.    The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate Petitioner was made by Respondents in the United States and in this judicial district, the decision to detain Petitioner at Guantánamo was made in the United States and in this judicial district, and the decision to continue detaining Petitioner was, and is, being made by Respondents in the United States and in this judicial district.

27.    Upon information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Petitioners Abdur Razakah and Ahmad Doe are subject to the Executive Order.

28.    Petitioners Abdur Razakah and Ahmad Doe are not properly subject to the Executive Order.

29.    Petitioners Abdur Razakah and Ahmad Doe have not been, and are not being, detained lawfully either pursuant to the Executive Order, President Bush's authority as Commander-in-Chief, and/or the laws and usages of war in that Petitioners have been denied the process due to them under the common law and the Due Process Clause of the Fifth Amendment to the Constitution of the United States, domestic civil and military law, and international law.

KL3:2483281.1

**Guantánamo Bay Naval Station**

30.     On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba.  In April 2002, prisoners were transferred to Camp Delta, a more permanent prison facility at Guantánamo.  Camp Delta includes Camp I, where Petitioners and other detainees perceived as the most cooperative of Guantánamo's inmate population are held.  Approximately 150 detainees are held there.  Currently, prisoners are housed in Camp Delta and Camp V, an additional maximum-security interrogation and detention center, as well as other camps including Camp Iguana, where prisoners determined not to be enemy-combatants are detained.

31.     Prisoners incarcerated at Guantánamo are entitled to test the legality of their detention in the federal courts. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (June 28, 2004).

32.     On a date unknown to counsel, but known to Respondents, the United States military transferred Petitioners Abdur Razakah and Ahmad Doe to Guantánamo, where they have been held ever since, in the custody and control of Respondents.

**The Conditions of Detention at Guantánamo**

33.     Since gaining control of Petitioners Abdur Razakah and Ahmad Doe, the United States military has held them virtually *incommunicado.*

34.     Upon information and belief, Petitioners Abdur Razakah and Ahmad Doe have been or will be interrogated repeatedly by agents of the United States Departments of Defense and Justice, and the Central Intelligence Agency, though they have not been charged with an offense and have not been notified of any pending or contemplated charges.  They have not appeared before a lawful military or civilian tribunal, and have not been provided access to counsel or the means to contact and secure counsel.  They have not been adequately informed of

10

their rights under the United States Constitution, the regulations of the United States Military, the Geneva Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of Refugees or customary international law. Indeed, Respondents have taken the position that Petitioners Abdur Razakah and Ahmad Doe should not be informed of these rights. As a result, Petitioners Abdur Razakah and Ahmad Doe lack any ability to protect or to vindicate their rights under domestic and international law.

35.    Upon information and belief, Petitioners Abdur Razakah and Ahmad Doe have been forced to provide involuntary statements to Respondents' agents at Guantánamo.

36.    Upon information and belief, Petitioners Abdur Razakah and Ahmad Doe have been held under conditions that violate their constitutional and international rights to dignity and freedom from torture and from cruel, inhuman and degrading treatment or punishment. *See, e.g.,* Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 83-115, Ch. 12-13, AMR 51/063/2005 (13 May 2005); Physicians for Human Rights, "Break Them Down: Systematic Use of Psychological Torture by US Forces," Ch.3 (2005); United Nations Press Release, "United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees," Feb. 4, 2005; International Committee of the Red Cross, Press Release, "The ICRC's Work at Guantánamo Bay," Nov. 30, 2004; International Committee of the Red Cross, Operational Update, "US Detention Related to the Events of September 11, 2001 and Its Aftermath – the Role of the ICRC," July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the 'War on Terror'*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.org/library/Index/ENGAMR 511452004); Barry C. Scheck, *Abuse of*

11

*Detainees at Guantanamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5.

37.    Indeed, many of these violations – including isolation for up to 30 days, 28-hour interrogations, extreme and prolonged stress positions, sleep deprivation, sensory assaults, forced nudity and humiliation, hooding, and the use of dogs to create anxiety and terror – were actually interrogation techniques approved for use at Guantánamo by the most senior Department of Defense lawyer. *See e.g.*, Action Memo from William J. Haynes II, General Counsel, DOD, to Secretary of Defense (Nov. 27, 2002); *Pentagon Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations*, at 62-65 (Apr. 4, 2003).[1]

38.    In a confidential report to the United States government, the ICRC charged the U.S. military with intentional use during interrogations of psychological and physical coercion on prisoners at Guantánamo that is "tantamount to torture." *See* Neil A. Lewis, "Red Cross Finds Detainee Abuse in Guantánamo," *New York Times*, Nov. 30, 2004, at A1.  The report includes claims that doctors and other medical workers at Guantánamo participated in planning for interrogations. *Id.; see also* M. Gregg Bloche and Jonathan H. Marks, "When Doctors Go to War," *New England Journal of Medicine*, Jan. 6, 2005, at 3-4.

----

[1]    Additional details of the cruel and degrading conditions suffered by detainees at Guantánamo are set out at length in a statement by numerous released British detainees. *See* Shafiq Rasul, Asif Iqbal & Rhuhel Ahmed, *Composite Statement: Detention in Afghanistan and Guantanamo Bay*, 300, *at* http://www.ccr-ny.org/v2/reports/docs/Gitmo-compositestatementFINAL23 july04.pdf).  The Department of Defense also informed the Associated Press that a number of interrogators at Guantánamo have been demoted or reprimanded after investigations into accusations of abuse at the facility. *See Report Details Guantanamo Abuses*, Assoc. Press, Nov. 4, 2004.

39.    Since details of the ICRC's report emerged, new revelations of abuse and torture at Guantánamo have appeared, including FBI memos detailing torture and "highly aggressive interrogation techniques," such as 24-plus hour interrogations involving beatings, temperature extremes, dogs, prolonged isolation, and loud music. *See, e.g.,* Carol D. Leonnig, "Guantanamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land," *Wash. Post*, Aug. 13, 2005, at A18; Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 83-115, Ch. 12-13, AMR 51/063/2005 (13 May 2005); Amnesty International, *Guantánamo: An Icon of Lawlessness,* Jan. 6, 2005, at 3-5; Neil A. Lewis, "Fresh Details Emerge on Harsh Methods at Guantánamo," *New York Times*, Jan. 1, 2005, at A11; Carol D. Leonnig, "Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos," *Washington Post*, Dec. 26, 2004, at A1; Neil A. Lewis and David Johnston, "New F.B.I. Memos Describe Abuses of Iraq Inmates," *New York Times*, Dec. 21, 2004, at A1; Dan Eggen and R. Jeffrey Smith, "FBI Agents Allege Abuse of Detainees at Guantánamo Bay," *Washington Post*, Dec. 21, 2004, at A1; Neil A. Lewis, "F.B.I. Memos Criticized Practices at Guantánamo," *New York Times*, Dec. 7, 2004, at A19.

40.    In fact, many of the egregious interrogation techniques used in the Abu Ghraib detention center and other detention facilities in Iraq – such as the use of aggressive dogs to intimidate detainees, sexual humiliation, stress positions, and sensory deprivation – were pioneered at Guantánamo. *See* Josh White, "Abu Ghraib Dog Tactics Came From Guantanamo; Testimony Further Links Procedures at 2 Facilities," *Wash. Post*, July 27, 2005, at A14; *and* Josh White, "Abu Ghraib Tactics Were First Used at Guantanamo," *Wash. Post*, July 14, 2005 at A1.

41.    The unlawful interrogation techniques used by Respondents at Guantánamo include not only direct physical and psychological abuse but also impermissible conduct

intended to undermine the detainees' due process rights, such as representing to detainees that government agents are their habeas lawyers for the express purpose of extracting information from the detainees. *See* Sam Hannel, "Lawyers Describe Guantánamo Detainees," *Seattle Post-Intelligencer*, Jan. 19, 2005.

42.    In addition, military defense lawyers have been instructed to limit their representation of detainees in a manner that would operate to the detriment of their clients in violation of due process requirements. *See* David Johnston & Neil Lewis, "Lawyer Says Military Tried To Coerce Detainee's Plea," *NY Times,* June 16, 2005, at A25 (Late Ed.).

43.    Respondents, acting individually or through their agents, have stated that the humanitarian limitations which normally apply to the U.S. military's use of coercive interrogation techniques under the auspices of the Department of Defense, *do not apply* to interrogations conducted by CIA agents or other specially-designated government officers assigned to such work. *See* Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 27-43, Ch. 5, AMR 51/063/2005 (13 May 2005); Eric Lichtblau, "Gonzales Says '02 Policy on Detainees Doesn't Bind CIA," *New York Times*, Jan. 19, 2005, at A17; Dan Eggen and Charles Babington, "Torture by U.S. Personnel Illegal, Gonzales Tells Senate," *Washington Post*, Jan. 18, 2005, at A4.

44.    In published statements, President Bush and Secretary Rumsfeld, and the predecessors of Hood and Bumgarner, respectively, Lenhert and Carrico, have proclaimed that the United States may hold the detainees under their current conditions indefinitely. *See, e.g.,* Roland Watson, *The Times* (London), Jan. 18, 2002 ("Donald Rumsfeld, the U.S. Defense Secretary, suggested last night that Al-Qaeda prisoners could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case

against them."); Lynne Sladky, Assoc. Press, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held 'We have to look at Camp X-ray as a work in progress […]' Lehnert told CNN. Lehnert said plans are to build a more permanent prison 'exactly in accordance with federal prison standards."); John Mintz, "Extended Detention in Cuba Mulled," *The Washington Post*, February 13, 2002 ("As the Bush Administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantanamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").

45.    According to the Department of Defense, detainees who are adjudged innocent of all charges by a military commission may nevertheless be kept in detention at Guantánamo indefinitely.    *See* Department of Defense Press Background Briefing of July 3, 2003, at http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html (last visited August 24, 2005).

46.    Counsel for Respondents have also consistently maintained that the United States may hold the detained petitioners under their current conditions indefinitely.    *In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK), *et al.*, (D.D.C.), Tr. of Dec. 1, 2004 Oral Argument on Motion to Dismiss at 22-24, Statements of Principle Deputy Associate Attorney Gen. Brian Boyle; *see also* Dana Priest, "Long-Term Plan Sought for Terror Suspects," *Wash. Post*, Jan. 2, 2005, at A1.

47.    In fact, the Government has failed to release a number of Uighur detainees from Guantánamo even after it has determined that the detainees are "no longer enemy combatants." *See* Robin Wright, "Chinese Detainees Are Men Without a Country; 15 Muslims, Cleared of Terrorism Charges, Remain at Guantanamo With Nowhere to Go," *Wash. Post*, August 24, 2005,

at A1 (Final Ed.); Ben Fox, "U.S. to Ease Conditions for Some Detainees," *Chicago Trib.*, Aug. 11, 2005, at C4.

48.     The Government has acknowledged its plan to begin constructing a new, more permanent detention facility at Guantánamo. Christopher Cooper, "In Guantánamo, Prisoners Languish in a Sea of Red Tape," *Wall Street Journal*, Jan. 26, 2005, at A1; Associated Press, "Guantánamo Takes on the Look of Permanency," Jan. 9, 2005.

**Rendition**

49.     During interrogations, detainees have also been threatened with rendition or transfer to countries that permit indefinite detention without charge or trial and/or routinely practice torture. Upon information and belief, the United States has secretly transferred detainees to such countries without complying with the applicable legal requirements for extradition. This practice, known as "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture. *See* Jane Mayer, "Outsourcing Torture: The Secret History of American's "Extraordinary Rendition" Program, *The New Yorker*, Feb. 14, 2005, at 106.

50.     The U.S. government's "extraordinary rendition" program has been well documented by key American and international news organizations, including the *Washington Post*, *The Los Angeles Times*, and the British Broadcasting Corporation (the "BBC"). According to news accounts:

> Since September 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence source. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics -- including torture and threats to families -- that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogations, the sources said.

KL3:2483281.1

Rajiv Chanrasekaran & Peter Finn, "U.S. Behind Secret Transfer of Terror Suspects," *Wash.*
*Post*, Mar. 11, 2002, at A1; *see also* Dana Priest, "Long Term Plan Sought for Terror Suspects,"
*Wash. Post*, Jan. 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements
between the United States and other countries, such as Egypt…that agree to have local security
services hold certain suspects in their facilities for interrogation by CIA and foreign liaison
officers.").

51.    In fact, the Government has recently announced its intention to render many
Guantánamo detainees to countries which have a documented record of human rights violations,
including state-sponsored torture. *See, e.g.,* Matthew Waxman, "Beyond Guantanamo," *Wash.*
*Times*, Aug. 20, 2005, at A17; Robin Wright and Josh White, "U.S. Holding Talks on Return of
Detainees;    Administration    Close    to    Reaching    Agreements    With    10    Muslim
Governments," *Wash. Times*, Aug. 9, 2005, at A13; Neil Lewis, "Guantanamo Detention Site Is
Being Transformed, U.S. Says," *NY Times*, Aug. 6, 2005, at A8 (Late Ed.); Paul Richter, "U.S. to
Repatriate 110 Afghans Jailed at Guantanamo Bay," *LA Times*, Aug. 5, 2005, at A18.

52.    Moreover, upon information and belief, the Government is conditioning the
transfer or rendering of detainees to their countries of origin on the requirement that the home
country imprison the detainee without regard to the detainee's individual factual or legal
situation. *See* Robin Wright and Josh White, "U.S. Holding Talks on Return of Detainees;
Administration Close to Reaching Agreements With 10 Muslim Governments," *Wash. Post*,
August 9, 2005, at A13; BBC Worldwide Monitoring, "USA to release 107 Yemenis from
Guantanamo Bay," August 10, 2005 (available from LEXIS, MWP90 file) ("The US authorities
declared few days ago that they would extradite detainees from Guantanamo Bay to Afghanistan,
Saudi Arabia and Yemen on the condition [that they are] to be put in jail.").

KL3:2483281.1

53.     Upon information and belief, Petitioners are at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture during interrogations and incarceration.  Upon information and belief, the Chinese government has specifically demanded that the United States return the Uighurs in Guantánamo to China to face charges of terrorism.

54.     Petitioners cannot legally or ethically be returned or rendered to the People's Republic of China.  To do so would very likely subject them to arbitrary arrest, torture or even death at the hands of the Chinese regime.  According to the State Department, in China during 2004, "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse…[S]tate-run media reported that 460 people were killed by law enforcement officials and over 100 seriously injured through abuse or dereliction of duty in 2003."  U.S. Dept. of State, Country Reports on Human Rights Practices – 2004 (China Report) § 1(c)(2005) (available at www.state.gov/g/drl/rls/hrrpt/2004/41640.htm).  The State Department reports particularly harsh abuse of ethnic Uighur Muslims:

> The [Chinese] Government used the international war on terror as a justification for cracking down harshly on suspected Uighur separatists expressing peaceful political dissent and on independent Muslim religious leaders…Uighurs were executed and sentenced to long prison terms during the year on charges of separatism…In October 2003, Uighur Shaheer Ali was executed after being convicted of terrorism.  He had been repatriated forcibly from Nepal in 2002, where he had been interviewed by UNHCR and granted refugee status.

*Id.*  at Introduction and § 5, subsection on National/Racial/Ethnic Minorities; Mark Mazzetti & John Hendren, "*U.S. Quietly Exploring Alternatives to Guantanamo Bay,*" Los Angeles Times, June 15, 2005 ("The repatriation of nearly two dozen ethnic Uighurs from China detained at Guantanamo Bay has been held up because of State Department concerns that the Uighurs might be tortured or killed after being turned over to Chinese custody.").

KL3:2483281.1

## V.
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES - UNLAWFUL DEPRIVATION OF LIBERTY)

55.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

56.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals, without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioners the process accorded to persons seized and detained by the United States military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice,  Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

57.     To the extent that Petitioners' detention purports to be authorized by the Executive Order, that Order violates common law principles of due process as well the Due Process Clause of the Fifth Amendment on its face and as applied to Petitioners.

58.     To the extent that Respondents claim that Petitioners' detention is authorized by the Executive's purported "necessary power to wind up wartime detentions in an orderly fashion," that detention violates common law principles of due process as well the Due Process Clause of the Fifth Amendment.

19

59.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## SECOND CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES - UNLAWFUL CONDITIONS OF CONFINEMENT)

60.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

61.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioners to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

62.    Accordingly, Petitioners are entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

## THIRD CLAIM FOR RELIEF

### (GENEVA CONVENTIONS - ARBITRARY DENIAL OF DUE PROCESS)

63.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

64.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioners the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

65.    Violations of the Geneva Conventions are direct treaty violations, are violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241 (c)(3).

KL3:2483281.1

66.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

67.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

### FOURTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW - ARBITRARY DENIAL OF DUE PROCESS)

68.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

69.    By the actions described above, Respondents have denied and continue to deny Petitioners the due process accorded to persons seized and detained by the United States military in times of armed conflict as established by customary international humanitarian and human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

70.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

### FIFTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE - TORTURE)

71.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

72.    By the actions described above, upon information and belief, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon detainees in

21

order to obtain coerced information or confessions from detainees, punish or intimidate detainees or for other purposes. Upon information and belief, among other abuses detainees have been held in conditions of isolation; placed in constant vulnerability to repeated interrogation and severe beatings; kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement for minor rule infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

73.     The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

74.     Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against detainees.

75.     On information and belief, Petitioners were subject to the same severe physical and psychological abuse and agony as other detainees and are entitled to habeas, declaratory, and injunctive relief, and other relief to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE - WAR CRIMES)

76.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

KL3:2483281.1

77.     By the actions described above, upon information and belief, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of detainees constitutes war crimes and/or crimes against humanity in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated, among others, the Fourth Geneva Convention, Common Article III of the Geneva Conventions and Additional Protocols I and II of the Geneva Conventions as well as customary international law prohibiting war crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decisions, and other authorities.

78.     As a result of Respondents' unlawful conduct, upon information and belief, detainees have been and are being forced to suffer severe physical and psychological abuse and agony.  Upon information and belief, Petitioners have been subject to the same conditions as detainees, and are therefore entitled to habeas, declaratory, and injunctive relief, and such other relief as the Court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – CRUEL, INHUMAN OR DEGRADING TREATMENT)

79.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

80.     Upon information and belief, the acts described herein had the intent and the effect of grossly humiliating and debasing detainees, forcing them to act against their respective wills and consciences, inciting fear and anguish, and breaking their physical or moral resistance.

81.     The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts

KL3:2483281.1

violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

82.     Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman or degrading treatment of detainees.

83.     Upon information and belief, Petitioners were forced to suffer the same severe physical and psychological abuse and agony, and are entitled to declaratory and injunctive relief, as well as other relief to be determined at trial.

### EIGHTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE - ARBITRARY ARREST AND PROLONGED ARBITRARY DETENTION)

84.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

85.     The acts described herein constitute arbitrary arrest and detention of detainees in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

86.     Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of detainees in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in

24

multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

87.    As a result of Respondents' unlawful conduct, detainees, upon information and belief, have been and are being deprived of their freedom, separated from their families, and forced to suffer severe physical and mental abuse.  Furthermore, Petitioners, upon information and belief, are subject to the same conditions, and are therefore entitled to habeas, declaratory, and injunctive relief, and such other relief as the Court may deem appropriate.

## NINTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE- ENFORCED DISAPPEARANCE)

88.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

89.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the enforced disappearance of detainees in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

90.    As a result of Respondents' unlawful conduct, detainees have been and are being deprived of their freedom, separated from their families, and forced to suffer severe physical and mental abuse.  Upon information and belief, Petitioners are subject to the same conditions, and are therefore entitled to declaratory and injunctive relief and such other relief as the Court may deem appropriate.

KL3:2483281.1

## TENTH CLAIM FOR RELIEF

### (ARTICLE II OF THE UNITED STATES CONSTITUTION-
### UNLAWFUL DETENTION)

91.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

92.    The United States has not shown that Petitioners are, or have ever been, enemy aliens, lawful or unlawful belligerents, or combatants of any kind.  The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield."  *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2642 n.1 (2004).

93.    By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize detainees and transfer them to military detention, and by authorizing and ordering their continued military detention at Guantánamo Bay Naval Station.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of detainees.

94.    President Bush's Executive Order authorizing the military seizure and detention of detainees by the Respondents is *ultra vires* and illegal in that it exceeds the Executive's authority under Article II of the United States Constitution.  Accordingly, the Executive Order is void on its face, and as applied to Petitioners.

95.    To the extent that Respondents assert that their authority to detain Petitioners derives from a source other than the Executive Order, including without limitation, the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of

26

KL3:2483281.1

the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

96.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA - ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION)

97.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

98.    The UCMJ governs the detention of persons by the armed forces of the United States.  Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See*, *e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

99.    By arbitrarily and capriciously detaining Petitioners in military custody for nearly four years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

100.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

KL3 2483281.1

## TWELFTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA - ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS )

101.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

102.    By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioners the process accorded to persons seized and detained by the United States military in times of armed conflict as established by Army Regulation 190-8 in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

103.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA – TORTURE AND CRUEL, INHUMAN OR DEGRADING TREATMENT)

104.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

105.    By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioners to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

106.    Accordingly, Petitioners are entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

KL3:2483281.1

## FOURTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

107.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

108.    Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioners' right to consult with counsel by conditioning counsel's access to Petitioner on unreasonable terms, including classification/declassification procedures, all in violation of Petitioners' attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

109.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## FIFTEENTH CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE - RENDITION)

110.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

111.    Upon information and belief, Petitioners are at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture.  The transfer of Petitioners to a country that creates a foreseeable and direct risk that they will be subjected to torture constitutes a violation of Petitioners' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

112.    Accordingly, Petitioners are entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

KL3:2483281.1

## SIXTEENTH CLAIM FOR RELIEF

### (CONVENTION AGAINST TORTURE, GENEVA CONVENTIONS AND CONVENTION RELATING TO THE STATUS OF REFUGEES- RENDITION)

113.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

114.    Upon information and belief, Petitioners are at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture.  The transfer of the Petitioners to a country that creates a foreseeable and direct risk that they will be subjected to torture constitutes a direct violation of Petitioners' rights under the Covenant Against Torture and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

115.    Accordingly, Petitioners are entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SEVENTEENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTES - RENDITION)

116.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

117.    Upon information and belief, Petitioners are at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture.  The transfer of the Petitioners to a country that creates a foreseeable and direct risk that they will be subjected to torture constitutes a violation of Petitioners' rights under customary international law, which may be vindicated under the Alien Tort Statute.

118.    Accordingly, Petitioners are entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

30

## VI.
## STATEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11(B)(3)

119.    Under the unique and extraordinary circumstances of this case, the factual allegations made in paragraphs 4, 12-13, 15-18, 21, 27, 34-36, 49, 52-53, 72, 77-78, 80, 83, 87, 90, 111, 114 and 117 that are made upon information and belief are made pursuant to Rule 11(b)(3) of the Federal Rules of Civil Procedure on the basis that those allegations "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).  Upon information and belief, Petitioner desires undersigned counsel to file this petition on his behalf.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief as follows:

1.    Grant the Writ of Habeas Corpus and order Respondents to release Petitioners Abdur Razakah and Ahmad Doe from their current unlawful detention;

2.    Order that Petitioners Abdur Razakah and Ahmad Doe be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate their rights;

3.    Order that Petitioners Abdur Razakah and Ahmad Doe cannot be transferred to any other country without the specific, written agreement of Petitioners and Petitioners' counsel while this action is pending;

4.    Order that Petitioners Abdur Razakah and Ahmad Doe cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioners will be subject to torture;

5.    Order Respondents to allow counsel to meet and confer with Petitioners Abdur Razakah and Ahmad Doe, in private and unmonitored attorney-client conversations;

31

6.      Order Respondents to cease all interrogations of Petitioners Abdur Razakah and Ahmad Doe, direct or indirect, while this litigation is pending;

7.      Order Respondents to cease all acts of torture and cruel, inhuman and degrading treatment of Petitioners Abdur Razakah and Ahmad Doe;

8.      Order and declare the Executive Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, the treaties of the United States and customary international law;

9.      Order and declare that the prolonged, indefinite, and restrictive detention of Petitioners Abdur Razakah and Ahmad Doe without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international humanitarian law; and

10.     Grant such other relief as the Court may deem necessary and appropriate to protect Petitioners' rights under the common law, the United States Constitution, federal statutory law, and international law, including, if necessary, designating Petitioner Usama Hasan Abu Kabir to act as Next Friend of Petitioners Abdur Razakah and Ahmad Doe.

Dated:  December 12, 2005

Respectfully submitted,

Counsel for Petitioners:

_____

Paul Schoeman (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Joel Taylor (Pursuant to LCvR 83.2(g))
Alison Sclater (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

Barbara Olshansky (NY-0057)
Tina Monshipour Foster (Pursuant to LCvR 83.2(g))
Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6439
Fax:  (212) 614-6499

KL3:2483281.1

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioners certify, pursuant to L. Civ. R. 83.2(g), that they are representing Petitioners without compensation.

Dated: December 9, 2005

Respectfully submitted,

Counsel for Petitioners:

_____
Paul Schoeman (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

_____
J. Wells Dixon (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

_____
Joel Taylor (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

_____
Alison Sclater (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

Michael J. Sternhell (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

- and -

Barbara Olshansky (NY-0057)
Tina Monshipour Foster (Pursuant to LCvR 83.2(g))
Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6439
Fax:  (212) 614-6499

# EXHIBIT A

I, USAMA HASAN ABU KABIR, UNDERSTAND THE TERM "NEXT FRIEND" AND KNOW THAT THE FOLLOWING PEOPLE WHO I KNOW FROM THIS PRISON WANT LAWYERS AND WANT ME TO HELP ASSERT THEIR LEGAL RIGHTS IN ANY WAY POSSIBLE, AND I AUTHORIZE (FOR THEM) CLIVE STAFFORD SMITH TO ENSURE THAT THEY HAVE LEGAL REPRESENTATION:

1. ABDUL NASSER (TURKISTANI)
2. ABO AKTAR "
3. MOHAMMED " "
4. THABID " " "
5. ABDULSOMAD 匡 " "
6. ALI "
7. ABU BAKER "
8. ABDUSABER "
9. KHAUD " " "
10. AHMAD " " "
11. JALAL JALALDIN "
12. ABDURRAZAKH " '
13. AHMAD " " ''
14. SABEL " "
15. ABDULLAH " ? " (COULD BE KAZAKHSTANI)
16. ABDURAHMAN " "
17. SADAR " "
18. ARKEEN " (BRETHER OF SATDAR)
19. ADEL " '
20. HAMMAD

**UNCLASSIFIED**

(E) +/-

2

21  ABDURAZZAK  (KAZAKHSTAN)
        EL VATANY
22  ABDULLAH AL EOT (K.S.A.)

23  JABIR  AL  ELVATANY  ( '' )

24  ZABIN  IHAIHA  ASSAMMERY (KSA)

25  YAKUB              (SYRIA)

26  JIHAD              ''

27  BILAL             ''

28  MOHAMMED          ''

29  ABU AHMED         ''

30  ABU RAWDA         ''

31  ABDULLAH          ''

32  ABU MOHAMMED  (ALGERIA)

33  DR. ABU MOHAMMED   ''

34  ABU ABDULLAH       ''

35  HAMAD         (SUDAN)

36  DATED MAY 1, 2005.

اسامه ابو كاسر علانه                
USAMA  ABU  KASIR

WITNESS
       CLIVE STAFFORD SMITH

UNCLASSIFIED

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that a true and correct copy of the foregoing instrument has been served by Certified Mail, Return Receipt Requested, this 9th day of December, 2005 upon the following parties:

**Kenneth L. Wainstein**
UNITED STATES ATTORNEY
District of Columbia
Judiciary Center
555 4th Street, N.W.
Washington, D.C.  20530

**George W. Bush**
PRESIDENT, UNITED STATES OF
AMERICA
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C.  20301-1000

**Army Brig. Gen. J. Hood**
COMMANDER, JOINT TASK FORCE-
GTMO
JFT-GTMO
APO AE 09360

**Army Col. M. Bumgarner**
COMMANDER, JDOG
JTF-GTMO
APO AE 09360

**Alberto R. Gonzales**
ATTORNEY GENERAL OF THE
UNITED STATES
U.S. Department of Justice
Robert F. Kennedy Building
Tenth St. & Constitution Ave., N.W.
Room 5111
Washington, D.C.  20530

**Donald Rumsfeld**
SECRETARY, UNITED STATES
DEPARTMENT OF DEFENSE
1000 Defense Pentagon
Washington, D.C.  20301-1000

**Brig. Gen. J. Hood**
UNITED STATES ARMY
Army Pentagon
Washington, D.C. 20310-0200

**Col. M. Bumgarner**
UNITED STATES ARMY
Army Pentagon
Washington, D.C.  20310-0200

I further certify that I caused a true and correct copy of the foregoing instrument to be served by hand this 9th day of December, 2005 upon the following party:

**Kenneth L. Wainstein**
UNITED STATES ATTORNEY
District of Columbia
Judiciary Center
555 4th Street, N.W.
Washington, D.C.  20530

_____
J. Wells Dixon