IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDUR RAZAKAH, *et al.*,

Petitioners,

v.

GEORGE W. BUSH, *et al.*,

Respondents.

Civil Action No. 05-CV-2370 (EGS)

**PETITIONERS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITIONERS' MOTION FOR EXPEDITED ENTRY OF PROTECTIVE ORDER**

**Preliminary Statement**

Petitioners Abdur Razakah and Ahmad Doe ("Petitioners"), acting on their own behalf and through their next friend, Usama Hasan Abu Kabir, and by and through their undersigned counsel, respectfully submit this reply memorandum in further support of their motion for entry of the Protective Order. The relief requested is straightforward and modest in scope. Petitioners seek entry of the Protective Order simply to gain access to counsel. This is the same access to counsel currently enjoyed by detainees in whose cases the Protective Order has already been entered. There is no reason why the same undersigned counsel who have access to their clients in another detainee case – in which the Protective Order was recently entered with Respondents' consent – should not also have access to the Petitioners here.

Contrary to the assertions set forth in Respondents' memorandum in opposition to Petitioners' motion ("Resp'ts' Opp'n"), Petitioners' motion implicates neither the applicability of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (the "DTA") to these proceedings or the validity of Petitioners' continued detention. Furthermore, because entry of the Protective Order would not in any way impact the ultimate disposition of Petitioners' substantive claims or prejudice Respondents in any way, and because the District Court has imposed an informal stay of all substantive motions in Guantánamo detainee cases while the applicability of the DTA is before the Court of Appeals, Respondents' arguments concerning the standing of Petitioners' next friend to bring this action are not only meritless, but also inapposite at this time. Accordingly, Petitioners' motion should be granted.

**Background**

Petitioners are Uighurs, a Turkic Muslim minority group native to western China, whom the government has wrongly classified as "enemy combatants." They are being held virtually *incommunicado* in military custody in Camp I at Guantánamo, without charge, without

access to counsel and without being afforded any fair process by which they might challenge their detention. Because they have no meaningful way of securing legal representation for themselves, Petitioners filed a habeas corpus petition through their next friend, Usama Hasan Abu Kabir, on December 12, 2005 (the "Petition"). Due to restrictions imposed by Respondents on access to Guantánamo detainees, Petitioners have not yet been able to communicate with their counsel and will not be able to communicate with their counsel until the Court has entered the Amended Protective Order, "Protected Information" Order, and Supplemental Filing Procedures Order, previously entered by Judge Joyce Hens Green in *Ab-dah v. Bush*, No. 04-CV-1254 (HHK) (D.D.C.) (collectively the "Protective Order"), and other coordinated Guantánamo detainee cases.

Petitioners' counsel initially sought Respondents' consent to entry of the Protective Order. Respondents refused their consent, and Petitioners filed the instant motion on January 12, 2006. That same day, attorneys from the Center for Constitutional Rights, co-counsel to Petitioners herein and numerous other Guantánamo habeas petitioners, and Respondents' counsel appeared before Shelly Snook, administrative clerk to Chief Judge Hogan. We have been informed that Mr. Snook reported that, in light of the Court of Appeals' *sua sponte* request for supplemental briefing on the applicability of the DTA in the appeals *Khalid v. Bush*, No. 04-CV-1142 (RJL), 355 F. Supp. 2d 311 (D.D.C. 2005), and *In re Guantánamo Detainee Cases*, No. 02-CV-0299 (CKK), 355 F. Supp. 2d 443 (D.D.C. 2005), the District Court would not rule on any pending motions and would prefer that no additional motions be filed until the Circuit issued its decision. Ms. Snook clarified, however, that Magistrate Judge Kay would still be available to rule on motions related to non-substantive issues, such as counsel access to their clients.

This motion was filed before the assigned district court judge, the Honorable Emmet G. Sullivan, because this case is not yet subject to the November 2, 2005 Coordination Order entered by Judge Kessler in *Rasul v. Bush*, No. 02-299 (CKK) (D.D.C.), and other coordinated cases, which authorized Magistrate Judge Kay to rule on such issues.[1] However, this motion is exactly the sort that the District Court contemplated could and would still be filed while its informal stay is pending. In contrast, Respondents' opposition is precisely the kind of substantive attack on the viability of the Petition that the District Court has prohibited while the stay is pending. Respondents argue that Petitioners' motion should be denied because of the appellate proceedings concerning the DTA and because they "have not demonstrated why [their] petition . . . brought by another detainee claiming to act as their 'next friend,' should not be dismissed for lack of proper next friend standing." Resp'ts' Opp'n at 1-2. Obviously cognizant of the fact that their opposition violates the terms of the informal stay, Respondents imply, without explicitly moving, that the Court should dismiss the Petition. Respondents' opposition is an attempt to circumvent the District Court's clear admonition against substantive motion practice while the stay is pending and its equally clear directive that the informal stay would not operate to deprive detainees of access to counsel.

**Argument**

"[T]he writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). "The scope and flexibility of the writ – its capacity to reach all manner of illegal

[1] The instant case was assigned to Judge Sullivan because it was filed as related to *Mamet v. Bush*, No. 05-CV-01886 (EGS) (D.D.C.). Respondents have separately objected to Petitioners' related case designation. Although we believe that relation was proper (as set forth in a separate submission) and that this Court may grant the instant motion, Petitioners would not object should the Court refer the motion to Magistrate Judge Kay for consideration or to the appropriate district court judge if the related case designation is not upheld.

detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts." *Id.* at 291. "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). The Supreme Court affirmed that the great writ's protections apply to Guantánamo detainees in *Rasul v. Bush*, 542 U.S. 466, 485 (2004), holding that "federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."

Petitioners moved for entry of the Protective Order to gain access to counsel so that they can meaningfully avail themselves of the jurisdiction extended to this Court by *Rasul*. Respondents' objections to entry of the Protective Order are nothing more than an attempt to place before the Court substantive issues affecting the merits of this litigation on which the Court may feel compelled not to rule in light of the informal stay and which are, in any case, immaterial to Petitioners' motion. In fact, Respondents have not identified any prejudice that they will suffer from entry of the Protective Order while the substantive issues they raise are pending, nor could they given that access to detainees in other cases in which the Protective Order has already been entered continues without interruption. Their attempt should be denied.

## I.
## Respondents' Substantive Attack on the Petition Should Not Impede Petitioners' Access to Counsel

Respondents argue that Petitioners are not entitled to entry of the Protective Order and access to their counsel because their next friend Usama Hasan Abu Kabir lacks standing to bring this action. Resp'ts' Opp'n at 2. The Court, however, can still enter the Protective Order without ruling on whether Petitioners' next friend authorization is valid and without in any way prejudicing Respondents' defense of this action.

The only effect of entering the Protective Order at this time is to facilitate counsel's efficient and timely access to their clients. Undersigned counsel also represent three other Uighur detainees in *Mamet v. Bush*, No. 05-CV-01886 (EGS) (D.D.C.), and are tentatively scheduled to meet with these petitioners in Guantánamo from March 13 through 17, 2006. In the *Mamet* case, Respondents consented to entry of the Protective Order after enactment of the DTA on December 30, 2005 – a fact which demonstrates the arbitrary nature of Respondents' position here that the DTA deprives the Court of jurisdiction to enter the Protective Order. In the interest of efficiency, counsel have formally requested a meeting with Petitioners herein during the same week they are currently scheduled to meet with the *Mamet* petitioners. Although Respondents did not object to counsel's request to meet with the *Mamet* petitioners, they denied counsel's request to meet with Petitioners Razakah and Ahmad, citing their objection to entry of the Protective Order and their challenge to Mr. Kabir's standing as Petitioners' next friend.

Entry of the Protective Order would allow Petitioners herein to meet with counsel during their already scheduled visit with the *Mamet* petitioners. Such a meeting would swiftly resolve Respondents' next-friend challenge without the need for further involvement of the Court. If Petitioners' next friend authorization is valid, entry of the Protective Order would allow counsel to confirm Petitioners' manifest desire for legal representation.[2] If, however, contrary to every rational expectation, Mr. Abu Kabir is not in fact Petitioners' next friend and

[2] Two of the *Mamet* petitioners, Ahmad Doe and Aktar Doe, also appear on the same next friend authorization executed by Mr. Kabir. Respondents initially sought to dismiss the *Mamet* petition, arguing that petitioners' next friend authorizations were invalid. They subsequently withdrew their motion to dismiss and consented to entry of the Protective Order after undersigned counsel provided the government and the Court with letters from the *Mamet* petitioners confirming counsel's authority to represent them. *See* Response to Petitioners' Notice of Additional Facts (Document #18), *Mamet v. Bush*, No. 05-CV-01886. Nevertheless, Respondents' motion unnecessarily frustrated the *Mamet* petitioners' ability to communicate with counsel, who have still not met with their clients over four months after they filed a petition on their behalf.

Petitioners do not wish undersigned counsel to litigate on their behalf, entry of the Protective Order would allow Petitioners to communicate that fact to counsel.

Whether Mr. Abur Kabir has executed a valid next friend authorization on behalf of Petitioners is immaterial to whether the Court should allow Petitioners simply to communicate with counsel. By placing that issue before the Court when they know full well that the informal stay may act to preclude its disposition, Respondents have sought merely to deprive Petitioners of counsel and perpetuate their isolation.[3] To the extent that Respondents can possibly envision a scenario in which allowing Petitioners access to counsel could impact the merits of this action, Petitioners are prepared to stipulate to entry of the Protective Order without prejudice to Respondents' right to move to dismiss for lack of next friend standing once the current informal stay has been lifted.

## II.
## Respondents' Claim That Petitioners' Next Friend Lacks Standing to Bring This Action Is Meritless

Should the Court decide that it must determine the validity of Petitioners' next friend authorization before entering the Protective Order, it should still grant Petitioners motion because Respondents' challenge to the authorization is meritless. Respondents argue that Petitioners are not entitled to challenge the legality of their detention through their next friend for two reasons. First, they argue that Petitioners have failed to demonstrate that they cannot submit petitions on their own behalf. Second, they argue that Petitioners' next friend does not have a

[3] Petitioners also note that as a practical matter the Court of Appeals' ultimate ruling with respect to whether the DTA is applicable to these proceedings would not impact Petitioners' need or right to communicate with counsel. If the DTA is applicable to these proceedings, Petitioners would still be entitled pursuant to § 1005(e)(2)(A) thereof to challenge the validity of their detention as enemy combatants before the Court of Appeals. If the DTA is not applicable, then Petitioners urgently require the assistance of counsel to prepare for their eventual habeas hearing before the District Court.

sufficiently "significant relationship" with them to show that he is truly dedicated to Petitioners' interests in this litigation. Neither of these arguments is supportable.

### A. Petitioners' Ability to Challenge Their Detention on Their Own Behalf or Through Family Members Is Wholly Illusory

Respondents contend that Petitioners may file habeas petitions on their own behalf because the Department of Defense ("DOD") has notified each Guantánamo detainee of his right to file a habeas petition and has provided each detainee with the address of the District Court. *See* Resp'ts' Opp'n at 5. Respondents also argue that DOD has taken "affirmative steps to facilitate legal representation for detainees" who have indicated a desire to challenge the legality of their detention by providing them with a form to complete and mail to the American Bar Association ("ABA"), which has agreed to recruit volunteer counsel for detainees desiring representation. *Id.* at 6. In addition, Respondents argue that detainees have been permitted to contact family and friends who may file habeas petitions on their behalf. *Id.*; *see also* Second Declaration of Frank Sweigart ¶¶ 3-5, 7 & Exs. A, D ("Sweigart Decl.") (attached as Exhibit A to Resp'ts' Opp'n). As set forth in the Declaration of Gitanjali S. Gutierrez ("Gutierrez Decl.") (attached hereto as Exhibit A) detailing her conversations with Petitioners' next friend, Mr. Abu Kabir, there is ample reason to doubt Respondents' claims that Petitioners were ever adequately informed of their rights or could have fully comprehended whatever information they may have received concerning their right to petition the District Court for a writ of habeas corpus.

To Mr. Abu Kabir's knowledge, not all of the detainees in Guantánamo received all of the various notifications DOD claims to have provided to detainees. Mr. Abu Kabir cannot remember ever having seen or heard of the ABA notification informing detainees that the ABA could help them secure lawyers. *See* Gutierrez Decl. ¶¶ 16-17. Moreover, the Enemy Combatant Notices ("ECNs") allegedly provided to detainees advising them of their status are

not sufficient to advise them fully or adequately of their rights. The ECNs are vague and ambiguous, provide no practical information about how to file habeas petitions in the District Court, and contain inadequate descriptions of detainees' legal rights to ensure that they will get the legal representation that they desire or need. *See* Declaration of Clive Stafford Smith ¶¶ 108-16 ("Smith Decl.") (attached hereto as Exhibit B) (describing inadequate notices); Declaration of Attorney Barbara Olshansky ¶¶ 18-22 ("Olshansky Decl.") (attached hereto as Exhibit C) (same); *see also* Sweigart Decl. Exs. C & D.

The notices simply instruct detainees to write the "United States District Court for the District of Columbia" to file a habeas petition and list the Court's address in Washington, D.C. As Mr. Abu Kabir explains, this notification is confusing for many of the prisoners. The detainees have no means to understand whether the "United States District Court for the District of Columbia" is another branch of the military or government agency affiliated with the military or whether it is an independent body. *See* Gutierrez Decl. ¶ 8. While the ECNs refer to a "court," the detainees are seeking an "attorney" to help them. Mr. Abu Kabir further explains that the detainees believe strongly that writing the Court, by itself, will not help them. The detainees want lawyers to help them present their case to the courts in an unfamiliar legal system. *See id*. at ¶ 9. The military police ("MPs") at Guantánamo have not explained to the detainees what the ECNs are, nor have the "personal representatives" charged with assisting detainees during their CSRT hearings. Indeed, Mr. Abu Kabir is aware of some detainees who simply mailed the entire ECN sheet itself back to the court because they did not understand what else they could do to secure legal assistance. *See id*. at ¶¶ 11-12.

The pervasive and well known unreliability of the military mail system at Guantánamo has led many detainees to conclude that it is useless to send regular letters through

the military to an unfamiliar court in the hope of finding an attorney. *Id*. at ¶ 13. In fact, of the numerous detainees whom Mr. Abu Kabir knows to have written repeatedly to the District Court in English, none have received a response or an attorney visit as a result of their letters. From Mr. Abu Kabir's perspective, this confirms the futility of writing to the court address provided by the military as a means of securing legal counsel. *Id*. at ¶ 14.

Based on detainees' experiences in other cases, there is also reason to doubt that the ECNs are being translated properly into languages that detainees understand. *See* Smith Decl. ¶¶ 117-19. Indeed, it would be surprising if the ECNs had been translated into Uighur given the relative unavailability of Uighur translators. *See, e.g.*, Declaration of Jay W. Hood ¶ 8 ("Hood Decl.") (noting "scarcity of Uighur translators") (attached hereto as Exhibit D). These problems only exacerbate the obstacles faced by detainees who often are not well-educated and have no ability to understand the American legal process, even assuming they can write or communicate in English.

Respondents' contention that they have provided Petitioners and other detainees with adequate means and opportunity to file habeas petitions is also false. To the contrary, the United States military has consistently interfered with Guantánamo detainees' access to counsel. *See* Smith Decl. ¶¶ 97-107; *see also* Olshansky Decl. ¶¶ 5, 9, 11-18. Among other things, over the last four years the government has:

- Isolated and mistreated detainees who have sought access to counsel;
- Told detainees that they have a better chance of being released if they do not hire a lawyer; and
- Falsely impersonated defense counsel in an effort to get detainees to talk.

*See* Smith Decl. ¶¶ 99-101, 103-04. In light of such conduct – which to our knowledge Respondents have never denied – the notion that the government might assist detainees in

obtaining counsel, or that detainees could trust the military or any attorney referred to them by the military, is simply not credible.

Respondents' contention that Petitioners' family members could file petitions on their behalf is also plainly wrong. Detainees' families often do not know that their relatives are being held at Guantánamo Bay because the government refuses to divulge even the most basic information about who it is detaining there. *See* Smith Decl. ¶ 10. It is often difficult to identify, let alone contact, detainees' family members and alert them that their relatives are being detained in Guantánamo and desire their assistance in challenging their detention. Many detainees' family members reside in some of the most remote regions of the world, do not speak English and have no access to the media, the Internet, or any other means of contacting legal counsel or bringing a habeas petition on behalf of detainees. *See* Smith Decl. ¶¶ 39-42. In this case, Petitioners Razakah and Ahmad were abducted by the U.S. military in Pakistan and Afghanistan, respectively, after they had previously fled persecution in China. There is similarly no effective way to identify or locate their family members in Central Asia.

Even if we were able somehow to contact Petitioners' families, Chinese government officials might prohibit or otherwise interfere with their involvement in this case. *See* Smith Decl. ¶¶ 69-77 (discussing foreign governments' interference with access to detainees' families). This is particularly likely given that the Chinese government has specifically demanded that the United States return the Uighurs in Guantánamo to China to face charges of terrorism. *See* Petition ¶ 53. Many detainees are reluctant to have a family member act as their next friend for fear of placing those family members at such risk. *See* Smith Decl. ¶¶ 88-89. Many Uighur detainees have specifically expressed to Mr. Abu Kabir that they do not want their families to be contacted about becoming next friends because they fear the Chinese government

would persecute their families if it learned of what they were doing. This leaves the men with no recourse other than to turn to fellow detainees for assistance. *See* Gutierrez Decl. ¶ 22.

Respondents' further contention that Petitioners could file petitions on their own behalf is disingenuous. While Respondents claim that detainees are "afforded the opportunity to send and receive mail," and are supplied with pens, paper and envelopes, *see* Resp'ts' Opp'n at 5 n.4, detainees at Guantánamo are unable to communicate with the outside world, let alone able to locate counsel or file habeas petitions in the District Court. Mail frequently does not reach (and is not received from) detainees, or is often significantly delayed, making effective *pro se* litigation impossible. *See* Smith Decl. ¶¶ 79-80. It is also difficult for detainees to communicate with the outside world because many are in poor physical and mental health due to their prolonged detention and mistreatment. *See* Olshansky Decl. ¶ 22.

Although Respondents' point out that 55 detainees have already filed *pro se* petitions, that fact provides no basis for granting Respondents' motion in this case. As one court has already concluded, *pro se* litigation by Guantánamo detainees is effectively impossible. In *Al-Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C 2004) (Kollar-Kotelly, J.), for example, the court considered whether detainees have a legal right to be represented by counsel. The court found specifically that:

> [Detainees] have been detained virtually incommunicado for nearly three years without being charged with any crime. To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation. Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system. Finally, this Court's ability to give Petitioners' claims the "careful

> consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

*Id.* Accordingly, the court held, "Petitioners cannot be expected to exercise this right without the assistance of counsel." *Id.* This case is no exception.

**B. Respondents' Contention That Petitioners' Next Friends Lack a Sufficiently Significant Relationship with Petitioners to Litigate on Their Behalf Is Baseless**

Respondents' contention that the Petition should be dismissed because Petitioners' next friend lacks a sufficiently significant relationship with them to litigate this action on their behalf also should be rejected.

While Respondents contend that the "dearth of basic biographical and personal information about the detainees on whose behalf relief is sought indicates that the purported next friends do not share any meaningful relationship with these detainees," Resp'ts' Opp'n at 11, the authorization states that the Mr. Abu Kabir knows the Petitioners and that he has been asked to help them obtain legal representation. *See* Petition Ex. A. Indeed, Mr. Abur Kabir has consistently described the relationship between himself and his fellow detainees as being one of the closest relationships he has experienced in his life and as strong as, if not at times stronger, than his relationship with this father or actual brother. *See* Gutierrez Decl. ¶ 27.

In response to certain detainees' requests that Mr. Abu Kabir act as their next friend, DOD has moved some of these prisoners. This can make it impossible to communicate with them once they are separated. Mr. Abu Kabir has made clear, however, that the geographical separation that now exists between him and these detainees cannot weaken or undermine the strength of the relationship and his personal commitment to acting in their best interest. *See id.* ¶¶ 29-30.

We note further that the next friend authorization in this case complies fully with the procedures specifically outlined by the military for inclusion in the ECNs allegedly provided to non-"enemy combatants" like Petitioners. Those ECNs specifically provide, in relevant part, that:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You may ask a **friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member or **friend** who could file this petition for you, you may file your own petition.
>
> . . .
>
> [A] court will only consider your case if you file a petition or if one is filed by a lawyer, **friend** or family member on your behalf.

Sweigart Decl. Ex. C (emphases added). Detainees have understood these notices to mean that they may file a request for legal assistance for their "friends" at Guantánamo Bay. *See* Smith Decl. ¶¶ 86. Accordingly, it is not surprising that Guantánamo detainees have enlisted their cell mates and other prisoners – the only friends they have known for the past four years. Indeed, apart from their captors in Afghanistan and Pakistan and their current military jailors, Petitioners have had no contact with anyone else who could communicate with the outside world on their behalf. While the ECNs are in many respects confusing and ambiguous to many detainees, Mr. Abu Kabir, a sophisticated person who speaks and reads English, accurately understood the ECNs' above-referenced provisions to mean that he could help fellow detainees whom he knew desired counsel, and does not understand why the government now would not permit something that they specifically said he could do. *See* Gutierrez Decl. ¶ 19.

Finally, while Respondents contend that they are unable to identify certain detainees and that some detainees have been identified incorrectly, *see* Resp'ts' Opp'n at 12, Respondents *nowhere* contend that they are unable to identify the Uighur Petitioners in this case,

whose Internment Serial Numbers ("ICNs") are set forth in the Petition. *See* Petition ¶ 4. Even if there were any doubt as to Petitioners' identities, it is Respondents who would bear full responsibility for those problems. Indeed, Respondents have consistently refused to provide what they believe are the correct names of prisoners, or prisoners' ICNs, which has made identification of individual detainees more difficult. *See* Smith Decl. ¶¶24-30. Accordingly, Respondents cannot now be heard to argue that Petitioners' next friend authorization is somehow improper because of the purported "practical difficulty" of identifying detainees. Resp'ts' Opp'n at 12.

For all of these reasons, the next friend authorization in this case is more than adequate to sustain the Court's jurisdiction over the Petition. If there remains any doubt as to the sufficiency of the authorization, the Court should order that undersigned counsel be permitted access to Petitioners in order to confirm their desire for counsel to represent them. To the extent that Respondents truly doubt Petitioners' obvious desire for legal representation, they could allow Petitioners to meet with undersigned counsel during their already scheduled visit with the *Mamet* petitioners. Inexplicably, Respondents have refused Petitioners' request for such a meeting.

## Conclusion

WHEREFORE, for the above-stated reasons and for any other reason that may become known to the Court, Petitioners respectfully request that the Court grant the aforementioned requested relief.

Dated: New York, New York
February 3, 2006

Respectfully submitted,

Counsel for Petitioners:

/s/ Paul Schoeman

Paul Schoeman (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Joel Taylor (Pursuant to LCvR 83.2(g))
Alison Sclater (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000

Barbara Olshansky (NY-0057)
Tina Monshipour Foster (Pursuant to LCvR 83.2(g))
Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499