prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

### Ultimately, It Became Possible to Cut Out the Need for International Travel and Secure Authorizations from Guantanamo Bay

78.    In November 2004, I was first able to visit two clients in Guantanamo Bay. This was a great relief, because it opened up a new avenue for helping the prisoners get counsel.

79.    My clients told me that other prisoners desperately wanted counsel and asked me how they could help. My initial idea was to write out a form that my clients could take back to their cells and use as the format for other prisoners. If other prisoners wanted me to help them, they could write out the form and send it to me. However, this proved ineffective. One client I had at the time was not well educated, and found it hard to understand how to go about it.

80.    We also had to contend with the unacceptable legal mail system from Guantanamo Bay. I have my clients keep logs of the letters that they send me, and the ones they receive from me. The letters that my clients send to me either do not get through at all, or take an unacceptably long time arriving. Via this method, I only received four signed requests for counsel, and those did not come through the mail to me until *May 29, 2005*, five months after they had been sent.

### The Next Friend Petitioners Relied on the Representations or Promises Made by the U.S.

81.    Thus, by early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

82.    One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

83.    To set this in context, the Center for Constitutional Rights (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

14

84.    The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You **may ask a friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member **or a friend** who could file this petition for you, you may file your own petition.

*Exhibit A* to *Declaration of Frank Sweigard* (filed with *Respondent's Motion*) (italics in original; bold emphasis supplied).[2]

85.    It should be noted that Respondents did not begin to provide this notice to the prisoners until December 2004, roughly six months after the Supreme Court identified the prisoners' right to file for habeas corpus. *Declaration of Frank Sweigard, at ¶3.* Why this was delayed so long is not explained.

86.    However, virtually every prisoner should, at this stage, have been provided with the information in *Exhibit A* in one form or another – either orally or in writing, either in English or Arabic, or some other language. I have discussed this document with some of my clients, and they have understood this to mean that they could file a request for legal assistance for their 'friends' in Guantanamo Bay.

87.    It is difficult to see how the Respondents can expect to craft and circulate this notice, and then argue that 'friends' in Guantanamo Bay cannot file a next friend petition. Indeed, under the ECN, the prisoner is not told that his first alternative is to file a petition himself: The default alternative is to have a friend file a petition, and only if there is no available friend is the prisoner told that he 'may' file a petition on his own. Therefore, from the prisoners' perspective, this is not an issue of whether another prisoner may act as 'next friend' – but simply whether the U.S. Military is going to be held to its promise.

88.    The prisoners certainly have no way of having a lawyer act as next friend and most prisoners would rather have a fellow prisoner as 'next friend' than a family member. For example, one of my British resident clients, Jamal Kiyemba, has stated in an unclassified document that "[t]he prisoners want to know why they have to have a family member contacted on this. It's personal. They think this is just a way of dragging their families into this process, putting them at risk. This is particularly true when the

---

[2] The identical language appears in the other 'Notifications'. *See Exhibits B & C* to *Declaration of Frank Sweigard.* For identical language in another similar form provided to the prisoners, *see also* Exhibit E, attached to *Declaration of First Lieutenant Wade M. Brown* (filed with *Respondent's Motion*).

family is in a repressive society back home. What is the point of having a family member involved?"

89.    Based on this, various of my clients have wanted to act as next friends for other prisoners with whom they have become friendly while in the prison. I have asked them to be sure that the prisoners for whom they act desire legal assistance. (I refer to these prisoners as 'prisoner next friends.')

### The Special Problems of Camp Echo

90.    It is unrealistic – and, given that Respondents are holding our clients incommunicado, unreasonable -- for Respondents to pretend that the prisoners can easily secure the legal assistance they desired.

91.    It is not easy for any prisoner to secure help, but it is next to impossible for some who are held in certain areas. Camp Echo has been one example, and prisoners there continue to have problems, although it is used now mainly for client legal visits.

92.    On one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. Lowery when a man who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. Lowery allowed me to speak to him, and he said that he "desperately want[ed] a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified so that I could execute my own statement as the basis for filing a petition for a writ of habeas corpus on his behalf.

93.    Not only is it difficult for prisoners to get help in Camp Echo, but Respondents make it very difficult for them even to have a friend in the prison to file on their behalf. As Jamal Kiyemba notes, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other prisoner, or you are punished. . . ."

### The Special Problems of Camp V and Level 2, 3 & 4 Prisoners

94.    Camp V has now taken over from Camp Echo as the solitary confinement camp, and the prisoners are not meant to have any contact there. The prisoners in Camp V, and those who have been held in restrictive custody of other kinds, face other problems.

95.    Camp V prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel. More important, those in Camp V, and those in restrictive levels, are not allowed pen and paper. Respondents suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' Motion, at 7 n.4.* For these prisoners, this is just not true, according to the reports of my clients.

16

96.     According to the unclassified information that I have secured from my clients, "particularly with levels 3 & 4 [prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel." This has been confirmed by my own experience. When I met with my prisoners on one visit, the Sergeant at Camp Echo said that the prisoners could not have a pen except when I was present with them. Clearly, it is impossible for prisoners to represent themselves without a pen.

### Other Military Interference with the Right to Counsel

97.     One issue raised by Respondents is whether my clients have a community of interest with the other prisoners such as to justify their acting as 'next friends.' It is very hard to see how any rational person would not want assistance in vindicating his rights. To the limited extent that some prisoners are mistrustful of American lawyers who volunteer to help them, this is almost exclusively attributable to the manipulative strategies adopted by Respondents and their personnel.

98.     It should always be remembered that the Military could easily have solved all of these problems. All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it. Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

99.     Far from making counsel available, Respondents have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the military has sometimes made a practice of taking the prisoners over there long before they are needed.

100.    As one of my clients, Jamal Kiyemba, has explained in unclassified materials:

> "Camp Echo is the most lonely place on earth. Last time I had a legal visit, I was all alone for ten days. They brought me over there, they would not let me take my Koran, and they put me in an isolation cell with nothing. There is no way to talk to any other prisoner, you're not meant to talk to the guards. There is a camera and microphones in the cell to make sure this is obeyed. The camera seems to shrink the cell, and make you paranoid. * * * There is no communal

17

> prayer. Showers and recreation were greatly limited – I got
> to go into the outside cell once for half an hour in six days,
> and got one shower. In [Camp] Delta I get outside [e]very
> day, and have a shower every day. If I complain [about
> Camp Echo], I am told that it is the lawyer's fault. If I did
> not have to come for a legal visit, I would not be treated like
> this."

101.    I have kept a log of when my clients were brought over to Camp Echo for visits, and when they left after my visit. When I was in Guantanamo in May, two of my clients were brought over to Camp Echo five days before my scheduled meeting, one eight days early and one *eleven* days early. I learned on my subsequent trip that one of my clients was held in solitary confinement in Camp Echo for *eleven* days after I met with him. There is no imaginable security reason for this; however, it was a huge imposition on my clients' right to meet with their attorneys.

102.    There have also been other consistent and troubling steps taken by the Military to frustrate the right to counsel. On a basic level, the prisoners have a hard time believing that the lawyers are for real because (due to Respondents' opposition to counsel visiting) it took almost three years for them to begin to come to the prison. How, the prisoners ask, can this be a legitimate legal system if the lawyers did not come all that time? It strikes the prisoners as more likely that the lawyers are simply the next devious step in the interrogation system.

103.    This impression is radically enhanced by the Military's deceitful practices. My unclassified notes reflect that several prisoners have told me that investigators have impersonated lawyers in an effort to get prisoners to talk. More recently, a juvenile prisoner explained to me how the interrogator had boasted about her experience in the U.S. Supreme Court and what she was going to do for the young man. Naturally, when they learn that these 'lawyers' are actually interrogators, this makes the prisoners loathe to believe that we are really lawyers on their side.

104.    The interrogators consistently tell prisoners that the lawyer's advice is wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it less likely that the prisoner will get out.

105.    Not one of my clients believes that attorney-client discussions are confidential, and there have been suggestions that the Military does monitor supposedly privileged hearings. Certainly, the Military has tried to interrogate the prisoners about what they discussed with their lawyers. With more than one of my clients, after I left, the interrogators sought to question them about their privileged discussions with me.

106.    As one prisoner said:

> "We all know that everything we say in these rooms is
> being monitored by them, and every time we say that we

18

> particularly hated being treated in a particular way, we
> know that this will later be used against us. There are
> constant examples of this. Last time my lawyer was here, I
> told him that I did not like being spoken to by my ISN
> number all the time, because it was so dehumanizing. * * *
> When I got back to my cell, they suddenly started doing
> this a whole lot more. And other things I just don't want to
> mention."

Regardless of whether the Military does violate the order of the court, the prisoners all
believe they do – a belief based on the consistent deceit and manipulation that the
Military has practiced.

107.     The requirement that everything said to counsel has to be subjected to
review before counsel can speak publicly about it is also a basis for creating mistrust with
the prisoners. As Jamal Kiyemba said to me, "[w]hat am I meant to think of my
Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?"

## Inadequate Descriptions of Legal Rights

108.     Respondents suggest, via the declaration of Frank Sweigart, that they have
"notified each detainee at Guantanamo Bay of his right to file a petition for habeas
corpus, and has provided each detainee with the address of the United States District
Court in the event that he desires to submit his own petition to the Court." *Respondents'*
*Motion, at 7.*

109.     It would be inappropriate to rely on the Enemy Combatant Notification as
sufficient to ensure that the prisoners will get the legal assistance that they need. To my
knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a
result of the ECN notice.

110.     The prisoners are not even consistently allowed a copy of the ECN to
study. For example, according to reports of my clients that have been unclassified, Omar
Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed
it briefly, and Shaker Aamer was able to keep his copy.

111.     The ECN states that the Assisting Military Officer (AMO) will help the
prisoner to understand his right to file for habeas corpus. ("Please talk to your Assisting
Military Officer if you have any questions about this notification. Your Assisting
Military Officer will meet with you later."). However, in my experience this is simply
not done – certainly not on any systematic level.

112.     None of my clients have ever heard of an AMO. They have heard of a
Personal Representative (PR). Yet, setting aside the ethical propriety of the Military
encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided
inadequate 'advice' in the cases with which I am familiar.

113.    Omar Deghayes received only one visit from a PR (with respect to the CSRT), and he received no meaningful assistance. Mr. Deghayes thought the PR was an interrogator (he was even told he had a "Reservation," the euphemism for interrogation), the PR would not give Omar his name, would not have his handcuffs taken off, only met with him for about ten minutes total, and did not tell him until well into the meeting that he was the PR. *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et all. v. Bush), at 4-5 (filed April 1, 2005)*. Such advice as Mr. Deghayes sought was not given. The PR did not, or would not, tell him whether there as any point attending the CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind of tribunal it would be, or how he might secure witnesses. *Id. at 5*. Neither could Mr. Deghayes get an answer as to how he could file a statement or secure witnesses when (as a Level 3 or 4 prisoner) he could not have a pen and paper.

114.    In another instance, Shaker Aamer had one meeting with a PR, and that was prior to his CSRT. His PR told him:

> "I'm not a lawyer. I'm more of a middle man. I'm not here to help you. I cannot give you any advice. I'm just here to take what you want to send to the [CSR] tribunal."

115.    According to Jamal Kiyemba when, prior to my being able to visit him, he asked for help understanding the habeas process, he found that "the advice is incomprehensible. The officers [PR/AMO] who are meant to explain the habeas corpus process to us do not know."

116.    Since meeting with my clients, I have instructed them to request to meet with the PR/AMO on a regular basis as they have to present a meaningful case to their ARB. I provided my clients with a list of suggested questions that they might ask about the ARB, as well as the habeas process. To my knowledge, to date, no PR/AMO has responded to the request of *any* of my clients for a meeting, let alone to provide this information.

## Problems Stemming from the Different Cultures and Languages of the Prisoners

117.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic.

118.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*." (emphasis in original). Recently, a very sophisticated graduate of Oxford University asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-

20

American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education or a person from a country with a wholly different legal system will do so.

119.    To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know. Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face great problems seeking legal assistance on his own.

### Problems Counsel Would Face in Getting More Information
### About a Prisoner Without Being Able to Meet with that Prisoner

120.    To the extent that Respondents insist that more information be supplied by the next friends about the prisoners who they would like to assist, this would cause a tremendous delay in securing legal assistance for the prisoners.

121.    The timing of Respondents' motion is perplexing to me. Hitherto, Respondents' counsel have contacted me on more than one occasion to seek my assistance to flesh out information about prisoners, when they were having difficulty identifying the prisoner in a particular petition. For example, in one e-mail, counsel for Respondents asked me as follows:

Clive,

When you speak to Messrs. Deghayes and Kiyemba this week, please ask them to provide more information about the detainees on whose behalf they purportedly acts as next friends. ISN numbers would be best. At this point, based on the information in the petitions, we have not been able to identify the following petitioner names with actual detainees at GTMO:

Mohammed al Nadour (Inram v. Bush) (Deghayes)
Mohammed Fahreo (Inram v. Bush) (Deghayes)
Mohamad Morotany (Sliti v. Bush) (Deghayes)
Mohmoud Al Soury (Sliti v. Bush) (Deghayes)
Ahmed Doe (Ahmed Doe v. Bush) (Deghayes)

Abdusabuy Doe (Kiyemba v. Bush)
Abdusamad Doe (Kiyemba v. Bush)
Abdunasir Doe (Kiyemba v. Bush)
Hammad Doe (Kiyemba v. Bush)
Hudhaifa Doe (Kiyemba v. Bush)
Jalaal Doe (Kiyemba v. Bush)
Khalid Doe (Kiyemba v. Bush)
Saabir Doe (Kiyemba v. Bush)
Saadiq Doe (Kiyemba v. Bush)

Thanks,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084

122.    While I was under no obligation to do this, I tried to cooperate with Respondents. Indeed, since Respondents seemed to be having the most trouble with the Turkestanis, I wrote up a memo to Mr. Warden identifying the prisoners and providing cell locations and other information, to help Respondents identify prisoners who, after all, have been in Respondents' custody for more than three years. I did the best I could on this, even though Respondents refused to reciprocate by providing me with a table of prisoners that could radically assist me in this task.

123.    It is perplexing that the only person on the list provided by Mr. Warden who is subject to this motion is Ahmad Doe. I should note that I do not have unclassified all of my notes yet, and have not been able to determine whether I got additional information about Mr. Doe that could help on this point. But for reasons best known to themselves, Respondents did not ask me to get additional information with respect to the other six petitions challenged in their motion.

124.    Respondents knew that I was in Guantanamo between August 4th and 14th, yet they filed their motion after I had returned, and I will not be going back down there until mid-October (assuming that they permit a visit then). It would be November at the earliest that I could therefore get additional information about these clients, delaying their legal rights even more.

125.    Since I cannot go sooner, I consent to counsel for the other prisoners speaking with my clients, where relevant, on a visit to Guantanamo Bay to secure this information before I am able to visit again.

### Checks Already in Place if Prisoners
### Decide They Do Not Want Lawyers

126.    There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner.

22

127.    This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

## Background of Declarant

128.    For informational purposes, I will provide a limited resume of my experience in this area.

129.    I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

130.    Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004. The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South. I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

131.    Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per cuiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

132.    I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

133.    Because of the importance of effective counsel in a meaningful judicial system, I have taken an very active role in systematic litigation on behalf of the right to counsel. This has included a class action on the right to counsel in capital post-

23

conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

134.    I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

135.    I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

136.    I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, MS, 1993).

137.    In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity. For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

138.    I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

139.    I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991).

140.    I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for the next five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote all of my time to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest. My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation. I have assumed this role solely because the work so obviously needed to be done. I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

141.    I am now based in the United Kingdom. I have dual U.S. and U.K. nationality.

24

## Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this 12th day of September, 2005, in London, England.

_____

CLIVE A. STAFFORD SMITH