# EXHIBIT A

## Schoeman, Paul

| | |
|---|---|
| **From:** | Mcpalmer, Teresa A CDR Code 14 [teresa.mcpalmer@navy.mil] |
| **Sent:** | Thursday, February 02, 2006 12:05 PM |
| **To:** | Agnieszka Fryszman; Alan Pfeuffer; Alan Sussman; Amy Baggio; Anant Raut; Andrea George; Angela Campbell; Anna Holland; Arnold Natali; Baher Azmy; Barbara Olshansky; Ben Jacewicz; Beth Gilson; Beth Jacob; Billy Nolas; Brent Mickum; Bridget McCormack; Bryan Joshua Colangelo; Candance Gorman; Carl Lietz; Carol Bruce; Charles Travis; Chris Moore; Chris Schatz; Christine Dahl; Clark Hodgson; Clive Smith; Cody M. Weston (Perkins Coie) (E-mail); David Hickerson; David Remes; David Sleigh; Desmond McCallum; Doug Mulkoff; Edmund Burke; Edward Shaw; Eldon Greenberg; Emily Meazell; Emmett Bondurant; Erwin Chemerinsky; George Clarke; George Daly; Gita Gutierrez; Gordon Woodward; Greg Smith; GT Hunt; Harvey Schwartz; Heather Rogers; Howard Manchel; Ian Wallach; James R. Alsup; James Wade; Jan Kitchel; Jane Barrett; Jared Goldstein; Jeff Davis; Jeff Ertel; Jeff Lang; Jennifer Argabright; Jerry Cohen; Joe Margulies; John Chamberlin; John Chandler; John Connolly; John Lundquist; John Minock; Jonathan Hafetz; Joseph O'Neil; Joshua Denbeaux; Judith Chomsky; Julia Dekluiver; Julia Tarver; Kevin Boris; Louis Marjon; Marc Falkoff; Marc Goldman; Marjorie Smith; Mark Denbeaux; Martha Rayner; Martin Bahl; Mary Petras; Matthew Dodge; Michael Mone; Michael Rapkin; Michael Smith; Muneer Ahmad; Murray Fogler; Nancy Hollander; Neil Katyal; Neil Koslowe; Pat Bronte; pcurnin@stblaw.com; Paul Leder; Paul Rashkind; Paul Reichler; Schoeman, Paul; Peter Ryan; Rachel Clingman; Randy Coyne; Reginald McKnight; Richard Coughlin; Richard Cys; Richard Girgg; Richard Soble; Rob Kirsch; Robert Gensburg; Robert Rachlin; Rodger Eddleman; Rufus Pennington; Sabin Willett; Sam Kauffman; Sarah Havens; Scott Barker; Scott O'Connell; Sergio Rodriguez; Stephen Demik; Stephen Truitt; Steve Wax; Stewart Eisenberg; Suhana Han; Susan Manning; Sylvia Royce; Thomas Belsky; Tom Johnson; Tom Sullivan; Trip Macintosh; Walter Lesnevich; Wes Powell; William Brenna; William Murphy; William Wertheimer |
| **Subject:** | COUNSEL SUBMISSION FOR ARB 2 |

```
Ladies and gentlemen,
The Office for the Administrative Review of the Detention of Enemy Combatants
(OARDEC) informs you of your opportunity to provide input regarding your client for
review and consideration by the 2006 Administrative Review Boards (ARBs).  If you
submitted matters to the ARB process last year on behalf of your client, those
matters are already part of your client's records and will be considered by the
2006 ARB.  There is no need for you to resubmit the same or similar documents.  If
you have new information that will aid the ARBs in assessing the threat your client
may continue to pose to the U.S. or its allies, you can submit that information
through the process described in the attached fact sheet.  The Privilege Review
Team must receive your submission no later than 24 February 2006; OARDEC cannot
guarantee that materials received after that date will be included in the ARB
hearings.  Please note that the OARDEC Legal Advisor will acknowledge receipt of
your submission but will not be able to answer any substantive or procedural
questions about your client's ARB last year or this year.
Sincerely,
Terri McPalmer
CDR, JAGC, U.S. Navy
```

### Fact Sheet for Habeas Counsel Regarding Administrative Review Boards (ARBs)

- **THE ADMINISTRATIVE REVIEW BOARD PROCESS.** The ARBs are an administrative review process to annually assess whether there is reason to believe that an enemy combatant might pose a continuing threat to the United States or its allies in the ongoing conflict against al Qaeda and its affiliates and supporters, and whether there are other factors warranting the enemy combatant's continued detention. The ARBs began in December 2004. Information on the ARB procedures can be obtained through the Department of Defense website at http://www.defenselink.mil/releases/2004/nr20040915-1253.html.

- **TIMING OF ARBS.** The Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) schedules and conducts all ARB hearings. OARDEC will not be providing information to counsel on the scheduling or outcomes of the ARBs.

- **COUNSEL INVOLVEMENT.** Counsel are not permitted to represent the detainee in the ARB hearing. However, as discussed below, counsel are provided the opportunity to submit information to the ARB if counsel believes that information is relevant to the assessment that his/her client is no longer a threat to the United States or its allies.

- **TIMING FOR SUBMISSION OF COUNSEL MATERIALS.**

    o February 24, 2006 is the deadline for counsel submissions for the 2006 ARB hearings. All submissions received by the Privilege Review Team by that deadline will be provided to the ARBs. Submissions received after that deadline will be provided to the ARB if it has not occurred prior to receipt. If your client's ARB occurs before the Privilege Review Team receives your submission, the information will be retained for consideration at your client's next annual review if he remains in detention.

    o Any materials submitted last year will be provided to the 2006 ARB so there is no need for you to resubmit the same or similar documents.

- **CLASSIFICATION REVIEW AND MARKING.** In order for OARDEC to conduct a proper classification review of your submissions, information submitted by counsel for consideration in an ARB hearing <u>must</u> clearly annotate the sources for any portions that include references to classified, protected, or "For Official Use Only" (FOUO) information. Without the source information, we cannot properly label the documents with the appropriate classification markings; without proper markings, the documents will not be used in the ARB process. Therefore, you should annotate your submission by indicating what information is derived from classified, protected, or FOUO sources, and indicate what document(s) that information came from (e.g., "classified exhibit R-17 to the CSRT"). This will enable us to go to the source document and then determine the proper classification level of that portion of your submission. It is the responsibility of counsel to follow all applicable information security regulations with respect to the handling of classified, protected, or FOUO information. Counsel should work closely

with the designated Court Security Officers to ensure compliance with security regulations.

- **HOW TO SUBMIT INFORMATION FOR ARB CONSIDERATION.** If you have information to submit that does not refer to classified or protected information, you must mail it to the Privilege Review Team. The Team will ensure that your submission is delivered to the OARDEC Legal Advisor. If your submission includes references to classified or protected information, you must provide that document to the Privilege Review Team at the secure facility. A member of the Team will ensure it is properly marked and transmit it to the OARDEC Legal Advisor. The Legal Advisor will contact you to confirm receipt of your classified and unclassified submissions but will not provide any further details regarding the processing of your submission.

    o Unclassified material should be mailed to:

    Privilege Review Team - REF - ARB Submissions
    U.S. Department of Justice
    Litigation Security Section
    20 Massachusetts Avenue, NW
    Suite 5300
    Washington, DC  20530

This information is provided to you solely to identify points of contact to facilitate the transmission of your submissions to the ARB. Neither the Privilege Review Team nor the OARDEC Legal Advisor is permitted to discuss other matters with you regarding your client's ARB. This includes your suggestions on how and when ARBs should be conducted, your questions about ARB procedures, and other such matters.

# EXHIBIT B

KRAMER LEVIN NAFTALIS & FRANKEL LLP

J. WELLS DIXON
ASSOCIATE
PHONE 212-715-9491
FAX 212-715-8000
JDIXON@KRAMERLEVIN.COM

February 24, 2006

Via Federal Express

Administrative Review Board
c/o Privilege Review Team - REF - ARB Submissions
U.S. Department of Justice
Litigation Security Section
20 Massachusetts Avenue, NW, Suite 5300
Washington, D.C. 20530

      Re:    2006 Administrative Review Board Hearings for
                Abdur Razakah (ISN 219) and Ahmad Doe (ISN 201)

Dear Members of the Board:

      We represent petitioners Abdur Razakah (ISN 219) and Ahmad Doe (ISN 201) ("Petitioners") in the case *Razakah v. Bush*, Civil Action No. 05 CV 2370 (EGS), pending in the District of Columbia. We respectfully submit this memorandum in connection with Petitioners' 2006 Administrative Review Board ("ARB") hearings. For the reasons set forth below, the Board should find that Petitioners do not present any threat to the United States or its allies and are of no intelligence value, and recommend their release from imprisonment at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo").[1]

**Preliminary Statement**

      Petitioners are among a unique group of detainees who, as a result of misfortune, misunderstanding, misinformation and, ultimately, inertia, are being indefinitely detained for no useful or legitimate purpose. We hope that in the course of these ARB proceedings, the Board will come to recognize the true nature of Petitioners' circumstances and begin the process of effectuating their release.

      Petitioners are Uighurs, a Turkic Muslim minority group native to western China that has been brutally oppressed by the communist Chinese government. Petitioners are civilians who have been wrongly classified as "enemy combatants" by the President – perhaps at the request of the Chinese government in exchange for that country's continuing cooperation in the

---

[1] Nothing in this memorandum or its attachments involves classified information. All factual information concerning Petitioners, including how they came to be detained at Guantánamo, is based on their habeas corpus petition and other publicly available documents.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Administrative Review Board
February 24, 2006
Page 2

global fight against terrorism – and who have been imprisoned virtually *incommunicado* for several years at Guantánamo.[2] Indeed, Petitioners are among a group of approximately twenty-two Uighurs currently detained at Guantánamo, most of whom the government has already determined are non-enemy combatants and should be released from imprisonment because they present no threat to the United States or its allies and are of no intelligence value.[3] Moreover, we believe that like these other Uighur detainees, Petitioners have twice been cleared for release from Guantánamo – once after a Pentagon review in late 2003 and again in March 2005 – but remain incarcerated indefinitely and virtually *incommunicado*.[4]

---

[2] *See, e.g.*, Congressional Research Service, *Report for Congress: China's Relations with Central Asian States and Problems with Terrorism* 3-4 (Dec. 17, 2001) ("According to a number of analysts, China, Russia, and the Central Asian states, in exchange for lending support and cooperation to the U.S. in the fight against global terrorism, may want 'support for their campaigns against groups they view as terrorists,' and a reduction in the level of criticism over what the United States views as human rights abuses."); Human Rights Watch, *Devastating Blows: Religious Repression of Uighurs in Xinjiang* 25 (Apr. 2005) ("The Chinese embassy in Washington continues to press for their repatriation. It has declared that Beijing considers the Uighurs at Guantanamo to be 'East Turkestan terrorists' who should be returned to China.") [hereinafter *Devastating Blows*] (attached hereto as Ex. A).

[3] *See, e.g., Uighurs Face Return From Guantanamo*, FIN. TIMES, Mar. 16, 2005 ("The Pentagon determined last year that half of the two dozen Uighur Chinese captured in the war on terrorism have no intelligence value and should be released."); Demetri Sevastopulo, *Cheney Backs Guantanamo Bay Prison Amid Growing Unease*, FIN. TIMES, June 14, 2005 ("The U.S. is holding about 550 detainees at Guantanamo, including about a dozen Uighur Chinese whom the U.S. has determined are no longer 'enemy combatants.'"); Carol Rosenberg, *Guantanamo Bay: Closing Terror Prison Tricky for U.S.*, MIAMI HERALD, June 12, 2005 ("Navy Secretary Gordon England confirmed in March that Guantanamo captives include Chinese Muslims – reportedly about two dozen – who are no longer classified as 'enemy combatants,' the Bush administration term for terrorism suspects."); Editorial, WASH. POST, May 3, 2005 ("[T]he military has determined that about 15 of [the Uighurs at Guantánamo] are not 'enemy combatants' . . . The Pentagon has, consequently, cleared them for release.").

[4] *See* Demetri Sevastopulo, *Uighurs Face Return to China From Guantanamo*, FIN. TIMES, Mar. 16, 2005 (Pentagon determined last year that half of the Uighur detainees have no intelligence value and should be released); Robin Wright, *Chinese Detainees are Men Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantanamo with Nowhere to Go*, WASH. POST, Aug. 24, 2005, at A1 ("15 Uighurs have actually been cleared for release from Guantanamo Bay twice, once after a Pentagon review in late 2003 and again last March, U.S. officials said.").

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Administrative Review Board
February 24, 2006
Page 3

On December 12, 2005, Petitioners filed a habeas corpus petition challenging the legality of their detention. However, despite the fact that we have obtained the necessary security clearance, the government has not permitted us to communicate with Petitioners. The government also has refused to allow us to meet with our clients, including during a visit to Guantánamo scheduled for the week of March 13, 2006. In addition, the government has consistently refused to provide us with any records or other information relating to Petitioners' Combatant Status Review Tribunals ("CSRTs"), as a result of which the government initially determined that they are enemy combatants. The government has even refused to tell us which (if any) of the unclassified CSRT records it publicly disclosed to the Associated Press in redacted form relate specifically to our clients.

The government's uncompromising efforts to deny us information about our clients have severely handicapped their ability to contest their status in these ARB proceedings.[5] We nonetheless believe that there is no basis for Petitioners' continuing detention.

### Petitioners Present No Threat to the United States or Its Allies

Although we do not know the specific reasons for Petitioners' detention, we believe that their CSRT records would show that like the other Uighur detainees at Guantánamo – again, most of whom the government has already determined are non-enemy combatants – Petitioners were not "fighters for" or "members of" the Taliban or Al Qaeda. Nor would those records include any credible evidence that Petitioners were "associated with" such forces.[6]

---

[5] *See* Correspondence with Justice Department (attached hereto as Ex. B). With all due respect to the uniformed officers on the Board, the government's refusal to provide any information concerning our clients that may form the basis for their enemy combatant designation, or which may be relied on to justify their continuing imprisonment at Guantánamo, violates not only traditional notions of fairness and due process under federal and international law, but also undermines the well-established standards of the Uniform Code of Military Justice and the Geneva Conventions relating to the treatment of enemy prisoners of war and other detainees. *See, e.g., Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees,* Army Regulation 190-8, § 1-6 (1997); United Nations Commission on Human Rights, *Situation of Detainees at Guantánamo Bay* 14-21 (Feb. 15, 2006) [hereinafter United Nations Report] (attached hereto as Ex. C). We therefore object to the procedures established for the CSRT and ARB hearings as fundamentally flawed and incapable of ensuring the fair and impartial adjudication of Petitioners' rights and obligations as detainees. Moreover, if the Board determines that there are factual matters in Petitioners' files that may warrant their continued detention, we request immediate access to those materials and an opportunity to present a written response to the Board concerning those materials as part of the 2006 ARB hearings.

[6] We note that of the more than 500 detainees at Guantánamo, 55% are not alleged by the government to have committed any hostile acts against the United States or its coalition allies.

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Administrative Review Board
February 24, 2006
Page 4

      We believe that Petitioner Abdur Razakah was present in Afghanistan after the United States began military operations in that country in October 2001, but we are not aware of any allegations or evidence that he took up arms against United States forces or supported forces hostile to or engaged in armed conflict with the United States. To the contrary, we believe that he fled to Afghanistan in order to escape the pervasive and well-documented persecution of Uighurs in the Xinjiang Autonomous Region of China. Petitioner Razakah later fled from Afghanistan, eventually making his way to Pakistan with a large number of other refugees including other non-enemy combatant Uighurs detainees. In Pakistan – away from any battlefield involving American forces – Petitioner Razakah was detained by local bounty hunters and eventually turned over to the United States military.[7] We understand that the United States paid a $5,000 bounty for him, as it did for other non-enemy combatant Uighurs detainees.[8]

      We believe that Petitioner Ahmad Doe likewise was present in Afghanistan after the United States began military operations in that country in October 2001. Again, however, we are not aware of any allegations or evidence that he took up arms against United States forces or supported forces hostile to or engaged in armed conflict with the United States. We believe that Petitioner Ahmad Doe instead was detained by members of the Northern Alliance after fleeing persecution in China and was imprisoned in Mazar-e-Sharif before eventually being turned over to the United States military, perhaps for a substantial bounty. Moreover, we believe that at

---

According to the government, only 8% are Al Qaeda fighters; 40% have no definitive connection with Al Qaeda at all; and 18% have no definitive affiliation with either Al Qaeda or the Taliban. In addition, only 5% of detainees were captured by United States forces; and 86% were arrested by Pakistanis or the Northern Alliance and turned over to the United States at a time when the United States offered large bounties for the capture of suspected enemies. *See* Mark & Joshua Denbeaux, *Report on Guantanamo Detainees: A Profile of 517 Detainees Through Analysis of Department of Defense Data* 2-3 & App. A (Feb. 8, 2006) [hereinafter Denbeaux Report] (attached hereto as Ex. D).

[7] *See also* United Nations Report at 14 ("Many of the detainees held at Guantánamo Bay were captured in places where there was – at the time of their arrest – no armed conflict involving the United States.") (attached hereto as Ex. C).

[8] *See, e.g.*, Michelle Faul, *Guantanamo Detainees Say Arabs, Muslims Sold for U.S. Bounties*, ASSOC. PRESS, May 31, 2005. We also understand that the government has found certain Uighur detainees to be enemy combatants based on information provided by bounty hunters. *See* Denbeaux Report at 14-15 & App. A (attached hereto as Ex. D). In addition, we note that the government's determination that some of the Uighurs captured with Petitioner Razakah are non-enemy combatants – but that he remains an enemy combatant – further illustrates the apparent arbitrary nature of the CSRT process.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Administrative Review Board
February 24, 2006
Page 5

some point Petitioner Ahmad Doe was shot in the foot while at Mazar-e-Sharif, but we are not aware of any allegations or evidence that he was involved in the prison uprising at that location in November 2001. We understand that his leg was subsequently amputated by medical personnel at Guantánamo, and we imagine his on-going medical care at the base has been a source of difficulty.

Finally, as indicated above, we believe that like the other non-enemy combatant Uighur detainees, Petitioners have twice been cleared for release from Guantánamo despite their enemy combatant designation. Indeed, it is well known in political and diplomatic circles that the United States has been attempting to resettle a large number of the Uighurs at Guantánamo, including both enemy combatants and non-enemy combatants. This has also been widely reported in the press.[9]

### Petitioners Are of No Intelligence Value

Petitioners also plainly are of no intelligence value to the United States or its allies. We assume that like all detainees at Guantánamo, Petitioners have been interrogated since they arrived there several years ago by officials from the military, the Central Intelligence Agency or the National Security Agency, and various law enforcement agencies including the Federal Bureau of Investigation and the Naval Criminal Investigative Service. As a result of these likely interrogations over a period of several years, we can only assume that the government has obtained any and all information from Petitioners that it can hope to extract from them. Similarly, because Petitioners have not been designated for military commissions or otherwise charged with any crimes, we can only assume that their interrogations have failed to yield any evidence to support such charges against them or against others. Moreover, we believe that Petitioners' interrogations at Guantánamo likely included questioning (and possibly torture or other abuse) by agents of the communist Chinese government over a period of two weeks in 2002.[10] Given these circumstances and the length of time that has passed, it would be futile to continue to detain Petitioners on the ground that they might be of intelligence value.

---

[9] *See, e.g.*, Neil A. Lewis, *Freedom for Chinese Detainees Hinges on Finding A New Homeland*, N.Y. TIMES, Nov. 8, 2004, at A17 ("United States military officials have concluded that at least half of the Uighurs [at Guantánamo] are eligible for release.").

[10] *See* Amnesty International, *People's Republic of China: Uighurs Fleeing Persecution as China Wages Its "War on Terror"* 33-34 (2004) ("Amnesty International has received credible allegations that during this visit [by Chinese agents to Guantánamo Bay in September 2002], which reportedly lasted between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds. It is alleged that during this time, the detainees were subjected to intimidation and threats, and to 'stress and duress' techniques such as environmental manipulation, forced sitting for many hours, and sleep deprivation, some of

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Administrative Review Board
February 24, 2006
Page 6

### There Is No Other Basis to Detain Petitioners

We are aware of no other basis for Petitioners' continuing detention. However, we are informed that at least one other Uighur has been held as an enemy combatant based on a finding that he was "associated with Taliban forces" because he traveled to Afghanistan in 2001 and had some connection with the East Turkistan Islamic Movement ("ETIM").[11] In addition, we understand that ETIM is alleged – only by the Chinese – to have some connection to and receive some financial support from Al Qaeda and the Taliban. While we do not know whether similar allegations concerning ETIM have been made against Petitioners – and we do not concede in any way that such allegations are applicable to or otherwise provable against Petitioners – such claims in any event would be insufficient to establish that Petitioners pose a threat to the United States or its allies and should be imprisoned indefinitely and virtually *incommunicado* as enemy combatants.

China's brutal repression of the Uighurs is well-documented and undisputed.[12] China plainly has used the global war on terrorism as a pretext for oppressing Uighur Muslims with impunity.[13] In particular, China has "opportunistically used the post-September 11

---

which allegedly occurred on the instruction of the Chinese delegation.") (attached hereto as Ex. E).

[11] *See* Docket Entry #16, *Mamet v. Bush*, Civil Action No. 05 CV 1602 (ESH) (D.D.C.) (unclassified CSRT return for Uighur petitioner Edham Mamet, ISN 102). Similar allegations were made with respect to other Uighur detainees who have since been exonerated. *See* Denbeaux Report at 21 (allegations against subsequently cleared Uighur detainees have included claims that they: traveled to Afghanistan in 2001; received small arms training; possessed Kalashnikov AK-47 rifles; stayed at camps or guest houses allegedly connected to Al Qaeda or the Taliban; and fled to Pakistan where they were captured by bounty hunters) (attached hereto as Ex. D).

[12] *See, e.g.*, U.S. Dept. of State, Country Reports on Human Rights Practices – 2004 (China Report) § 1(c) (2005) (available at www.state.gov/g/drl/rls/hrrpt/2004/41640.htm) ("Former detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse . . . [S]tate-run media reported that 460 people were killed by law enforcement officials and over 100 seriously injured through abuse or dereliction of duty in 2003.").

[13] U.S. Dep't of State, *China's Human Rights Record and Falun Gong: Testimony Before the House Committee on International Relations, Subcommittee on Africa, Global Human Rights and International Operations* (July 7, 2005) ("The [Chinese] government also has at times used the global war on terror as a pretext for cracking down on Uighur Muslims who were peacefully

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Administrative Review Board
February 24, 2006
Page 7

environment to make the outrageous claim that [Uighur] individuals disseminating peaceful religious and cultural messages in Xinjiang are terrorists."[14] The Chinese government also has successfully influenced the United States in connection with this effort. For example:

> The U.S. government, keen after September 11 to enlist Chinese support in its efforts against Islamic terrorism, agreed to a Chinese request that it co-sponsor the inclusion of a little-known Uighur organization, the East Turkestan Islamic Movement (ETIM), on the U.N.'s list of terrorist organizations purportedly linked to al-Qaeda and subject to the freezing of assets. Although American officials declared that they had "independent evidence" of such a connection, the State Department press release explaining this decision quoted verbatim a document issued by the Chinese government in 2002 [entitled "'East Turkistan' Terrorist Forces Cannot Get Away with Impunity"] that similarly outlawed ETIM. The U.S. statement even mistakenly attributed all the terrorist incidents described in that document solely to ETIM, a claim that even the Chinese authorities had not made.[15]

More recently, however, the United States has begun to question China's claim that the Uighurs present a terrorist threat. The United States also appears to have some doubt now about the designation of ETIM as a terrorist organization:

> U.S. officials have privately indicated unease at the decision to list ETIM. In December 2003 the U.S. declined to support China's request to list another Uighur organization, the East Turkestan Liberation Organization. The U.S. has also publicly insisted that the ETIM listing and the international war on terror should not be used by China to justify internal repression against political

---

expressing dissent or sought to practice their faith, and on independent Muslim religious leaders.") (available at www.state.gov/g/drl/rls/rm/2005/50110.htm).

[14] *Devastating Blows* at 8 (attached hereto as Ex. A).

[15] *Id.* at 21-22. We also note that in a report published before this time period, the Congressional Research Service addressed a number of armed groups allegedly operating in the Xinjiang region but did not mention ETIM. See Congressional Research Service, *Report for Congress: China's Relations with Central Asian States and Problems with Terrorism* (Dec. 17, 2001). We further note that while the government currently lists ETIM as a terrorist organization for purposes of freezing assets, that organization does not appear to have been designated as a terrorist organization for purposes of the Immigration and Nationality Act. See Congressional Research Service, *Report for Congress: U.S.-China Counter-Terrorism Cooperation: Issues for U.S. Policy* 5 (May 12, 2005).

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Administrative Review Board
February 24, 2006
Page 8

opponents or minorities. President Bush stressed in October 2001 in Shanghai that, "The war on terrorism must never be an excuse to persecute minorities."[16]

The government has further acknowledged that the Uighur detainees at Guantánamo cannot and will not be repatriated to China — despite Chinese demands — because they would likely be tortured or killed based on their cultural and ethnic identity.[17] We nonetheless can envision a hypothetical situation where a Uighur detainee might agree that he is an enemy combatant only in order to ensure that he is not repatriated to China.

Accordingly, to the extent that the Board may possess information provided by the Chinese government that would purportedly link Petitioners to Al Qaeda or the Taliban through ETIM, or otherwise establish that Petitioners pose a threat to the United States or its allies based on some alleged connection to ETIM, we respectfully submit that such "evidence" is likely fabricated and should not be credited especially absent independent corroborating evidence which we believe does not exist. In particular, we are aware that in at least one other Uighur detainee case, the CSRT panel relied on a single paragraph of information plainly provided by the Chinese government as the only evidence that the detainee was associated with the Taliban through ETIM, and that ETIM had some connection to or received some financial support from Al Qaeda and the Taliban. Indeed, that document was drafted nearly verbatim from the above-referenced document published in 2002 by the Chinese government, which was pejoratively entitled "'East Turkistan' Terrorist Forces Cannot Get Away with Impunity."[18]

---

[16] *Devastating Blows* at 22 (attached hereto as Ex. A); *see also* Mike Jendrzejczyk, Editorial, *Condemning the Crackdown in Western China*, ASIAN WALL ST. J., Dec. 16, 2002 ("Since the Sept. 11 attacks, China has tried to use the terrorism issue to bolster its domestic political agenda. Its greatest accomplishment was moving the administration of U.S. President George W. Bush from a position of unqualified criticism of China's crackdown on ethnic minorities to taking actions that indirectly lend legitimacy to Beijing's policies. But the Bush administration is now increasingly concerned about China's diplomatic offensive, as Beijing uses the U.S. decision on ETIM to justify a broad crackdown on peaceful Uighur dissent and Muslim religious activities – a crackdown that long predates Sept. 11.").

[17] *See Powell Says Detained Uighurs Will Not Be Returned to China*, AGENCE FRANCE-PRESS, Aug. 13, 2004; *see also, e.g.*, Docket Entry #11, *Mamet v. Bush*, No. 05-CV-1886 (EGS) (D.D.C.) ("The Uighur NLECs in this case present a situation where the detainees cannot be repatriated to China due to concerns over potential mistreatment; efforts are underway, however, to locate a suitable country for transfer.").

[18] *Compare* Exhibit R-5 to Docket Entry #16, *Mamet v. Bush*, Civil Action No. 05 CV 1602 (ESH) (D.D.C.), *with "East Turkistan" Terrorist Forces Cannot Get Away with Impunity*, Information Office of the State Council (Jan. 21, 2002) (available at www.china-embassy.ch/eng/xwss/t138040.htm) (attached hereto as Exs. F and G, respectively).

KL3:2499383.1

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Administrative Review Board
February 24, 2006
Page 9

Moreover, although not otherwise corroborated, that document apparently formed the only basis for the CSRT determination that the detainee was an enemy combatant. In any event, according to its own guidelines this Board should not consider or otherwise credit any such evidence as may be alleged to relate to Petitioners because it would be inherently vague, unsupported, and not established through reliable sources. *See* Administrative Review Board Process § 3(e)(3) (Sept. 14, 2004).

### Conclusion

Apart from any questionable claims by the Chinese, we are not aware of any evidence that Uighur refugees in Central Asia have ever been supported by radical Islamic groups – including the Taliban and Al Qaeda – or that Islam serves as a motivating force for Uighur separatists in China.[19] Far from having ties to international terrorism or otherwise posing a threat to the United States or its allies, the Uighurs detainees – including Petitioners – pose a unique problem for the government and for us because they do not belong in Guantánamo but cannot be repatriated to China. It is therefore in our mutual interests to find a suitable country of transfer for these innocent men as soon as possible. As an initial step toward that end, we ask the Board to recommend their release from imprisonment. We also ask the Board to recommend that Petitioners be transferred immediately to Camp Iguana, where the other Uighurs are detained in less restrictive living conditions pending a resolution of their unfortunate situation.

Respectfully submitted,

J. Wells Dixon

Enclosures

---

[19] We note specifically that the China-Afghanistan border is controlled by the anti-Taliban Northern Alliance and Uighurs therefore could have no contact with the Taliban in that region. Uighurs also are more culturally and ethnically related to the Uzbeks in Afghanistan than they are to the Pashtuns who dominate the Taliban. *See* Human Rights Watch, *China: Human Rights Concerns in Xinjiang* (Oct. 2001) (attached hereto as Ex. H).

KL3:2499383.1