*PREVIOUSLY FILED WITH THE CSO
AND CLEARED FOR PUBLIC FILING*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| ABDUR RAZAKAH, *et al.*, | **ORAL ARGUMENT REQUESTED** |
| Petitioners, | |
| v. | Civil Action No. 05 CV 2370 (EGS) |
| GEORGE W. BUSH, *et al.*, | |
| Respondents. | |

---

# PETITIONERS' MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITONERS AND THE COURT WITH THIRTY-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONERS FROM GUANTÁNAMO

KL3:2528470.4

*PREVIOUSLY FILED WITH THE CSO AND CLEARED FOR PUBLIC FILING*

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioners Abdur Razakah and Ahmad Doe respectfully move for an order requiring Respondents to provide counsel for Petitioners and the Court with thirty-days' advance notice of any intended removal of Petitioners from the Guantánamo Bay Naval Base in Cuba ("Guantánamo").

## PRELIMINARY STATEMENT

Petitioners are citizens of the Xinjiang Autonomous Region, a western province of China also commonly referred to as "Turkistan" or "East Turkistan." They are Uighurs, a Muslim ethnic group that has been brutally oppressed by the communist Chinese government. We believe that Petitioners – like many other Uighur detainees – may have been cleared for release from Guantánamo more than a year ago but remain imprisoned indefinitely and virtually *incommunicado*, without having been charged, and without having been afforded any fair process by which they might challenge their detention. As detailed in the habeas corpus petition that Petitioners filed with this Court on December 12, 2005, Petitioners deny being "enemy combatants" and contend that they are being detained in violation of the Constitution, treaties and laws of the United States.

We have reason to believe Respondents have contemplated or are contemplating removal of Petitioners from Guantánamo to foreign territories, where they may be subjected to torture or indefinite imprisonment without due process of law. As Uighur citizens of Xinjiang, Petitioners, in particular, have reason to fear that they will be removed to China, where the persecution, torture, and oppression of Uighurs are well-documented. Petitioners are therefore requesting advance notice of transfer from Guantánamo to enable their counsel to contest any such transfer or removal, and to thwart any effort by Respondents to defeat the jurisdiction of this

KL3:2528470.4

*PREVIOUSLY FILED WITH THE CSO
AND CLEARED FOR PUBLIC FILING*

Court. Courts in this district have granted this relief in numerous other detainee cases, *see, e.g.*, *Hamoud v. Bush*, No. 05-CV-1894, slip. op. (RWR) (D.D.C. July 6, 2006); *Al-Joudi v. Bush*, No. 05-CV-301, 2005 WL 774847 (GK) (D.D.C. Apr. 4, 2005), *appeal docketed*, No. 05-5231 (D.C. Cir. June 16, 2005); *Al-Shiry v. Bush*, No. 05-CV-0490 slip. op. (PLF) (D.D.C. Apr. 1, 2005), *appeal docketed*, No. 05-5226 (D.C. Cir. June 6, 2006), including cases involving Uighur detainees similarly situated to Petitioners, *see Mamet v. Bush*, No. 05-CV-1602, slip op. (ESH) (D.D.C. Sept. 30, 2005), *appeal docketed*, No. 05-5488 (D.C. Cir. Dec. 20, 2005); *Kiyemba v. Bush*, No. 05-CV-1509, slip op. (RMU) (D.D.C. Sept. 13, 2005), *appeal docketed*, No. 05-5487 (D.C. Cir. Dec. 30, 2005).

That Respondents may intend to unilaterally remove Petitioners to another jurisdiction without notice to or consultation with counsel is evidenced by their recent removal of five other Uighur detainees, three of whom are also represented by undersigned counsel. In May 2006, while their habeas petitions were still pending, these Uighurs were transferred from Guantánamo, without notice to counsel or the Court, to a refugee camp in Albania – an impoverished country with no Uighur-speaking community and little prospect for social integration or gainful employment. In fact, two of the Uighurs who were transferred to Albania were removed from Guantánamo on the last business day before the Court of Appeals was to hear argument in their case. By requesting the relief sought in this motion, counsel seek to prevent Respondents from acting unilaterally to disrupt or preempt the Court's adjudication of the issues raised by Petitioners' habeas petition.

## BACKGROUND

United States has secretly removed detainees and others suspected of links to terrorism to other countries for interrogation or detention without complying with extradition re-

quirements or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," may be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, and to foreign government officials, the U.S. Government has transferred numerous suspects into the custody of foreign governments that employ inhumane interrogation techniques. Officials in Germany and Italy have said that the U.S. Government, acting through the CIA, has abducted terrorist suspects and transported them to Egypt and Afghanistan for interrogation. *See* Stephen Grey & Elisabetta Povoledo, *Intelligence Officials Arrested in Kidnapping*, International Herald Tribune, July 7, 2006, *available at* http://www.iht.com/articles/2006/07/06/news/italy.php; Souad Mekhennet & Craig S. Smith *German Spy Agency Admits it Knew of 'Rendition' by U.S.*, International Herald Tribune, June 2, 2006, *available at* http://www.iht.com/articles/2006/06/02/news/spy.php. According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, *available at* http://www.newyorker.com/fact/content/?050214fa_fact6, ¶ 7. According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics -- including torture and threats to families -- that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

- 3 -

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, 2002, at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* Wash. Post, Dec. 26, 2002, at A1.

News reports also indicate that the U.S. Government has been actively negotiating the terms of transfer of detainees to other countries as part of its plan to dramatically reduce the detainee population at Guantánamo. *See* Carol J. Williams, *U.S. to Free 141 Terror Suspects*, L.A. Times, April 25, 2006, *available at* 2006 WLNR 7400895 (Westlaw). This follows on the removal of over 300 detainees from Guantánamo over the last few years to Afghanistan, Saudi Arabia, and elsewhere in the Middle East, Africa, and Europe. *See* Defense Department Press Release, *Detainee Transfer Announced*, June 24, 2006, *available at* http://www.defenselink.mil/releases/2006/nr20060624-13329.html. Last year, for example, the Government reached an agreement to transfer 110 detainees to Afghanistan for further detention, and negotiations on similar arrangements have been ongoing with Saudi Arabia. *See* Neil A. Lewis, *Guantánamo Detention Site is Being Transformed, U.S. Says*, N.Y. Times, Aug. 6, 2005, *available at* 2005 WLNR 12387210 (Westlaw). According to news reports, more than half of the twenty-two Uighurs detained in Guantánamo have been cleared for release, *see* Robin Wright, *Chinese Detainees Are Men Without a Country*, Wash. Post, August 24, 2005, at A1; five of these Uighurs were removed to a refugee camp in Albania earlier this year, *see infra*, p. 6.

Petitioners, in particular, have reason to fear that they will be transferred into the custody of the government of China.[1] The Chinese Government's violent and continuing repres-

---

[1] Respondents have represented that they do not intend to remove Uighur detainees to China. *See Powell Says Detained Uighurs Will Not Be Returned to China*, Agence France-Press (Aug. 13, 2004); *see also, e.g., Mamet v. Bush*, No. 05-CV-1886 (EGS) (D.D.C.) (dkt. no. 11), at 16 ("The Uighur NLECs in this case present a situation where the detainees cannot be repatriated (continued...)

- 4 -

*PREVIOUSLY FILED WITH THE CSO AND CLEARED FOR PUBLIC FILING*

sion of Uighurs in East Turkistan is well-documented. *See* U.S. Department of State, *Country Reports on Human Rights Practices—2005 (China Report)*, available at http://www.state.gov/g/drl/rls/hrrpt/2005/61605.htm.[2] According to the U.S. State Department, in 2005 the Chinese Government's "war on terror continued to be used as a pretext for cracking down harshly on Uighurs expressing peaceful political dissent and on independent Muslim religious leaders." *Id.* Indeed, the Chinese Government has indicated that, given the opportunity, it intends to interrogate and prosecute Petitioners, along with other Uighur detainees: Counsel has learned that approximately six months after their arrival in Guantánamo, Petitioners were interrogated, with the consent of the U.S. Government, by Chinese intelligence agents.[3] Petitioners

---

to China due to concerns over potential mistreatment; efforts are underway, however, to locate a suitable country for transfer."). Nonetheless, the possibility remains that Petitioners will be transferred to a country where they will be vulnerable to Chinese efforts to extradite, capture, interrogate, or otherwise persecute them. In June 2006, for example, an ethnic Uighur with Canadian citizenship, while visiting his children in Uzbekistan, was apparently turned over by the Uzbek authorities to the Chinese government, which may plan to subject him to torture or execution. *See* Press Release, *Uzbekistan Deports a Canadian Uyghur to a Deeply Uncertain Fate in China*, Uyghur-American Association, June 26, 2006 (attached as Ex. A). The Chinese have similarly sought to pressure the Albanian government to deport three other Uighurs represented by undersigned counsel, released from Guantánamo earlier this year into a refugee camp in Tirana, Albania. *See infra*, pp. 6-7.

[2]   *See also* U.S. Department of State, *China's Human Rights Record and Falun Gong: Testimony Before the House Committee on International Relations, Subcommittee on Africa, Global Human Rights and International Operations* (July 7, 2005), available at www.state.gov/g/drl/rls/rm/2005/50110.htm; Human Rights Watch, *China: Human Rights Concerns in Xinjiang* (Oct. 2001), available at http://www.hrw.org/backgrounder/asia/china-bck1017.pdf; Amnesty International, *People's Republic of China: Uighurs fleeing persecution as China wages its "war on terror"* (July 7, 2004), available at http://web.amnesty.org/aidoc/aidoc_pdf.nsf/Index/ASA170212004ENGLISH/$File/ASA170210 4.pdf.

[3]   *See* Amnesty International, *People's Republic of China: Uighurs Fleeing Persecution as China Wages Its "War on Terror"* (2004), at 33-34 ("Amnesty International has received credible allegations that during this visit [by Chinese agents to Guantánamo Bay in September 2002], which reportedly lasted between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds. It is alleged that during this time, the detainees were subjected to intimidation and threats, and to 'stress and duress' techniques such (continued...)

-5-

were told that if they refused to answer questions they could be "forced to talk" in Beijing or Urumchi, a city in East Turkistan. The Chinese interrogators photographed Petitioners and referred to information that each detainee had shared with their American interrogators, such as the names and addresses of their family members in China.

Respondents have already demonstrated that they will act unilaterally in attempting to transfer Petitioners beyond the jurisdiction of this court. On May 5, 2006, five Uighur detainees, three of whom are represented by undersigned counsel, were flown, in shackles, without notice to counsel or the Court, to a refugee camp in Tirana, Albania. At the time, three of the Uighurs had habeas corpus petitions pending in the district court, and two had appeals pending before the Court of Appeals. The U.S. Government, in fact, transferred two of the Uighurs to Albania on the last business day before the Court of Appeals was to hear argument in their appeal, *Qassim v. Bush, et al.*, No. 05-5477 (D.C. Cir. 2006). All five now find themselves in a country where – unlike several other western countries, including the United States, Canada, Sweden and Germany – there is no Uighur community and where no one speaks the Uighur language. Without economic or social ties, their prospects of securing gainful employment in a country where 30% of the population is impoverished and the average annual per capita income is less than $2,000 are bleak. *See* U.S. Department of State, *Background Notes (Albania)*, available at http://www.state.gov/r/pa/ei/bgn/3235.htm. The Chinese Government, moreover, has continued to seek custody of the Uighurs; a Chinese delegation in Tirana has pressured the Albanian Government to turn over the Uighurs, *see* Bruce Konviser, *A Strange Kind of Freedom*, To-

---

as environmental manipulation, forced sitting for many hours, and sleep deprivation, some of which allegedly occurred on the instruction of the Chinese delegation.").

*PREVIOUSLY FILED WITH THE CSO
AND CLEARED FOR PUBLIC FILING*

ronto Star, June 13, 2006 (attached as Ex. B), and, counsel recently learned, has attempted to gain access to the Uighurs in the refugee camp.

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). This Court can also grant Petitioners preliminary injunctive relief under Fed. R. Civ. P. 65, in order "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004). Accordingly, courts in this district have held that similarly situated Guantánamo detainees are entitled to the injunctive relief sought by Petitioners in this motion. *See, e.g., Hamoud v. Bush*, No. 05-CV-1894, slip. op. (RWR) (D.D.C. July 6, 2006); *Mamet v. Bush*, No. 05-CV-1602, slip op. (ESH) (D.D.C. Sept. 30, 2005), *appeal docketed*, No. 05-5488 (D.C. Cir. Dec. 20, 2005); *Kiyemba v. Bush*, No. 05-CV-1509, slip op. (RMU) (D.D.C. Sept. 13, 2005), *appeal docketed*, No. 05-5487 (D.C. Cir. Dec. 30, 2005); *Al Daini v. Bush*, No. 05-CV-634 (RWR), slip op. (D.D.C. June 6, 2005), *appeal docketed*, No. 05-5229 (D.C. Cir. June 16, 2005); *Al-Joudi v. Bush*, No. 05-CV-301 (GK), 2005 WL 774847 (D.D.C. April 4, 2005), *appeal docketed*, No. 05-5231 (D.C. Cir. June 16, 2005); *Al-Shiry v. Bush*, No. 05-CV-0490 slip. op. (PLF) (D.D.C. Apr. 1, 2005), *appeal docketed*, No. 05-5226 (D.C. Cir. June 6, 2006); *Al-Oshan v. Bush*, No. 05-CV-0520 (RMU), slip op. (D.D.C. Mar. 31, 2005), *appeal docketed*, No. 05-5237 (D.C. Cir. June 16, 2005).

The Court must consider four factors in determining whether to issue a preliminary injunction: (1) whether Petitioners will suffer irreparable harm if the injunction is denied; (2) whether an injunction will substantially injure other interested parties; (3) whether Petitioners are

*PREVIOUSLY FILED WITH THE CSO AND CLEARED FOR PUBLIC FILING*

substantially likely to succeed on the merits of their claims; and (4) whether issuing the injunction will further the public interest. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). These four factors "interrelate on a sliding scale," and "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Serona Labs*, 158 F.3d at 1318.

Petitioners stand to suffer irreparable harm in at least two respects. First, if removed to China, or to another country that might repatriate Petitioners to China – for example, Uzbekistan, Kazakhstan, Kyrgyzstan, or Pakistan – without the opportunity to challenge their removal, Petitioners will face indefinite detention, torture or death. In their habeas petition, Petitions seek, *inter alia*, declaratory and injunctive relief that would prevent the U.S. Government from effecting a transfer "that creates a foreseeable and direct risk that [Petitioners] will be subjected to torture." (Petition for a Writ of Habeas Corpus, filed Dec. 12, 2005, at 29-30). While Petitioners of course do not wish to hinder any effort to free them from detention, they are concerned that they will be removed to a country where they may be tortured or persecuted. In this motion, Petitioners simply seek an opportunity to challenge, if necessary, a proposed transfer on the grounds described in their petition, before that transfer has been accomplished. Second, insofar as removal from Guantánamo without the requested notice would potentially deprive Petitioners of the ability to challenge the legality of their detention in this or any other court, Petitioners face loss of their "right to 'test the legitimacy of [their] executive detention.'" *Al-Joudi*, 2005 WL 774847, at *4 (quoting *Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.D.C. 1998)). Thus, petitioners face

KL3:2528470.4

irreparable injury even if the jurisdiction to which they are removed does not practice torture, but merely seeks to detain Petitioners without affording them fair process.[4]

Respondents, on the other hand, will suffer no injury if the Court grants the requested relief. Petitioners at this stage ask only that Respondents be required to provide advance notice of the U.S. Government's intention to remove Petitioners from Guantánamo – an injunction would therefore not interfere with any interest Respondents have in determining where the Petitioners are ultimately sent. See *Al-Joudi*, 2005 WL 774847, at *5 ("Beyond 'vague premonitions' that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority."); *Abdah v. Bush*, No. 04-CV-1254 (HHK), slip op. at 10-11 (D.D.C. Mar. 29, 2005), *appeal docketed*, No. 05-5224 (D.C. Cir. June 2, 2005) ("[T]he court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their client will intrude upon executive authority.").

The third factor – substantial likelihood of success on the merits – also weighs in favor of issuing an injunction. It is not necessary that Petitioners demonstrate that their "right to a

---

[4] This latter category of harm also includes deprivation of the opportunity to mitigate collateral consequences that may follow from the U.S. Government's determination that Petitioners have been and are being legitimately detained: If Petitioners are removed before they are able to vindicate their rights in this Court, it is substantially more likely that they will be imprisoned, persecuted, or mistreated wherever they are transferred. See *Al-Joudi*, 2005 WL 774847, at *3 n.7 ("Furthermore, a determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention."). Given this possibility, merely transferring Petitioners out of U.S. custody will not resolve the claims raised by Petitioner or otherwise moot their habeas petition. *See, e.g., Carafas v. LaVallee*, 391 U.S. 234, 238-39 (1968) (habeas petition not moot where petitioner has been released, if petitioner filed petition while in custody and continues to suffer collateral consequences from conviction); *Smith v. Ashcroft*, 295 F.3d 425 (4th Cir. 2002) (habeas petition not moot where petitioner has been deported and no longer in U.S. custody, but continues to suffer collateral consequences from removal order); *Chong v. District Director, INS*, 264 F.3d 378, 386 (3d Cir. 2001) (same).

KL3:2528470.4

final decision, after a trial, be absolutely certain, wholly without doubt." *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.* 559 F.2d 841, 844 (D.C. Cir. 1977) (internal quotation marks omitted). Rather, a preliminary injunction seeking to preserve the status quo is warranted "when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Id.* In this case, Petitioners have properly invoked the jurisdiction of this Court, *see Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004); Judge Green, moreover, has ruled that detainees in similar circumstances to Petitioners have stated actionable claims under the Due Process Clause and the Geneva Conventions. *See In Re Guantánamo Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), *appeals docketed*, Nos. 05-5064, *et al.* (D.C. Cir. Mar. 7, 2005); *see also Hamdan v. Rumsfeld*, 548 U.S. __, 126 S. Ct. 2749, 2794-96 (2006) (Common Article 3 of Geneva Conventions applicable to person captured incident to the war with Al Qaeda). There is thus no question that the Petitioners have raised a substantial legal question entitling them to the requested relief, especially in light of the irreparable injury they would sustain in the absence of an injunction.

Finally, the public interest favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioners from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court and represented by counsel – be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely. *See Al-Joudi*, 2005 WL 774847, at *6 ("[T]he public interest is undeniably served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner.").

*PREVIOUSLY FILED WITH THE CSO AND CLEARED FOR PUBLIC FILING*

## CONCLUSION

For the forgoing reasons, Petitioners respectfully request that the Court grant their motion for an order requiring Respondents to provide counsel and the Court with thirty-days' advance notice before removing Petitioners from Guantánamo.

Dated:   New York, New York
         July 14, 2006

>   Respectfully submitted,
>
>   Counsel for Petitioners:
>
>   /s/ Paul Schoeman
>   _____
>   Paul Schoeman (Pursuant to LCvR 83.2(g))
>   Joel Taylor (Pursuant to LCvR 83.2(g))
>   Michael J. Sternhell (Pursuant to LCvR 83.2(g))
>   Darren LaVerne (Pursuant to LCvR 83.2(g))
>   KRAMER LEVIN NAFTALIS & FRANKEL LLP
>   1177 Avenue of the Americas
>   New York, New York 10036
>   Tel: (212) 715-9100
>   Fax: (212) 715-8000
>
>   Barbara Olshansky (NY-0057)
>   Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
>   J. Wells Dixon (Pursuant to LCvR 83.2(g))
>   CENTER FOR CONSTITUTIONAL RIGHTS
>   666 Broadway, 7th Floor
>   New York, New York 10012
>   Tel: (212) 614-6439
>   Fax: (212) 614-6499
>
>   Alison Sclater (Pursuant to LCvR 83.2(g))
>   245 East 80th Street, #9J
>   New York, New York 10021
>   Tel: (212) 717-2736

# EXHIBIT A

**Uyghur Human Rights Project** - http://www.uhrp.org
Uzbekistan deports a Canadian Uyghur to a deeply uncertain fate in China
http://www.uhrp.org/articles/177/1/Uzbekistan-deports-a-Canadian-Uyghur-to-a-deeply-uncertain-fate-in-China/-Uzbekistan-deports-a-Canadian-Uyghur-to-a-deeply-uncertain-fate-in-China.html
By Super Admin
Published on 06/26/2006



The Canadian Ministry of Foreign Affairs has been informed by officials in Uzbekistan that Huseyin Celil, a Uyghur and naturalized Canadian citizen who fled China several years ago, has been sent back to the People's Republic of China (PRC) by the Uzbek authorities. T

Uzbekistan deports a Canadian Uyghur to a deeply uncertain fate in China

For immediate release
June 23, 2006, 15:00 EDT
Contact: Uyghur Human Rights Project +1 (202) 349 1496



The Canadian Ministry of Foreign Affairs has been informed by officials in Uzbekistan that Huseyin Celil, a Uyghur and naturalized Canadian citizen who fled China several years ago, has been sent back to the People's Republic of China (PRC) by the Uzbek authorities. The Uyghur Human Rights Project (UHRP) fears he is at extremely high risk of arbitrary detention, torture, and even execution.

Concern for Mr Celil's fate is greatly heightened by the fact he is mentioned by name as an accomplice to Ismail Semed in Ismail Semed's sentencing document – Ismail Semed was sentenced to death on separatism charges in October 2005, and may already have been executed (see, UHRP: Uyghur sentenced to death on political charges in East Turkistan, April 7, 2006).

Huseyin Celil's forced return to China sometime in the past few days means he is almost certain to face charges of "splittism" relating to the political and religious activities he engaged in when he was still in East Turkistan (the Xinjiang Uyghur Autonomous Region, in the north west PRC), and during his first years of exile in Central Asia.

"This is terrifying news," said Alim Seytoff, Director of UHRP. "We were worried Uzbekistan were going to send him to Kyrgyzstan to face false charges, but for him to be sent to China to face false charges – this really is the worst case scenario."

A father of six with a heavily pregnant wife, Mr Celil is a highly respected and charismatic Imam in Hamilton, who went to Uzbekistan to try and meet up with three of his young children who had traveled to Tashkent from China to see him.

Mr Celil was initially detained in Tashkent on March 27, 2006, reportedly at the request of the Chinese authorities. He was also wanted by the Kyrgyz authorities on suspicion of committing serious crimes in 2000. However, he was able to conclusively prove that he was in Turkey when those crimes were committed in Kyrgyzstan, and it appears his extradition to China went ahead after the Uzbek authorities were satisfied he was not responsible for those crimes in Kyrgyzstan.

It is clear from Ismail Semed's sentencing document that the only evidence against him and other people named in the document – including Mr Celil – is the testimony of individuals interrogated by Chinese police. UHRP is extremely concerned that many of the testimonies cited as evidence to sentence Mr Semed to death and to implicate Mr Celil were extorted through torture.

Furthermore, two of the people whose testimony was cited as evidence were themselves executed in 1998, obviously making any cross-examination of prosecution witnesses impossible. As such, UHRP believes it will be impossible for Mr Celil to have a fair trial.

Another alleged accomplice to Ismail Semed named in the sentencing document, Kurban Yasin, who once shared a detention cell with Mr Celil in Kyrgyzstan on immigration charges, was also sent back to China and executed, according to UHRP's sources, having been accused of activities very similar to those ascribed to Mr Celil in the sentencing document.

**Background**

Mr Celil is the latest in a long line of Uyghurs known to have been sent back to China from neighboring states to face arbitrary detention, torture and possible execution. For instance, Ismail Semed was himself extradited from Pakistan in 2003, and in May of this year, fears were raised that two Uyghurs from East Turkistan, Yusuf Kadir Tohti and Abdukadir Sidik, may have been secretly sent back to China from Kazakhstan at the request of the Chinese authorities. Both men reportedly had computer disks containing information of 'an extremist character' when detained in Kazakhstan.

Mainly under the auspices of the Shanghai Cooperation Organization (SCO), the PRC has brokered agreements with most of its immediate neighbors for Uyghurs suspected of involvement in any political activities against the Chinese government to be returned to the PRC. Indeed, one of the main stated functions of the SCO under the the guidance of PRC has been to curtail and control the political activities of Uyghurs in the region.

Uyghurs are regularly sent back to the PRC following the minimal assurances that they will be handled in accordance with international human rights law. Deporting or extraditing people to face possible torture and execution severely undermines the principle of non-refoulement in customary international human rights law.

Even those states which are not members of the SCO regularly return Uyghurs to the PRC, apparently concerned with avoiding 'upsetting' China as it fast becomes the dominant presence in Central Asia.

As an example of these concerns, the Pakistani press reported this morning that the Chinese embassy in Islamabad had expressed concern that "members of the Eastern Turkistan Islamic Movement (ETIM) are planning to kidnap senior Chinese diplomats and consular officers" in Pakistan.

The Pakistani authorities reportedly responded to China's claim by saying the police will "hunt down the ETIM members [...] as soon as possible", raising fears that the Pakistani police will unfairly target Uyghurs in the country.

# EXHIBIT B

**Westlaw.**                                                                 **NewsRoom**

6/13/06 TRNTST A08                                                            Page 1


6/13/06 Toronto Star A08
2006 WLNR 10075174

                                    Toronto Star
              Copyright 2006 Toronto Star Newspapers Limited, All Rights Reserved.

                                    June 13, 2006


                                    Section: News

           A strange kind of freedom Wrongly sent to Guantanamo, rejected by the world;
         Albania wants to expel Uighurs sent there by U.S. Only China wants 5 men for jail,
                                    maybe execution

                                    Bruce Konviser

TIRANA, albania
SPECIAL TO THE STAR
News

  Five ethnic Uighurs from northwest China suffered through four years in
Guantanamo Bay only to be dumped by the U.S. in one of Europe's poorest nations,
which now says they are unwelcome and must leave.

  One country, China, has eagerly offered to take in the men - so it can prosecute
them as pro-independence terrorists and, many believe, execute them.

  Albania's decision to deny sanctuary to the Uighurs, who were apparently swept up
by bounty hunters in Pakistan in the aftermath of the Sept. 11 attacks and turned
over to the U.S., isn't based on security fears. The Pentagon decided at least a
year ago they weren't "enemy combatants" and pose no threat.

  In an interview, Argita Totozani, Albania's National Commissioner for Refugees,
said cultural reasons are behind her country's decision not to follow through on a
U.S.-brokered deal to grant political asylum to the five.

  "Their future is not here," she said. "There is not a Uighur community (here).
They don't speak any Albanian ... There is no integration possibility for them
here. We realized their future is not in Albania."

  Now, U.S. government lawyers are casting around for another country, other than
China, willing to take the Uighurs and, Totozani said, Canada is on the list.

  "They are trying to find a resettlement somewhere else - in America or Canada,"
she said. "I've heard they have relatives in Canada. There is a good community in

                  © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/13/06 TRNTST A08                                                          Page 2

Canada for Uighurs."

The U.S., however, is apparently not an option.

A senior State Department official, who insisted on anonymity, said in an exchange of emails that it was an "administrative decision" to deny the men an opportunity to resettle in the U.S. and to instead reach out to more than 100 other countries.

"It was determined that the Uighurs would be resettled in another country. They expressed a preference for a European country," with the knowledge they couldn't go to America, the official said.

The administration of President George W. Bush has not publicly explained why the men cannot resettle in the United States, but the State Department has apparently told the Albanians.

"Because of the atmosphere and the Sept. 11 story, the Americans would not really want Guantanamo Bay ex-prisoners to be part of their society," Totozani said. "It's not that easy to persuade Americans about their innocence."

Sabin Willett, a Boston attorney who represents the Uighurs, says the administration wanted his clients out of the U.S. so it wouldn't have to defend its handling of the Guantanamo Bay prison in federal court.

He says his clients were abruptly put on a plane and flown to Albania on Friday, May 5 - the last business day before the Washington, D.C., Court of Appeals was to hear arguments over his clients' legal rights.

"They wanted to avoid a ruling by the court of appeals that might limit their heretofore unlimited discretion to do whatever they want with people in Guantanamo Bay," Willet said in a telephone interview. "I think they also wanted to avoid public and judicial scrutiny of the big lie of Guantanamo, which is that it is a terrorist detention facility."

But the State Department insists there was nothing untoward about the timing of the men's abrupt departure for one of the poorest countries in Europe.

"It was only in April 2006 that we reached an agreement with the government of Albania, and we did not want to hold the detainees any longer than necessary," the official said.

Washington has praised the Albanian government for taking in the Uighurs, and insists they would readily assimilate in the predominantly Muslim country because of their shared faith. But not one of Albania's 3.5 million citizens speaks the Uighurs' distinct language.

The majority of Muslims in Albania are Sunnis, whereas Uighurs - who hail from the Xinjiang area of northwest China which had a brief independence as East Turkestan before World War II - practise a moderate, Sufi-tinged form of Islam.

While the U.S. tries to find a home for the men, China has sent a delegation to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/13/06 TRNTST A08                                                                 Page 3

Tirana to pressure the Albanians to return them. The group Human Rights in China accuses Beijing of religious and ethnic persecution of Uighurs, detaining, torturing and even killing peaceful activists while harassing ordinary practitioners. Washington is opposing China's efforts to get the men. Totozani said Albania is refusing China because it has the death penalty.

Even if Albania reverses its decision to expel the men, few would find it a victory to be welcomed into such a grim place. Fewer than 100 people have sought long-term resettlement here over the past 10 years according to Albanian and United Nations officials.

"Albania is a transit country," says UN refugee representative Hossein Kheradmand. "People don't come here for asylum because of the economic situation. They come from the east and try to cross Albania to get into Western Europe." The per capita annual income here is little more than $2,000 (U.S.)

So what do the Uighurs themselves think of the international squabble over their fate?

Nobody knows outside the refugee processing centre where they're being kept because Albanian officials have made it nearly impossible to interview them, even when arrangements are made in advance with their attorney.

Ali Rasha, the camp director refused to allow this journalist into the camp, insisting, "I don't have the authority." That claim was flatly rejected by Totozani, who says the director decides who comes and goes.

Rasha apparently had the authority to allow in a Chinese man, who freely walked out of the camp. He said he wasn't from the Chinese Embassy, insisting he was "a businessman" before marching off in a huff.

Bruce Konviser is a freelance reporter based in Prague.

ARBEN CELI reuters Two of five Uighurs walk in the Albanian National Centre for Refugees in Tirana. Above right, Argita Totozani, Albania's National Commissioner for Refugees, said cultural reasons have blocked asylum.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Legal (1LE33); International Terrorism (1IN37); Government (1GO80); Sept 11th Aftermath (1SE05))

REGION: (Albania (1AL95); China (1CH15); Southern Europe (1SO59); Americas (1AM92); North America (1NO39); Asia (1AS61); Far East (1FA27); Eastern Asia (1EA61); Latin America (1LA15); Mediterranean (1ME20); Cuba (1CU43); District of Columbia (1DI60); Europe (1EU83); USA (1US73); Eastern Europe (1EA48); Caribbean (1CA06); Canada (1CA33))

Language: EN

OTHER INDEXING: (ALBANIAN NATIONAL CENTRE; ALBANIANS; ARBEN; CHINESE EMBASSY; COURT OF APPEALS; GUANTANAMO; NATIONAL; PENTAGON; SPECIAL; STATE DEPARTMENT;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/13/06 TRNTST A08                                                      Page 4

TIRANA; UIGHUR; UNITED NATIONS)  (Ali Rasha; Argita Totozani; Bruce Konviser; Fewer; George W. Bush; Hossein Kheradmand; Now; Rasha; Sabin Willett; Totozani; Uighurs; Willet)

EDITION: ONT

Word Count: 1207
6/13/06 TRNTST A08
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.