# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— x
                                                :
ABDUR RAZAKAH, *et al.*,                         :     **ORAL ARGUMENT REQUESTED**
                                                :
              Petitioners,                    :
                                                :
           v.                                :     Civil Action No. 05 CV 2370 (EGS)
                                                :
GEORGE W. BUSH, *et al.*,                        :
                                                :
              Respondents.                  :
                                                :
———————————————————— x


**PETITIONERS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR AN ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITONERS AND THE COURT WITH THIRTY-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF <u>PETITIONERS FROM GUANTÁNAMO</u>**

*Approved for Public Filing*
*by the CSO*

Petitioners Abdur Razakah and Ahmad Doe respectfully submit this reply memorandum in further support of their motion for an order requiring Respondents to provide counsel for Petitioners and the Court with thirty-days' advance notice of any intended removal of Petitioners from the Guantánamo Bay Naval Base in Cuba ("Guantánamo").

## PRELIMINARY STATEMENT

Petitioners have asked for a limited form of relief – granted by numerous other courts in this district – that would preserve the status quo by assuring that Petitioners are permitted to contest any effort by Respondents to deprive them of the ability to vindicate their rights in this Court. In their Opposition, Respondents' both minimize the danger that Petitioners – as Uighur detainees targeted by the Chinese government for repatriation – face, and exaggerate the harm that Respondents would suffer should Petitioners' motion be granted. The requested relief will not require Respondents to reveal any information about the nature or terms of their negotiations to transfer Petitioners, nor will it require the Court to review the propriety of removal to a particular country. It simply asks that Respondents provide notice before they take a step that will effectively terminate this litigation and potentially place Petitioners' lives at risk.[1]

The need for this relief is pressing, given that Petitioners – we have reason to believe – have already been cleared for release and will be transferred from Guantánamo as soon as

---

[1]     Because Petitioners' habeas petition – which is not merely a challenge to "petitioners' designation as [] enemy combatant[s] through the Combatant Status Review Tribunal," as Respondents claim – was pending at the time the Detainee Treatment Act ("DTA") was enacted, the DTA does not strip this Court of jurisdiction over their petition. *See Hamdan v. Rumsfeld*, 548 U.S. ___, 126 S. Ct. 2749 (2006). Contrary to Respondents' contention, *see* Respondents' Memorandum in Opposition to Petitioners' Motion ("Respondents' Opp.") at 2, this is not a case in which the Court's jurisdiction remains unresolved following *Hamdan*.

*Approved for Public Filing*
*by the CSO*

Respondents find another country willing to take them.  Moreover, we believe Respondents may

seek to transfer Petitioners within the next month, as the Court of Appeals is scheduled to hear

argument in *Kiyemba v. Bush*, No. 05-5487, an appeal involving ten other Uighur detainees, on

September 11, 2006.  As noted in Petitioners' opening memorandum, at 6, Respondents trans-

ferred five Uighur detainees to Albania earlier this year, without notice, on the last business day

before the Court of Appeals was to hear argument in an appeal involving two of them, *Qassim v.*

*Bush*, No. 05-5477.

## ARGUMENT

I.    The Court should grant the requested relief regardless of whether Petitioners have sat-
      isfied the preliminary-injunction standard

Petitioners argued in their opening memorandum, and continue to maintain in this

reply, *infra*, that they are entitled to a preliminary injunction requiring Respondents to provide

advance notice of transfer.  Should the Court find, however, that a preliminary injunction is not

warranted under the circumstances, Petitioners respectfully ask that the Court order relief on the

grounds recently articulated by Judge Roberts in *Said v. Bush*, No. 05-CV-2384 (RWR) (July 25,

2005) (dkt. 41).  Judge Roberts ordered Respondents to provide thirty-days' advance notice of

any intended removal from Guantánamo in order to "preserve[e] and respect[] petitioners' right

to counsel and to be represented in this matter before this court, and right to communicate with

counsel for the purpose of representing the clients' legitimate interests . . . ." *Id.*, slip op. at 5.

As Judge Roberts pointed out, Respondents' refusal to provide counsel for Petitioners with no-

tice of removal prevents counsel from pursuing Petitioners' interests, and thus effectively denies

Petitioners the right to counsel afforded to them under the federal habeas statute, 28 U.S.C. §

2241,  the Criminal Justice Act, 18 U.S.C. § 3006A, and the All Writs Act, 28 U.S.C § 1651. *Id.*

- 2 -

*Approved for Public Filing*
*by the CSO*

at 4 (citing *Al Odah v. United States*, 346 F. Supp. 2d 1, 5-9, 14-15 (D.D.C. 2004)). To preserve

this right, the Court can issue an order requiring that Respondents provide notice of "a pending

or contemplated event over which [they] exercise control," *Said*, slip op. at 4 – i.e., transfer of

Petitioners – instead of issuing a preliminary injunction.

II.    Petitioners have met the standard for a preliminary injunction

"The purpose of a preliminary injunction is merely to preserve the relative posi-

tions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451

U.S. 390, 395 (1981). Petitioners have shown that the requested relief is necessary to preserve

their ability to pursue this case, and that it can be granted without implicating the separation-of-

powers concerns raised by Respondents, or otherwise harming any interest Respondents may

have with respect to negotiating the terms of Petitioners' transfer out of Guantánamo.

a.    Irreparable Harm

Respondents argue that Petitioners cannot show that they stand to suffer irrepara-

ble injury if they are transferred without advance notice because Respondents have represented

"that it is the policy of the United States not to repatriate or transfer a detainee to a country when

the United States believes, based on a number of factors and considerations, it is more likely than

not that the individual will be tortured there." Respondents' Opp. at 13. Petitioners should not

have to stake their fate on Respondents' assurances, particularly in light of the numerous ac-

counts of the U.S. Government's practice of rendition cited in Petitioners' opening memoran-

dum.[2] Petitioners' concerns in this regard have been further validated by the United Nations

---

[2]    It is of no comfort, as Respondents suggest it should be, that "'none of the these [reports of rendition] involve the transfer of detainees out of Guantanamo.'" Respondents' Opp. at 14 (continued...)

KL3:2534608.2

*Approved for Public Filing*
*by the CSO*

Human Rights Committee, which recently issued a report concluding that "[t]he Committee is concerned that in practice the [United States] appears to have adopted a policy to send, or to assist in the sending of, suspected terrorists to third countries, either from U.S. or other States' territories, for purposes of detention and interrogation, without the appropriate safeguards to prevent treatment prohibited by the [International Covenant on Civil and Political Rights]."[3] *Consideration of Reports Submitted by States Parties Under Article 40 of the Covenant* (Advance Unedited Version) (attached as Ex. A), at 4. It remains possible, moreover, that Respondents will transfer Petitioners to a country that, while itself not likely persecute or torture Petitioners, may place Petitioners at risk of being removed to a country that will. China, for example, continues to pressure Albania to turn over the five Uighur detainees released earlier this year. *See Albania Urged to Repatriate Terrorist Suspects*, Xinhua News Agency, July 29, 2006 (attached as Ex. B). Sending Petitioners to a country that is not capable of protecting them from China's influence will subject Petitioners to the same risks they would face if handed over to China directly. *See, e.g.*, Press Release, *Uzbekistan Deports a Canadian Uyghur to a Deeply Uncertain Fate in China*, Uyghur-American Association, June 26, 2006 (attached to Petitioners' opening memorandum as Ex. A). Petitioners simply ask that they be permitted the opportunity to evalu-

---

(quoting *Al-Anzi v. Bush*, 370 F. Supp. 2d 188, 190-91 (D.D.C. 2005). If it is or was the practice, in any context, of the United States to detain and torture terrorism suspects abroad in the face of its assertions that it is in compliance with international law, Petitioners have legitimate reason to question similar assertions by Respondents in this case.

[3]     The report goes on to observe that that United States "did not contest" the allegations in "numerous well publicized and documented allegations that persons sent to third countries [for purposes of detention and interrogation] were indeed detained and interrogated while receiving treatment grossly violating the prohibition contained in article 7 [of the Covenant] . . . ." *Id.* at 4-5.

*Approved for Public Filing*
*by the CSO*

ate this risk and potentially challenge a proposed transfer on this basis before it has been accomplished.

Respondents also assert that Petitioners have failed to demonstrate the possibility of irreparable harm because "release from United States custody will give petitioners all the relief they can seek through habeas," and that transfer into the custody of another country – even for purposes of continued detention – will therefore moot their habeas claims. Respondents' Opp. at 12. Courts in this district, however, have held that similarly situated detainees face irreparable injury insofar as transfer into the custody of another country would effectively deprive them of the ability to challenge the legitimacy of their detention, whether they are ultimately detained in United States or elsewhere. *See, e.g., Al-Joudi v. Bush*, No. 05-CV-301 (GK), 2005 WL 774847, at *4 (D.D.C. April 4, 2005). Moreover, as noted in Petitioners' opening memorandum, as a legal matter, Petitioners' habeas claims in this Court will survive transfer to another country as long as they continue to suffer collateral consequences as a result of their detention in Guantánamo; removal of Petitioners to a place where they cannot access counsel or pursue these claims as a practical matter would therefore also irreparably injure Petitioners. *See* Opening Mem. at 9 n. 4. Finally, Respondents ignore the fact that Petitioners, in addition to release from custody, seek declaratory and injunctive relief in their habeas petition that would prevent Respondents from removing them to a country where there is a foreseeable and direct risk of torture. *See* Opening Mem. at 8. Transfer to such a country would obviously cause irreparable injury to Petitioners because it would produce the very result they seek to avoid in pursuing this action, while potentially eliminating any means of legal redress.

KL3:2534608.2

*Approved for Public Filing
by the CSO*

b.  Injury to Respondents

Respondents fail to identify any meaningful way in which their own interests would be injured were they required to give counsel for Petitioners and the Court advance notice of transfer. They assert that "[a]n advance notice requirement . . . would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers." Respondents' Opp. at 23. Of course, an order that merely requires Respondents to provide notice of a planned transfer could not affect the manner in which Respondents negotiate with a foreign nation. Such an order would not require Respondents to reveal the status or details of their negotiations, and would in itself place no conditions on their ability to negotiate the terms of Petitioners' transfer, other than the condition that they not agree to transfer Petitioners before the thirty-days' notice is given. *See Al-Joudi*, 2005 WL 774847, at *5 ("[G]ranting Petitioners request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice."). Respondents provide no reason as to how a thirty-day delay in transferring Petitioners (even assuming that the negotiated agreement called for *immediate* transfer) would improperly interfere with any interest, other than Respondents' interest in attempting to rapidly remove Petitioners from this Court's jurisdiction before their claims can be heard.

- 6 -

*Approved for Public Filing*
*by the CSO*

c.  Likelihood of Success on the Merits

As in any motion for a preliminary injunction that seeks to preserve the status quo prior to an adjudication of the merits of an action, the Court must make an initial assessment of whether Petitioners are likely to prevail in their claims – or, where, as here, the threat of irreparable harm is great and the potential harm to the opposing party negligible, whether they have at least raised substantial legal issues.  In their petition, Petitioners have asserted, *inter alia*, that Respondents, by detaining them without due process of law, are violating their rights under Fifth Amendment to the U.S. Constitution.  Because the motion presently before the Court seeks, in part, to preserve Petitioners' ability to pursue this claim, the relevant inquiry is whether the claim is so "serious, substantial, difficult and doubtful, as to make [it] a fair ground for litigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  Given that a court in this district has held that similarly situated detainees have stated a viable claim on these grounds, *see In re Guantánamo Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), the Petitioners have clearly met the requisite standard.

d.  Public Interest

Respondents argue that "[t]he public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility."  Respondents' Opp. at 22.  Again, however, even accepting, *arguendo*, Respondents' premise that these concerns trump Petitioners' constitutional and statutory rights and the Court's constitutional mandate to curtail abuses of executive power, Respondents have failed to offer a specific example of how the requested relief would interfere with the executive's ability to "conduct mili-

- 7 -

*Approved for Public Filing
by the CSO*

tary functions" or "engage in foreign relations." At the same time, Respondents cannot deny that transferring Petitioners without notice would prevent Petitioners from pursuing certain constitutional claims that another court in this district has already held to be actionable. Such a result cannot be in the public's interest.

*Approved for Public Filing*
*by the CSO*

## CONCLUSION

For the foregoing reasons, and for those reasons contained in Petitioners' opening memorandum, Petitioners respectfully request that the Court grant their motion for an order requiring Respondents to provide counsel and the Court with thirty-days' advance notice before removing Petitioners from Guantánamo.

Dated:    New York, New York
          August 4, 2006

                    Respectfully submitted,

                    Counsel for Petitioners:

                    /s/ Paul Schoeman
                    Paul Schoeman (Pursuant to LCvR 83.2(g))
                    J. Wells Dixon (Pursuant to LCvR 83.2(g))
                    Joel Taylor (Pursuant to LCvR 83.2(g))
                    Michael J. Sternhell (Pursuant to LCvR 83.2(g))
                    Darren LaVerne (Pursuant to LCvR 83.2(g))
                    KRAMER LEVIN NAFTALIS & FRANKEL LLP
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Tel:  (212) 715-9100
                    Fax:  (212) 715-8000

                    Barbara Olshansky (NY-0057)
                    Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
                    CENTER FOR CONSTITUTIONAL RIGHTS
                    666 Broadway, 7th Floor
                    New York, New York 10012
                    Tel:  (212) 614-6439
                    Fax:  (212) 614-6499

                    Alison Sclater (Pursuant to LCvR 83.2(g))
                    245 East 80th Street, #9J
                    New York, New York  10021
                    Tel:  (212) 717-2736

KL3 2534608.2

# EXHIBIT A

HUMAN RIGHTS COMMITTEE
Eighty-seventh session
10-28 July 2006

**CONSIDERATION OF REPORTS SUBMITTED BY STATES PARTIES
UNDER ARTICLE 40 OF THE COVENANT**

# ADVANCE UNEDITED VERSION

### UNITED STATES OF AMERICA

### *Concluding observations*

1.    The Committee considered the second and third periodic reports of the United States of America (CCPR/C/USA/3) at its 2379th, 2380th and 2381st meetings (CCPR/C/SR.2379, 2380 and 2381), held on 17 and 18 July 2006, and adopted the following concluding observations at its 2395th meeting (CCPR/C/SR.2395), held on 27 July 2006.

### A. Introduction

2.    The Committee notes the submission of the State party's second and third periodic combined report, which was seven years overdue, as well as the written answers provided in advance. It appreciates the attendance of a delegation composed of experts belonging to various agencies responsible for the implementation of the Covenant, and welcomes their efforts to answer to the Committee's written and oral questions.

3.    The Committee regrets that the State party has not integrated into its reports information on the implementation of the Covenant in respect of individuals under its jurisdiction and outside its territory. The Committee notes however that the State party has provided additional material "out of courtesy". The Committee further regrets that the State party, invoking grounds of non-applicability of the Covenant or intelligence operations, refused to address certain serious allegations of violations of the rights protected under the Covenant.

4.    The Committee regrets that only limited information was provided on the implementation of the Covenant at the state level.

### B. Positive aspects

5.    The Committee welcomes the Supreme Court's decision in *Hamdan v. Rumsfeld* (2006) establishing the applicability of common article 3 of the Geneva Conventions of 12 August 1949, which reflects fundamental rights guaranteed by the Covenant, in any armed conflict.

6.    The Committee welcomes the Supreme Court's decision in *Roper v. Simmons* (2005), holding that the execution of persons who were below the age of eighteen when their crimes were committed violates the Eighth and Fourteenth Amendments. In this regard, the Committee

CCPR/C/USA/Q/3/CRP.4
page 2

reiterates the recommendation made in its previous concluding observations, encouraging the State party to withdraw its reservation to article 6 (5) of the Covenant.

7.      The Committee welcomes the Supreme Court's decision in *Atkins v. Virginia* (2002), holding that the execution of mentally retarded criminal defendants is a cruel and unusual punishment, and encourages the State party to ensure that persons suffering from severe forms of mental illness not amounting to mental retardation are equally protected.

8.      The Committee welcomes the adoption of the National Detention Standards in 2000, establishing minimum standards for detention facilities holding Department of Homeland Security detainees, and encourages the State party to adopt all measures necessary for their effective enforcement.

9.      The Committee welcomes the Supreme Court's decision in *Lawrence v. Texas* (2003), which declared unconstitutional legislation criminalizing homosexual relations between consenting adults.

## C. Principal subjects of concern and recommendations

10.      The Committee notes with concern the restrictive interpretation made by the State party of its obligations under the Covenant, as a result in particular of (a) its position that the Covenant does not apply in respect of individuals under its jurisdiction but outside its territory, nor in times of war, despite the contrary opinions and established jurisprudence of the Committee and the International Court of Justice; (b) its failure to take fully into consideration its obligation under the Covenant not only to respect, but also to ensure the rights enunciated in the Covenant; and (c) its restrictive approach in relation to some substantive provisions of the Covenant, not in conformity with the interpretation made by the Committee before and after the State party's ratification of the Covenant. (articles 2 and 40)

> **The State party should review its approach and interpret the Covenant in good faith in accordance with the ordinary meaning to be given to its terms in their context, including subsequent practice, and in the light of its object and purpose. It should in particular (a) acknowledge the applicability of the Covenant in respect of individuals under its jurisdiction and outside its territory, as well as in times of war; (b) take positive steps where necessary to ensure the full implementation of all Covenant rights; and (c) give good faith consideration to the understanding of the Covenant provided by the Committee pursuant to its mandate.**

11.      The Committee expresses its concern about the potentially overbroad reach of the definitions of terrorism under domestic law, in particular under 8 U.S.C. § 1182 (a) (3) (B) and Executive order 13 224 which seem to extend to conduct, e.g. in the context of political dissent which, although unlawful, should not be understood as constituting terrorism (articles 17, 19 and 21).

**The State party should ensure that its counter-terrorism measures are in full conformity with the Covenant and in particular that legislation adopted in this context is limited to crimes that would justify attracting the grave consequences associated with terrorism.**

12.    The Committee is concerned by credible and uncontested information that the State party has seen fit to engage in the practice of detaining people secretly and in secret places for months and years on end, without even keeping the International Committee of the Red Cross informed. In such cases, the rights of the families of the detained persons have also been violated. It is further concerned that, even when such persons may have their detention acknowledged, they and others have been held for months or years in prolonged incommunicado detention, a practice that violates the rights protected by articles 7 and 9. In general, it is concerned by an apparent practice, beyond the stated need to remove them from the battlefield, to hold people in places where their enjoyment of the protection of domestic or international law is blocked or substantially curtailed. (articles 7 and 9)

**The State party should immediately abolish all secret detention and secret detention facilities. It should also grant prompt access by the International Committee of the Red Cross to any person detained in connection with an armed conflict. It should only detain persons in places in which they can enjoy the full protection of the law.**

13.    The Committee is concerned that for a period of time the State party authorized the possible use of interrogation techniques such as prolonged stress positions and isolation, sensory deprivation, hooding, exposure to cold or heat, sleep and dietary adjustments, 20-hour interrogations, removal of clothing and of all comfort items, as well as religious items, forced grooming, and exploitation of detainees' individual phobias. While welcoming the assurance that, according to the Detainee Treatment Act, these techniques are no longer authorized under the present Army Field Manual for current use by military personnel or on military premises, the Committee remains concerned that (a) the State party refuses to acknowledge that such techniques, several of which were allegedly applied, either individually or used in combination and/or applied over a protracted period of time, violate the prohibition in article 7; (b) no one has been punished for the approved use of the techniques; (c) these techniques may still be authorized or used by other agencies, including intelligence agencies and "private contractors"; and (d) the State party has provided no information demonstrating that oversight systems of such agencies are capable of ensuring respect for the prohibition contained in article 7.

**The State party should ensure that any revision of the Army Field Manual only permits interrogation techniques consistent with the international understanding of the scope of the prohibition contained in article 7 of the Covenant; it should ensure that the current techniques or any revised techniques are binding on all agencies of government and others acting for them; it should ensure that there are effective means of recourse against abuses committed by agencies operating outside the military structure; it should sanction those who used or approved the use of the now withdrawn techniques; it should provide reparation to those upon whom they were applied; and it should inform the Committee of any revisions of the interrogation techniques approved by the Army Field Manual.**

CCPR/C/USA/Q/3/CRP.4
page 4

14.     The Committee notes with concern shortcomings in relation to the independence, impartiality and effectiveness of investigations conducted into allegations of torture and cruel, inhuman or degrading treatment or punishment by agents of U.S. military and non-military services, or contract employees, in detention facilities in Guantanamo, Afghanistan, Iraq, and other overseas locations, and into alleged cases of suspicious death in custody in any of these locations. It regrets that it has received insufficient information on prosecutions launched, sentences passed (which appear excessively light for offences of such gravity) and reparation granted to the victims. (articles 6 and 7)

> **The State party should conduct prompt and independent investigations into all allegations of suspicious deaths and torture or cruel, inhuman or degrading treatment or punishment by its agents (including commanders) as well as contract employees, in detention facilities in Guantanamo, Afghanistan, Iraq and other overseas locations. It should ensure that those responsible are prosecuted and punished in accordance with the seriousness of the crime committed. The State party should adopt all necessary measures to ensure that such acts will not recur, in particular through clear guidance to its agents (including commanders), as well as contract employees, about their respective obligations and responsibilities, in line with articles 7 and 10 of the Covenant, as well as the provision of adequate training. The State party should also refrain from relying in any proceedings on evidence obtained by treatment incompatible with article 7. The Committee wishes to be informed about how the State party intends to proceed to provide reparation to the victims.**

15.     The Committee notes with concern that section 1005 (e) of the Detainee Treatment Act bars detainees in Guantanamo from seeking review in case of allegations of ill-treatment or poor conditions of detention. (articles 7 and 10)

> **The State party should amend section 1005 of the Detainee Treatment Act so as to allow detainees in Guantanamo to seek review of their treatment or conditions of detention before a court.**

16.     The Committee notes with concern the State party's restrictive interpretation of article 7 of the Covenant according to which it understands (a) that the obligation not to subject anyone to treatment prohibited by article 7 of the Covenant does not include an obligation not to expose them to such treatment by means of transfer, rendition, extradition, expulsion or refoulement; (b) that in any case, it is not under any other obligation not to deport an individual who may undergo cruel, inhumane or degrading treatment or punishment other than torture, as the State party understands the term; and (c) that it is not under any international obligation to respect a non-refoulement rule in relation to persons it detains outside its territory. It also notes with concern the "more likely than not" standard it uses in non-refoulement procedures. The Committee is concerned that in practice the State party appears to have adopted a policy to send, or to assist in the sending of, suspected terrorists to third countries, either from U.S. or other States' territories, for purposes of detention and interrogation, without the appropriate safeguards to prevent treatment prohibited by the Covenant. The Committee is moreover concerned by numerous well-publicized and documented allegations that persons sent to third countries in this way were indeed detained and interrogated while receiving treatment grossly violating the prohibition

contained in article 7, allegations that the State party did not contest. Its concern is deepened by the so far successful invocation of State secrecy in cases where the victims of these practices have sought a remedy before the State party's courts (eg. the cases of *Maher Arar v. Ashcroft* (2006) and *Khaled Al-Masri v. Tenet* (2006)). (article 7)

> **The State party should review its position, in accordance with the Committee's General Comments 20 (1992) on Article 7 and 31 (2004) on the nature of the general legal obligation imposed on States parties. The State party should take all necessary measures to ensure that individuals, including those it detains outside its own territory, are not returned to another country by way of inter alia, their transfer, rendition, extradition, expulsion or refoulement if there are substantial reasons for believing that they would be in danger of being subjected to torture or cruel, inhuman or degrading treatment or punishment. The State party should conduct thorough and independent investigations into the allegations that persons have been sent to third countries where they have undergone torture or cruel, inhuman or degrading treatment or punishment, modify its legislation and policies to ensure that no such situation will recur, and provide appropriate remedy to the victims. The State party should exercise the utmost care in the use of diplomatic assurances and adopt clear and transparent procedures with adequate judicial mechanisms for review before individuals are deported, as well as effective mechanisms to monitor scrupulously and vigorously the fate of the affected individuals. The State party should further recognize that the more systematic the practice of torture or cruel inhuman or degrading treatment or punishment, the less likely it will be that a real risk of such treatment can be avoided by such assurances, however stringent any agreed follow-up procedures may be.**

17.    The Committee is concerned that the Patriot Act and the 2005 REAL ID Act may bar from asylum and withholding of removal any person who has provided "material support" to a "terrorist organization", whether voluntarily or under duress. It regrets having received no response on this matter from the State party. (article 7)

> **The State party should ensure that the "material support to terrorist organisations" bar is not applied to those who acted under duress.**

18.    The Committee is concerned that, following the Supreme Court ruling in *Rasul v. Bush* (2004), proceedings before Combatant Status Review Tribunals (CSRTs) and Administrative Review Boards (ARBs), mandated respectively to determine and to review the status of detainees, may not offer adequate safeguards of due process, due in particular to their lack of independence from the executive branch and the army, restrictions on the rights of detainees to have access to all proceedings and evidence, the inevitable difficulty they face in summoning witnesses, and the possibility given to CSRTs and ARBs, under Section 1005 of the 2005 Detainee Treatment Act, to weigh evidence obtained by coercion for its probative value. The Committee is further concerned that detention in other locations such as Afghanistan and Iraq is reviewed by mechanisms providing even fewer guarantees. (article 9)

CCPR/C/USA/Q/3/CRP.4
page 6

> **The State party should ensure, in accordance with article 9 (4) of the Covenant, that persons detained in Guantanamo are entitled to proceedings before a court to decide without delay on the lawfulness of their detention or order their release if the detention is not lawful. Due process, independence of the reviewing courts from the executive branch and the army, access of detainees to counsel of their choice and to all proceedings and evidence, should be guaranteed in this regard.**

19.    The Committee, having taken into consideration information provided by the State party, is concerned by reports that, following the September 11 attacks, many non-U.S. citizens, suspected to have committed terrorism-related offences have been detained for long periods pursuant to immigration laws with fewer guarantees than in the context of criminal procedures, or on the basis of the Material Witness Statute only. The Committee is also concerned at the compatibility of the Statute with the Covenant to the extent that it may be resorted to not only for up-coming trials but also, under the colour of law, to investigations or proposed investigations. (article 9)

> **The State party should review its practice with a view to ensuring that the Material Witness Statute and immigration laws are not used so as to detain persons suspected of terrorism or any other criminal offences with fewer guarantees than in criminal proceedings. The State party should also ensure that those improperly so detained receive appropriate reparation.**

20.    The Committee notes that the decision of the Supreme Court in *Hamdan v. Rumsfeld*, according to which those Guantanamo detainees accused of terrorism offences are to be judged by a regularly constituted court affording all the judicial guarantees required by common article 3 of the Geneva Conventions of 12 August 1949, remains to be implemented. (article 14)

> **The State party should provide the Committee with information on its implementation of the decision.**

21.    The Committee, while noting some positive amendments introduced in 2006, notes that section 213 of the Patriot Act, expanding the possibility of delayed notification of home and office searches; section 215 regarding access to individuals' personal records and belongings; and section 505, relating to the issuance of national security letters, still raise issues of concern in relation to article 17 of the Covenant. In particular, the Committee is concerned about the restricted possibilities for the affected persons to be informed about such measures and for them and recipients to effectively challenge them. Furthermore, the Committee is concerned that the State Party, including through the National Security Agency (NSA), has monitored and still monitors phone, email, and fax communications of individuals both within and outside the U.S., without any judicial or other independent oversight. (articles 2(3) and 17)

> **The State party should review sections 213, 215 and 505 of the Patriot Act to ensure full compatibility with article 17 of the Covenant. The State party should ensure that interference in one's privacy is conducted only where strictly necessary, under protection of the law, and that appropriate remedies are made available to the affected persons.**

22.    The Committee is concerned by reports that some 50 % of homeless people are African American although they constitute only 12 % of the U.S. population. (articles 2 and 26)

**The State party should take measures, including adequate and adequately implemented policies, to ensure the cessation of this form of de facto and historically generated racial discrimination.**

23.    The Committee notes with concern reports of de facto racial segregation in public schools, reportedly caused by discrepancies between the racial and ethnic composition of large urban districts and their surrounding suburbs, and the manner in which schools districts are created, funded and regulated. The Committee is concerned that the State party, despite measures adopted, has not succeeded in eliminating racial discrimination such as regarding the wide disparities in the quality of education across school districts in metropolitan areas, to the detriment of minority students. It further notes with concern the State party's position that federal government authorities cannot act under law absent an indication of discriminatory intent of state or local authorities. (articles 2 and 26)

**The Committee reminds the State party of its obligation under articles 2 and 26 of the Covenant to respect and ensure that all persons are guaranteed effective protection against practices that have either the purpose or the effect of discrimination on a racial basis. The State party should conduct in-depth investigations into the de facto segregation described above, and take remedial steps, in consultation with the affected communities.**

24.    The Committee, while welcoming the mandate given to the Attorney General to review the use by federal enforcement authorities of race as a factor in conducting stops, searches, and other enforcement procedures, and the prohibition of racial profiling made in guidance to federal law enforcement officials, remains concerned about information that such practices still persist in the State party, in particular at the state level. It also notes with concern information about racial disparities and discrimination in prosecuting and sentencing processes in the criminal justice system. (articles 2 and 26)

**The State party should continue and intensify its efforts to put an end to racial profiling used by federal as well as state law enforcement officials. The Committee wishes to receive more detailed information about the extent to which such practices still persist, as well as statistical data on complaints, prosecutions and sentences in such matters.**

25.    The Committee notes with concern allegations of widespread incidence of violent crime perpetrated against persons of minority sexual orientation, including by law enforcement officials. It notes with concern the failure to address such crime in legislation on hate crime at the federal level and in many states. It notes with concern the failure to outlaw employment discrimination on the basis of sexual orientation in many states. (articles 2 and 26)

**The State party should acknowledge its legal obligation under articles 2 and 26 to ensure to everyone the rights recognized in the Covenant, as well as equality before**

CCPR/C/USA/Q/3/CRP.4
page 8

the law and equal protection of the law, without discrimination on the basis of sexual orientation. The State party should ensure that federal and state law address sexual orientation-related violence in its hate crime legislation and that it outlaw discrimination on the basis of sexual orientation in its federal and state employment legislation.

26.    The Committee, while taking note of the various rules and regulations prohibiting discrimination in the provision of disaster relief and emergency assistance, remains concerned about information that poor people and in particular African-Americans, were disadvantaged by the rescue and evacuation plans implemented when Hurricane Katrina hit the United States of America, and continue to be disadvantaged under the reconstruction plans. (articles 6 and 26)

**The State party should review its practices and policies to ensure the full implementation of its obligation to protect life and of the prohibition of discrimination, whether direct or indirect, as well as of the United Nations Guiding Principles on Internal Displacement, in the areas of disaster prevention and preparedness, emergency assistance and relief measures. In the aftermath of Hurricane Katrina, it should increase its efforts to ensure that the rights of poor people and in particular African-Americans, are fully taken into consideration in the reconstruction plans with regard to access to housing, education and healthcare. The Committee wishes to be informed about the results of the inquiries into the alleged failure to evacuate prisoners at the Parish prison, as well as the allegations that New Orleans residents were not permitted by law enforcement officials to cross the Greater New Orleans Bridge to Gretna, Louisiana.**

27.    The Committee regrets that it has not received sufficient information on the measures the State party envisages adopting in relation to the reportedly nine million undocumented migrants now in the United States of America. While noting the information provided by the delegation that National Guard troops will not engage in direct law enforcement duties in the apprehension or detention of aliens, the Committee remains concern about the increased level of militarization on the southwest border with Mexico. (articles 12 and 26)

**The State party should provide the Committee with more detailed information on these issues, in particular on the concrete measures adopted to ensure that only agents who have received adequate training on immigration issues enforce immigration laws, which themselves should be compatible with the rights guaranteed by the Covenant.**

28.    The Committee regrets that many federal laws which address sex-discrimination are limited in scope and restricted in implementation. The Committee is especially concerned about the reported persistence of employment discrimination against women. (articles 3 and 26)

**The State party should take all steps necessary, including at state level, to ensure the equality of women before the law and equal protection of the law, as well as effective protection against discrimination on the ground of sex, in particular in the area of employment.**

29.    The Committee regrets that the State party does not indicate that it has taken any steps to review federal and state legislation with a view to assessing whether offences carrying the death penalty are restricted to the most serious crimes, and that, despite its previous concluding observations, the State party has extended the number of offences for which the death penalty is applicable. While taking note of some efforts towards the improvement of the quality of legal representation provided to indigent defendants facing capital punishment, the Committee remains concerned by studies according to which the death penalty may be imposed disproportionately on ethnic minorities as well as on low-income groups, a problem which does not seem to be fully acknowledged by the State party. (articles 6 and 14)

**The State party should review federal and state legislation with a view to restricting the number of offences carrying the death penalty. The State party should also assess the extent to which death penalty is disproportionately imposed on ethnic minorities and on low-income population groups, as well as the reasons for this, and adopt all appropriate measures to address the problem. In the meantime, the State party should place a moratorium on capital sentences, bearing in mind the desirability of abolishing death penalty.**

30.    The Committee reiterates its concern about reports of police brutality and excessive use of force by law enforcement officials. The Committee is concerned in particular by the use of so-called less lethal restraint devices, such as electro-muscular disruption devices (EMDs), in situations where lethal or other serious force would not otherwise have been used. It is concerned about information according to which police have used tasers against unruly schoolchildren; mentally disabled or intoxicated individuals involved in disturbed but non-life-threatening behaviour; elderly people; pregnant women; unarmed suspects fleeing minor crime scenes and people who argue with officers or simply fail to comply with police commands, without in most cases the responsible officers being found to have violated their departments' policies. (articles 6 and 7)

**The State party should increase significantly its efforts towards the elimination of police brutality and excessive use of force by law enforcement officials. The State party should ensure that EMDs and other restraint devices are only used in situations where greater or lethal force would otherwise have been justified, and in particular that they are never used against vulnerable persons. The State party should bring its policies into line with the United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials.**

31.    The Committee notes that (a) waivers of consent in research regulated by the U.S Department of Health and Human Services and the Food and Drug Administration may be given in case of individual and national emergencies; (b) some research may be conducted on persons vulnerable to coercion or undue influence such as children, prisoners, pregnant women, mentally disabled persons, or economically disadvantaged persons; (c) non-therapeutic research may be conducted on mentally ill persons or persons with impaired decision-making capacity, including minors; and (d) although no waivers have been given so far, domestic law authorizes the President to waive the prior informed-consent requirement for the administration of an investigational new drug to a member of the U.S. Armed Forces, if the President determines that

CCPR/C/USA/Q/3/CRP.4
page 10

obtaining consent is not feasible, is contrary to the best interests of the military members, or is not in the interests of U.S. national security. (article 7)

> **The State party should ensure that it meets its obligation under article 7 of the Covenant not to subject anyone without his/her free consent to medical or scientific experimentation. The Committee recalls in this regard the non derogable character of this obligation under article 4 of the Covenant. When there is doubt as to the ability of a person or category of persons to give such consent, e.g. prisoners, the only experimental treatment compatible with article 7 would be treatment chosen as the most appropriate to meet the medical needs of the individual.**

32.     The Committee reiterates its concern that conditions in some maximum security prisons are incompatible with the obligation contained in article 10 (1) of the Covenant to treat detained persons with humanity and respect for the inherent dignity of the human person. It is particularly concerned by the practice in some such institutions to hold detainees in prolonged cellular confinement, and to allow them out-of-cell recreation for only five hours per week, in general conditions of strict regimentation in a depersonalized environment. It is also concerned that such treatment cannot be reconciled with the requirement in article 10 (3) that the penitentiary system shall comprise treatment the essential aim of which shall be the reformation and social rehabilitation of prisoners. It also expresses concern about the reported high numbers of severely mentally ill persons in these prisons, as well as in regular in U.S. jails.

> **The State party should scrutinize conditions of detention in prisons, in particular in maximum security prisons, with a view to guaranteeing that persons deprived of their liberty be treated in accordance with the requirements of article 10 of the Covenant and the United Nations Standard Minimum Rules for the Treatment of Prisoners.**

33.     The Committee, while welcoming the adoption of the Prison Rape Elimination Act of 2003, regrets that the State party has not implemented its previous recommendation that legislation allowing male officers access to women's quarters should be amended to provide at least that they will always be accompanied by women officers. The Committee also expresses concern about the shackling of detained women during childbirth. (articles 7 and 10)

> **The Committee reiterates its recommendation that male officers should not be granted access to women's quarters, or at least be accompanied by women officers. The Committee also recommends the State party to prohibit the shackling of detained women during childbirth.**

34.     The Committee notes with concern reports that forty-two states and the Federal government have laws allowing persons under the age of eighteen at the time the offence was committed, to receive life without parole sentences, and that about 2,225 youth offenders are currently serving such sentences in U.S. prisons. The Committee, while noting the State party's reservation to treat juveniles as adults in exceptional circumstances notwithstanding articles 10 (2) (b) and (3) and 14 (4) of the Covenant, remains concerned by information that treatment of children as adults is not applied in exceptional circumstances only. The Committee is of the view

that sentencing children to life sentence without parole is of itself not in compliance with article 24 (1) of the Covenant. (articles 7 and 24)

> **The State party should ensure that no such child offender is sentenced to life imprisonment without parole, and should adopt all appropriate measures to review the situation of persons already serving such sentences.**

35.     The Committee is concerned that about five million citizens cannot vote due to a felony conviction, and that this practice has significant racial implications. It also notes with concern that the recommendation made in 2001 by the National Commission on Federal Election Reform that all states restore voting rights to citizens who have fully served their sentences has not been endorsed by all states. The Committee is of the view that general deprivation of the right vote for persons who have received a felony conviction, and in particular those who are no longer deprived of liberty, do not meet the requirements of articles 25 of 26 of the Covenant, nor serves the rehabilitation goals of article 10 (3).

> **The State party should adopt appropriate measures to ensure that states restore voting rights to citizens who have fully served their sentences and those who have been released on parole. The Committee also recommends that the State party review regulations relating to deprivation of votes for felony conviction to ensure that they always meet the reasonableness test of article 25. The State party should also assess the extent to which such regulations disproportionately impact on the rights of minority groups, and provide the Committee with detailed information in this regard.**

36.     The Committee, having taken note of the responses provided by the delegation, remains concerned that residents of the District of Columbia do not enjoy full representation in Congress, a restriction which does not seem to be compatible with article 25 of the Covenant. (articles 2, 25 and 26)

> **The State party should ensure the right of residents of the District of Columbia to take part in the conduct of public affairs, directly or through freely chosen representatives, in particular with regard to the House of Representatives.**

37.     The Committee notes with concern that no action has been taken by the State party to address its previous recommendation relating to the extinguishment of aboriginal and indigenous rights. The Committee, while noting that the guarantees provided by the Fifth amendment apply to the taking of land in situations where treaties concluded between the federal government and Indian tribes apply, is concerned that in other situations, in particular where land was assigned by creating a reservation or is held by reason of long possession and use, tribal property rights can be extinguished on the basis of the plenary authority of Congress for conducting Indian affairs without due process and fair compensation. The Committee is also concerned that the concept of permanent trusteeship over the Indian and Alaska native tribes and their land as well as the actual exercise of this trusteeship in managing the so called Individual Indian Money (IIM)

CCPR/C/USA/Q/3/CRP.4
page 12

accounts may infringe the full enjoyment of their rights under the Covenant. Finally, the Committee regrets that it has not received sufficient information on the consequences on the situation of Indigenous Native Hawaiians of Public Law 103-150 apologizing to the Native Hawaiians Peoples for the illegal overthrow of the Kingdom of Hawaii, which resulted in the suppression of the inherent sovereignty of the Hawaiian people. (articles 1, 26 and 27 in conjunction with Article 2, paragraph 3 of the Covenant).

> **The State party should review its policy towards indigenous peoples as regards the extinguishment of aboriginal rights on the basis of the plenary power of Congress regarding Indian affairs and grant them the same degree of judicial protection that is available to the non-indigenous population. It should take further steps in order to secure the rights of all indigenous peoples under articles 1 and 27 of the Covenant to give them greater influence in decision-making affecting their natural environment and their means of subsistence as well as their own culture.**

38.     The Committee sets 1st August 2010 as the date for the submission of the fourth periodic report of the United States of America.  It requests that the State party's second and third periodic reports and the present concluding observations be published and widely disseminated in the State party, to the general public as well as to the judicial, legislative and administrative authorities, and that the fourth periodic report be circulated for the attention of the non-governmental organizations operating in the country.

39.     In accordance with rule 71, paragraph 5, of the Committee's rules of procedure, the State party should submit within one year information on the follow-up given to the Committee's recommendations in paragraphs 12, 13, 14, 16, 20 and 26 above.  The Committee requests the State party to include in its next periodic report information on its remaining recommendations and on the implementation of the Covenant as a whole, as well as about the practical implementation of the Covenant, the difficulties encountered in this regard, and the implementation of the Covenant at state level. The State party is also encouraged to provide more detailed information on the adoption of effective mechanisms to ensure that new and existing legislation, at federal and at state level, is in compliance with the Covenant, and about mechanisms adopted to ensure proper follow-up of the Committee's concluding observations.

---

# EXHIBIT B


china.org.cn



中文 | Français | Deutsch | 日本語 | Русский язык | Español | عربى | Esperanto | BIG5

--- SEAR

**Mirror: US**    **TOP NEWS**

- HOME
- WEATHER
- CHINA
- INTERNATIONAL
- BUSINESS
- CULTURE
- GOVERNMENT
- SCI-TECH
- ENVIRONMENT
- SPORTS
- LIFE
- PEOPLE
- TRAVEL
- WEEKLY REVIEW

**Letters to Editor ▶**

Learning Chinese

Learn to Cook
Chinese Dishes

Exchange Rates

Hotel Service

China Calendar

**Hot Links**

[-----Media----- ▼]

China Development
Gateway

Chinese Embassies

**Alibaba.com**
- Alibaba
  Directory
- Alibaba China
- China Suppliers

# Albania Urged to Repatriate Terrorist Suspects

China on Saturday urged Albania to repatriate five "East Turkistan" terrorist suspects rather than give them political asylum.

"The five Chinese suspected terrorists should be handed over to China and they should not be given asylum," said Chinese Foreign Ministry spokesman Liu Jianchao.

The five suspects from the Uygur ethnic group were dumped into Albania for settlement by the United States in May. They were captured by U.S. troops in 2001 in Pakistan and imprisoned at the Guantanamo Bay, Cuba ever since.

They belonged to the "East Turkistan Islamic Movement", which is recognized by the United Nations as a terrorist group, Liu said.

Reports said Albania had granted the five asylum earlier this week.

China, however, has not been formally informed by the Albanian government that the asylum had been granted, the spokesman said.

(Xinhua News Agency July 29, 2006)

⇧ Top

🖶 Print
✉ Email

**➜ Related**

- China Urg
  Repatriatio
  Terrorist S
- 5 Chinese
  Suspects L
  Repatriate
- 'East Turki
  Major Thre

**➜ Web Li**

🖶 Print This Page | ✉ Email This Page

About Us    SiteMap    Feedback

Copyright © China Internet Information Center. All Rights Reserved
E-mail: webmaster@china.org.cn Tel: 86-10-68326688