**EXHIBIT B**

Approved for Public Filing by CSO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAWZI KHALID ABDULLAH FAHAD AL ODAH,     )
    *et al.*,     )
                  **Plaintiffs-petitioners,**     )
                                             )
            **v.**     )  **No. CV 02-0828 (CKK)**
                                             )
UNITED STATES OF AMERICA, *et al.*,     )
                                             )
                   **Defendants-respondents.**     )
                                            )

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS-RESPONDENTS' MOTION FOR PROCEDURES RELATED TO
REVIEW OF CERTAIN DETAINEE MATERIALS AND IN SUPPORT OF
PLAINTIFFS-PETITIONERS' MOTION FOR SANCTIONS AND INTERIM RELIEF**

       Fawzi Khalid Abdullah Fahad Al Odah, *et al.*, plaintiffs-petitioners (the "Kuwaiti

Detainees") oppose the motion of defendants-respondents (the "government") to authorize a

Defense Department "Filter Team" to read the Kuwaiti Detainees' attorney-client materials and

disclose portions of them to the Naval Criminal Investigative Service ("NCIS"), which is

investigating three detainee suicides that occurred at Guantanamo on June 10, 2006.  As part of

its investigation, NCIS unilaterally confiscated attorney-client materials and other materials,

totaling 1,100 pounds, belonging to virtually every detainee at Guantanamo, and apparently read

some of them.  Because NCIS's actions violated this Court's orders protecting the confidentiality

of their attorney-client materials, the Kuwaiti Detainees also are moving for the imposition of

sanctions against the government and to compel the government, as an interim measure,

immediately to deposit the materials with the Court until they are returned to the Kuwaiti

Detainees.

       <u>First</u>, NCIS's unilateral actions violated the Court's Memorandum Opinion and Order of

October 20, 2004 ("Oct. 20 Order") and its Amended Protective Order and Procedures for

Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, of November 8, 2004 ("Protective Order").[1] The Court ruled on October 20, 2004, that "the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between [the detainees and their counsel]."[2] The Court further ordered on November 8, 2004, that "legal mail" belonging to the detainees, which includes communications between counsel and the detainees related to counsel's representation, may not be inspected or read by personnel at Guantanamo.[3] NCIS's unilateral actions violated these orders and inflicted serious harm on the trust relationship painstakingly established with the Kuwaiti Detainees by counsel.

Second, the Court should not authorize a Defense Department "Filter Team" to read the Kuwaiti Detainees' attorney-client materials. The Court already has determined that those materials, which include not only counsel's communications to the Kuwaiti Detainees but also the Kuwaiti Detainees' own notes, are privileged.[4] Should the government make a particularized showing "'of a factual basis adequate to support a good faith belief by a reasonable person' ... that *in camera* review of the materials may reveal evidence to establish" that they are linked to the suicides or that an exception to the privilege applies to them,[5] the government may seek such review. That review should be conducted only by the Court or a person appointed by the Court and not by a government "taint" or "filter" team, whose use this Court has strongly criticized as

---

[1] The Oct. 20 Order is reproduced in *Al Odah v. United* States, 346 F. Supp. 2d 1 (D.D.C. 2004) ("*Al Odah*"). The Protective Order is reproduced in *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004).

[2] *Al Odah* at 5.

[3] Protective Order at 184, 186. A government "privilege team" is authorized to inspect "legal mail" for physical contraband before it is sent to Guantanamo. *Id.* at 186.

[4] *Al Odah* at 8-13 & n. 10.

[5] *United States v. Zolin*, 491 U.S. 554, 572 (1989).

"unwise" because it "constitutes a *per se* intentional intrusion" on privilege and "at the very least

... create[s] an appearance of unfairness."[6]  At the present time, however, the government has

made no such showing and offered no evidence whatsoever that the Kuwaiti Detainees' attorney-

client materials contain information relevant to the suicides.  Accordingly, the government's

motion should be denied.

     Third, the Court should impose sanctions against the government for its unlawful

conduct.  Furthermore, to mitigate the serious harm this conduct has caused, the Court should

order the government immediately to deposit the Kuwaiti Detainees' attorney-client materials

with the Court, pending their ultimate return to the Kuwaiti Detainees.

## STATEMENT

     NCIS's unlawful confiscation of the Kuwaiti Detainees' attorney-client materials should

not be viewed in isolation.  Since the Supreme Court's decision in this case, *Rasul v. Bush*, 542

U.S. 466 (2004), the government has worked relentlessly to interfere with counsel's ability to

communicate confidentially with and effectively represent the Kuwaiti Detainees.

     1.  The government's initial, post-*Rasul* position (which it has never disavowed) was that

the Kuwaiti Detainees have no right to counsel at all.[7]  This Court unequivocally rejected that

position, finding "that Petitioners are entitled to be represented by counsel pursuant to the federal

habeas statute, 28 U.S.C. § 2241, the Criminal Justice Act, 18 U.S.C. § 3006A, and the All Writs

Act, 28 U.S.C. § 1651."[8]  As a back-up, the government proposed a multitude of restrictions on

attorney-client communications, including audio and video real time monitoring of attorney-

---

[6]    *United States v. Neill*, 952 F. Supp. 834, 841 & n. 14 (D.D.C. 1997).

[7]    *See* Respondents' Response to Complaint at 9-23 (July 30, 2004).

[8]    *Al Odah* at 5.

client meetings, and *post hoc* classification review of meeting notes and legal mail.[9]  The Court

rejected those restrictions as well.[10]

Ultimately, Judge Joyce Hens Green issued an Amended Protective Order and Procedures

for Counsel Access to Detainees and the United States Naval Base in Guantanamo Bay, Cuba, on

November 8, 2004, safeguarding the attorney-client privilege while protecting national security.

Although the procedures mandated by the Protective Order infringe considerably on counsel's

free access to and communication with the Kuwaiti Detainees, counsel have abided by them.

The government makes no claim that counsel for the Kuwaiti Detainees have violated the

Protective Order.  NCIS's confiscation of the Kuwaiti Detainees' attorney-client materials,

despite counsel's compliance with the Protective Order and without any evidence that the

Kuwaiti Detainees or their materials are connected to the three suicides at Guantanamo, is

merely the latest – although certainly the most audacious – in a series of government acts

calculated to weaken the trust relationship between the Kuwaiti Detainees and their counsel.[11]

---

[9]    Respondents' Response to Complaint, Exh. A (Procedures for Counsel Access to Detainees, filed July 30,
2004), at 3-7.

[10]    *Al Odah* at 5.

[11]    Despite counsel's compliance with the Protective Order, the government has attempted to make counsel's
access to and ability to communicate with the Kuwaiti Detainees as difficult as possible.  The government's
behavior has forced counsel to come to this Court repeatedly to vindicate their clients' rights under the
Protective Order.  *See, e.g.,* Motion to Enforce Court's Order of October 20, 2004, on Access to Counsel
and for Appointment of a Special Master and Protective Motion for Modification of Stay Pending Appeal
(Feb. 24, 2005) (motion for dictionaries to allow easier attorney-client communication, timely issuance of
security clearance forms, and access to expeditious methods of transmitting attorney notes from client
meetings from Guantanamo Bay to the secure facility); Plaintiffs-Petitioners Motion for Writ of Injunction
(April 20, 2005) (protesting government's commentary, via interrogators, on counsel's religion and
comments that the Kuwaiti Detainees should not trust counsel and requesting that the Court enjoin this
behavior); Minute Order of August 31, 2005 (Court detailed its attempts to mediate between counsel for the
Kuwaiti Detainees and the government when the government refused to permit counsel to visit the
Kuwaiti Detainees as scheduled); Notice by Plaintiffs-Petitioners of Trip to Guantanamo October  9-12 and
Reservation of Right to Seek Reconsideration or Other Emergency Relief from the Court (October  3,
2005); Motion to Compel Privilege Team Compliance with the Amended Protective Order (Feb. 21,
2006) (raising incidents in which the "privilege team" has inhibited counsel access by refusing to review
attorney notes from meetings at Guantanamo or documents provided by Kuwaiti Detainees to counsel).

2. The government asserts in its motion that, when NCIS began its investigation of the three suicides, it discovered in the mesh wall of one of the deceased detainee's cell a handwritten note related to the suicide that was written on notepaper that was stamped on the back as privileged attorney-client material.[12] NCIS subsequently discovered notes written by two of the deceased detainees in the cell of a living detainee, and those notes, too, were written on stationery that had been stamped as confidential attorney-client materials.[13] Based solely on its discovery of these notes, NCIS, on or about June 14, 2006, unilaterally "impounded" approximately 1,100 pounds of materials belonging to virtually every detainee at Guantanamo, including all their privileged attorney-client materials.[14]

Following its confiscation of the detainees' materials, on June 18, 2006, NCIS began "sorting" materials in the bags collected from eleven unidentified detainees.[15] The sorting process involved "separating privileged information from non-privileged" and "conducting a preliminary scan of non-privileged materials for relevancy to the investigation."[16] That, in turn, led to the discovery of one document "containing instructions on tying knots" and "a JTF-Guantanamo- generated e-mail containing information regarding cell locations of detainees and other details regarding camp operational matters."[17] The government does not claim that either of these documents is classified. As a result of the discovery of the e-mail, an NCIS investigator "scanned" three envelopes belonging to one detainee that were marked as attorney-client

---

[12]    Respondents' Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing ("Gov't Motion") at 5; Declaration of Carol Kisthardt, dated July 7, 2006, ¶ 3.

[13]    Gov't Motion at 6; Kisthardt Decl. ¶ 3.

[14]    *Id.*

[15]    *Id.* at 7; Kisthardt Decl. ¶ 5.

[16]    *Id.*

[17]    *Id.*

materials.[18] The investigator saw that one of the envelopes contained a document bearing a mark that had been "secret" but was crossed-out to be "unclassified," and another envelope contained a document marked "FOUO" (For Official Use Only). The government does not claim that either of these documents is classified.

The government says that further review of the confiscated detainee materials has been "suspended" until "appropriate procedures and staffing" could be developed to guide NCIS in its encounter with privileged attorney-client materials.[19] The government represents that its motion is intended to obtain Court approval for those procedures.[20]

3. The purpose of NCIS's investigation is not clear. The government has staved off questions and concerns about the suicides, characterizing these desperate acts as "asymmetrical warfare"[21] and a "good PR move."[22] The government has scoffed at any suggestion that the detainees who committed suicide, after more than four years of imprisonment in oppressive conditions without being charged with wrongdoing or given an opportunity to prove their innocence before an independent tribunal, might simply have become depressed and despondent, determining that death was the more attractive alternative to ongoing indefinite detention far from family and country. Thus far, NCIS's inquiry appears to be aimed at proving the deceased

---

[18]    Gov't Motion at 7; Kristhardt Decl. . ¶ 5.

[19]    Gov't Motion at 8.

[20]    *Id.* at 8-12.

[21]    Statement of Rear Adm. Harry Harris Jr.. *See* Carol Rosenberg, *Commander: Suicide Plots Continuing*, MIAMI HERALD, June 20, 2006, *available at* http://www.miami.com/mld/miamiherald/news/local/14918527.htm.

[22]    Statement of Senior State Department Official Colleen Graffy. *See* Catherine Phillip, *US Dismisses Suicides as 'Good PR Stunt'*, TIMES (U.K.), June 12, 2006, *available at* http://www.timesonline.co.uk/article/0,,11069-2221381,00.html.

detainees' intent to commit "acts of war" and implicate other detainees in a suicide "plot,"[23]

rather than to answer the basic questions of how and why the suicides occurred.

Regardless of the nature of purpose of NCIS's investigation, the government does not

claim that NCIS has found evidence linking the Kuwaiti Detainees or their attorney-client

materials to the three suicides. Similarly, the government implies a connection between the three

suicides and incidents that allegedly occurred on May 18, 2006, when, according to the

government, several detainees unsuccessfully attempted suicide and others allegedly "ambushed

and attacked" guards in Camp Four.[24] However, the government does not claim the Kuwaiti

Detainees participated in those alleged actions. Thus, the government offers no particularized

justification for NCIS's wholesale confiscation of the Kuwait Detainees' privileged attorney-

client materials.

## ARGUMENT

### I.     NCIS'S UNILATERAL CONFISCATION OF THE KUWAITI DETAINEES' ATTORNEY-CLIENT MATERIALS WAS UNLAWFUL

NCIS's unilateral confiscation of the Kuwaiti Detainees' privileged attorney-client

materials was unlawful. In the Oct. 20 Order the Court ruled: "[T]he Government is not entitled

to unilaterally impose procedures that abrogate the attorney-client relationship and its

concomitant attorney-client privilege covering communications between [the Kuwaiti Detainees

and their counsel]."[25] The Protective Order prohibits physical interference by personnel at

Guantanamo with the Kuwaiti Detainees' privileged attorney-client materials.[26] NCIS's

---

[23]     Gov't Motion at 1.

[24]     *Id.* at 4.

[25]     *Al Odah* at 5.

[26]     Protective Order at 184, 186.

unauthorized confiscation of the Kuwaiti Detainees' privileged attorney-client materials violated

both orders. Moreover, if the Kuwaiti Detainees were among the eleven detainees' whose

confiscated attorney-client materials were subjected to NCIS's "sorting" and examination

processes, it is apparent that NCIS investigators read at least some of those materials, in plain

violation of the Court's orders.

Although NCIS did not seek permission from the Court to confiscate or read the Kuwaiti

Detainees' privileged attorney-client materials, nor did the government even notify the Court or

counsel about NCIS's actions until nearly a month after they took place, the government

attempts to justify NCIS's actions after the fact by minimizing the importance of the attorney-

client privilege. Once again, however, the government "fails to fully consider the nature of the

attorney client privilege."[27] The privilege is not mere "'policy,'" as the government would

characterize it,[28] but rather, as the Court previously quoted the Supreme Court,[29] "the oldest of

the privileges for confidential communication known to the common law," designed to

"encourage full and frank communication between attorneys and their clients and thereby

promote ... the observance of law and administration of justice." *Upjohn Co. v. United States*,

449 U.S. 383, 389 (1981).

Furthermore, the ability to communicate with counsel in privacy is crucial to the

attorney-client relationship. In the words of this Court: "[W]here the client has been afforded the

right to meaningful access to the courts, this right cannot be abridged, and ... the ability to

communicate in private with counsel is a crucial part of that meaningful access. ... In the instant

case, [the Kuwaiti Detainees] have been afforded access to the courts, which must necessarily be

---

[27]    *Al Odah* at 10.

[28]    Gov't Motion at 15.

[29]    *Al Odah* at 10.

meaningful, and this meaningful access includes the opportunity to consult with counsel in private."[30] *See Mann v. Reynolds*, 46 F.3d 1055, 1061 (10th Cir. 1995) ("policies will not be upheld if they unnecessarily abridge the defendant's meaningful access to his attorney and the courts"); *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990) (same); *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974) (same).

The government's argument to the contrary, suggesting that the privilege may be confined narrowly or dispensed with under the circumstances of NCIS's investigation into the three detainee suicides at Guantanamo, rests on cases that do not support this argument. For example, *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982), cited by the government in its motion,[31] does not confirm the government's narrow view of the privilege but merely points out that a voluntary disclosure by the client to a third party waives the privilege. Here, in contrast, there has been no waiver of privilege by the Kuwaiti Detainees.

There is no legal excuse for NCIS's violation of the Court's orders. The government relies on such cases as *United States v. Grant*, No. 04 CR 207BSJ, 2004 WL 1171258 (S.D.N.Y. May 25, 2004), *United States v. Stewart*, No. 02 CR 396 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002), *United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997), and *United States v. Zolin*, 491 U.S. 554 (1989) to justify NCIS's actions.[32] However, in each of those cases the government lawfully seized some attorney-client materials pursuant to a search warrant issued on probable cause or a statutory summons precisely describing the documents to be seized and their connection to criminal conduct. The issue in those cases was how to conduct a review of the seized material without unduly interfering with attorney-client privilege. Here, in contrast, the

---

[30]     *Al Odah* at 11 n. 12.

[31]     Gov't Motion at 15.

[32]     *Id.* at 15-16.

primary issue is the lawfulness of the warrantless seizure itself.[33] None of the cases relied upon

by the government justifies NCIS's violation of the Court's orders.

Finally, there is no factual justification for NCIS's confiscation (and possible reading) of

the Kuwaiti Detainees' privileged attorney-client materials. The government says that what

prompted NCIS's "impoundment" of 1,100 pounds of detainee materials, including all the

Kuwaiti Detainees' privileged attorney-client materials, was NCIS's discovery of several notes

related or relevant to the three suicides which were written on notepads that were stamped on the

back as attorney-client materials. Although there are cases holding that prison officials have

discretion to conduct searches of prisoners if reasonably related to legitimate penological

interests,[34] none of those cases sustains an indiscriminate seizure of prisoners' privileged

attorney-client materials based on such flimsy evidence and unsupported by a particularized

showing of need.

## II.    THE COURT SHOULD NOT AUTHORIZE A DEFENSE DEPARTMENT "FILTER TEAM" TO READ THE SEIZED ATTORNEY-CLIENT MATERIALS

There is no foundation for the government's motion to authorize a Defense Department

"Filter Team" to read the Kuwaiti Detainees' confiscated attorney-client materials and disclose

portions of them to NCIS. The Supreme Court has held that, before a court even may review

lawfully-seized attorney-client materials *in camera*, the government must make "'a showing of a

---

[33]     To the extent the Kuwaiti Detainees are entitled to invoke the protections of the Constitution, as indicated by the Supreme Court in *Rasul*, 542 U.S. at 483 n. 15, NCIS's confiscation and possible reading of the Kuwaiti Detainees' privileged attorney-client materials also violates the Fourth Amendment. Despite their status as alleged "enemy combatants," the Kuwaiti Detainees nonetheless had an actual and reasonable expectation of privacy in relation to these materials. *See Lonegan v. Hasty*, No. 04 CV 2743 (NG) (VVP), 2006 WL 1707258 at *14-15 (E.D.N.Y. June 22, 2006) (noting that "although a prison is not, for most purposes, a place where a person expects privacy, privileged communications between attorneys and clients ... are protected by the Fourth Amendment" and holding that attorneys communicating with detainees suspected of terrorist activities in connection with September 11 had a reasonable expectation of privacy in those privileged communications).

[34]     *See Turner v. Safley*, 482 U.S. 78 (1987), *Block v. Rutherford*, 468 U.S. 576 (1984), and *Bell v. Wolfish*, 441 U.S. 520, 550-557 (1979), cited by the government. Gov't Motion at 14.

factual basis adequate to support a good faith belief by a reasonable person' ... that *in camera* review of the materials may reveal evidence to establish" that an exception to the privilege applies.[35] Here, the government has made no such showing. Accordingly, the necessary predicate for the government's motion is missing.

The government does not deny that review of the Kuwaiti Detainees' attorney-client materials "will undermine the privilege by chilling future communications between a detainee and his counsel."[36] Nevertheless, the government contends that such a review is appropriate because of "manifest abuse of the legal mail system by detainees, and possibly others, such that the purported attorney-client materials among the detainees' documents may harbor information relevant to the pending investigation as well as information regarding plans or coordination respecting the prior suicides or possible future suicides."[37]

However, the government has offered no evidence of "manifest abuse" of the legal mail system by the Kuwaiti Detainees or "others." NCIS's discovery of some notes written on notepaper stamped on the back as attorney-client materials, as well as its discovery of a document with instructions on tying knots, a military e-mail regarding Guantanamo operations, and two documents bearing official but unclassified markings, do not come close to demonstrating a "manifest abuse" of the legal mail system. The government's speculation about abuse of the legal mail system is analogous to the generalized security concerns the government raised two years ago to unmonitored attorney-detainee meetings, which the Court rejected as "thinly supported."[38] There simply is no substitute for the particularizing showing the Supreme

---

[35]    *Zolin*, 491 U.S. at 572.

[36]    Gov't Motion at 18.

[37]    *Id.* at 18-19.

[38]    *Al Odah* at 10.

Court has held the government must make to permit any review of the Kuwaiti Detainees' privileged attorney-client materials.

Even if the government were to make the requisite particularized showing, *in camera* review of the Kuwaiti Detainees' privileged attorney-client materials may be conducted only by the Court or a Court-appointed third party, not by a Defense Department "Filter Team." Resort to government "taint" or "filter" teams to review lawfully seized attorney-client materials for the purpose of determining whether an exception to privilege would allow their disclosure to government investigators has been roundly criticized and rejected by the courts, including this Court. *See, e.g., In re Grand Jury Subpoenas,* Nos. 05-2274, 05-2275, 2006 WL 1915386, at *10-11 (6th Cir. July 13, 2006); *In re Search of the Scranton Hous. Auth.,* No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006) (collecting the cases); *United States v. Stewart,* at *4-8; *Black v. United States,* 172 F.R.D. 511, 516 (S.D. Fla. 1997); *United States v. Neill,* 952 F. Supp. 834, 840-41 & n. 14 (D.D.C. 1997); *United States v. Abbell,* 914 F. Supp. 519, 520-21 (S.D. Fla. 1995). These cases hold that *in camera* review of the Kuwaiti Detainees' attorney-client materials to determine whether an exception to privilege would allow their disclosure to NCIS may be conducted only by the Court or a Court-appointed third-party.

Just last week the Sixth Circuit, in *In re Grand Jury Subpoenas,* reversed a district court's use of such a government taint team. It pointed out that "taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors." *Id.* at *10. "[T]he government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations." *Id.* Similarly, this Court has said that the use

12

of government taint teams "constitutes a *per se* intentional intrusion" on privilege, is "unwise," and "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness." *Neill*, 952 F. Supp. at 841 & n. 14.

Moreover, the procedure the government has proposed for the Defense Department "Filter Team" in this case has been specifically rejected by the Sixth Circuit because of its potential to eviscerate attorney-client privilege. Under the government's proposal, the "Filter Team" will determine which materials are subject to attorney-client privilege and which are not, and it will disclose to NCIS's investigators all materials it determines are not subject to attorney-client privilege and are relevant to NCIS' investigation. Gov't Motion at 10-11, 16-18. Counsel for the Kuwaiti Detainees will have no opportunity to challenge that determination or prevent the "Filter Team" from disclosing to NCIS documents the "Filter Team" erroneously determined were not subject to attorney-client privilege. The Sixth Circuit, in *In re Grand Jury Subpoenas*, rejected this procedure because of the government team's unchecked power to determine what materials are subject to attorney-client privilege. It wrote:

> It is reasonable to presume that the government's taint team might have a more restrictive view of privilege than appellants' attorneys. But under the taint team procedure, appellants' attorneys would have an opportunity to assert privilege *only* over those documents which *the taint team has identified* as being clearly or possibly privileged. As such, we do not see any check in the proposed taint review procedure against the possibility that the government's team might make some false negative conclusions, finding validly privileged documents to be otherwise.

*Id.* at *11 (emphasis in original).

The government's reliance on *United States v. Grant* to support its motion is misplaced.[39] In *Grant*, a large number of documents, including some potentially privileged materials, were seized. As already noted, the materials in *Grant* were lawfully seized pursuant to a search

---

[39]     Gov't Motion at 19-20.

13

warrant issued upon a showing of probable cause that the materials particularly described in the application were connected to criminal conduct. 2004 WL 1171258 at *1. The only issue in *Grant* was who should segregate the materials to determine if they were responsive and not privileged. *Id.* The court authorized a government "privilege team" disassociated from the prosecutors to review the documents for possible use in a criminal proceeding.

Here, in contrast, NCIS's confiscation and possible reading of the Kuwaiti Detainees' privileged attorney-client materials was unlawful and not supported by any particularized showing of need. Moreover, the *Grant* court only permitted the government "privilege team" to do the initial review of the seized materials because defendants were guaranteed the opportunity to object to the use of any document before it was turned over to the trial team. *Id.* at *2. As discussed above, the government's proposal in the present case does not afford counsel for the Kuwaiti Detainees that essential right. Finally, the government's stated purpose is to use even privileged documents for the purposes of its investigation. *See* Gov't Motion at 20 ("the evidence to date indicates a manifest need for review of all of the detainee materials, including legal materials, in order to conduct a complete investigation into these matters"). Thus, *Grant* does not support the government's motion.

The government's motion is unprecedented and insupportable. If and when the government makes the requisite particularized showing of need to review the Kuwaiti Detainees' attorney-client materials, the government should seek *in camera* review from the Court or a person appointed by the Court.

14

**III.     THE COURT SHOULD SANCTION THE GOVERNMENT'S UNLAWFUL
CONDUCT AND, AS AN INTERIM MEASURE, ORDER IT TO DEPOSIT
THE SEIZED ATTORNEY-CLIENT MATERIALS WITH THE COURT**

The Court should not allow NCIS's confiscation and possible reading of the Kuwaiti

Detainees' privileged attorney-client materials to go unpunished.  The government does not

claim there was any emergency or imminent threat of destruction of the materials that

necessitated NCIS's actions without prior notice to the Court and counsel, and without Court

permission.  NCIS's actions were deliberate and calculated – and in flat violation of the Court's

orders.  Indeed, the government has not even explained why it waited nearly a month to inform

the Court and counsel about NCIS's actions.  Under these circumstances the Court should

impose sanctions against the government for its unlawful conduct.

Moreover, the Court should act to mitigate the harm NCIS's unlawful actions have

inflicted by ordering the government immediately to deposit the materials with the Court

pending their ultimate return to the Kuwaiti Detainees.  The Kuwaiti Detainees have long been

suspicious of the government's claims that it is respecting attorney-client privilege and the

confidentiality of their communications with counsel, and they have doubted even the Court's

assurances that the privacy of those communications would be ensured.  NCIS's confiscation of

the Kuwaiti Detainees' attorney-client materials shattered whatever faith the Kuwaiti Detainees

had in those claims and assurances.

The compelled deposit of the confiscated Kuwaiti Detainee attorney-client materials with

the Court would not impede NCIS's investigation because NCIS's review of the materials has

been suspended pending resolution of the government's motion.  On the other hand, such deposit

might restore some measure of the Kuwaiti Detainees' confidence that they may communicate

with counsel without fear of government monitoring and reprisal.  Therefore, as an interim

measure, the Court should order the government immediately to deposit the Kuwaiti Detainees' attorney-client materials with the Court.[40]

## **CONCLUSION**

For the foregoing reasons the Court should deny the government's motion and grant the Kuwaiti Detainees' motion.

Respectfully submitted,

_Neil N. Koslowe_

Thomas B. Wilner (D.C. Bar #173807)
Neil H. Koslowe (D.C. Bar #361792)
Amanda E. Shafer (D.C. Bar #497860)

SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100

_David J. Cynamon /mm_

David J. Cynamon (D.C. Bar #182477)
Matthew J. MacLean (D.C. Bar #479257)
Osman A. Handoo (D.C. Bar #489062)

PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
Telephone: (202) 663-8000
Facsimile: (202) 663-8007

Attorneys for Plaintiffs-Petitioners

Dated: July 21, 2006

---

[40]    If the Kuwaiti Detainees' request for this interim relief is deemed by the Court to be an application for a temporary restraining order or preliminary injunction, the request fully satisfies the four-part test for the grant of such relief. *See CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).