IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK QADIR,                          )
                                            )
                                            )
            Petitioner,                     )
                                            )
    v.                                      )    Civil Action No. 05-2370 (EGS)
                                            )
GEORGE W. BUSH, et al.,                     )
                                            )
            Respondents.                    )
_____)

## DECLARATION OF DAVID N. COOPER

Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate, Judge Advocate General's Corps Reserve, United States Air Force, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am a Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abdal Razak Qadir that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _January 2007_


DAVID N. COOPER, Lt Col, USAFR
Staff Judge Advocate
DOD, HQ OARDEC
Washington, DC



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 366

From: Director, Combatant Status Review Tribunal

**2 0 DEC 2004**

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 219**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #219 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

UNCLASSIFIED

14 Dec 04

MEMORANDUM

From: Legal Advisor
To:   Director, Combatant Status Review Tribunal

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
      FOR DETAINEE ISN # 219

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
      (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal #15 of 12 October 2004
      (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

   a. The detainee was properly notified of the Tribunal process and made a sworn
   statement at the Tribunal.

   b. The Tribunal was properly convened and constituted by enclosure (1).

   c. The Tribunal substantially complied with all provisions of references (a) and (b).
   Note that some information in exhibit R-4 was redacted. The FBI properly certified in
   exhibit R-2 that the redacted information would not support a determination that the
   detainee is not an enemy combatant. Also, some of the information in exhibits R-6 and
   R-9 was redacted. It is quite obvious that this information is either an ISN or an
   individual's name, both of which would have no bearing on an individual detainee's
   Enemy Combatant status.

   d. The detainee requested two witnesses. The Tribunal President found the witnesses to
   be relevant to the detainee's classification as an enemy combatant. Both witnesses were
   detainees at Guantanamo Bay, Cuba. The witnesses were produced and testified at the
   Tribunal. Although the Tribunal President did not administer the standardized Muslim
   oath to the two witnesses, they both promised to tell the truth. After the two witnesses
   had testified, the Tribunal President asked the detainee if he had any other evidence to
   present to the Tribunal. The detainee stated that he would have requested that his family
   testify to say that he was a businessman before he left to Afghanistan. Although the
   detainee was required to request all witnesses before the commencement of the Tribunal,
   the Tribunal President informed the detainee that the Tribunal would consider the
   information that the detainee had presented.

UNCLASSIFIED

UNCLASSIFIED

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 219

The detainee did not request any other evidence.

e. The Tribunal's decision that detainee # 219 is properly classified as an enemy
combatant was unanimous.

f. The detainee's Personal Representative was given the opportunity to review the record
of proceedings and declined to submit comments to the Tribunal.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.

JAMES R. CRISFIELD JR.
CDR, JAGC, USN

UNCLASSIFIED



Department of Defense
Director, Combatant Status Review Tribunals

12 Oct 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #15

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal
established by "Implementation of Combatant Status Review Tribunal Procedures for
Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004
is hereby convened.  It shall hear such cases as shall be brought before it without further
action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

          MEMBERS:

          ███████████████████, Colonel, U.S. Air Force; President

          ██████████████████, Lieutenant Colonel, U.S. Air Force; Member
          (JAG)

          ██████████████ Lieutenant Commander, U.S. Navy; Member

                              J. M. McGARRAH
                              Rear Admiral
                              Civil Engineer Corps
                              United States Navy



# HEADQUARTERS, OARDEC FORWARD
GUANTANAMO BAY, CUBA
APO AE 09360

5 November 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander

SUBJECT: CSRT Record of Proceedings ICO ISN# 219

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ██████.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

## (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:    #15

(U) ISN#:    219

Ref:   (a) (U) Convening Order for Tribunal #15 of 12 Oct 2004 (U)
       (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
       (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U/FOUO)

1. (U) This Tribunal was convened by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

2. (U) On 23 Oct 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #219 is properly designated as an enemy combatant as defined in reference (c).

3. (U) In particular, the Tribunal finds that this detainee is a member of, or affiliated with, the East Turkestan Islamic Movement, which is associated with al Qaida, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



                                                    Col, USAF
                    Tribunal President

UNCLASSIFIED//FOUO

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

## (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#15____
ISN #: _____219____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this detainee is properly classified as an enemy combatant and is a member of, or affiliated with, the East Turkestan Islamic Movement (ETIM), which is associated with al Qaida. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the detainee was captured with a weapon in Afghanistan in late 2001 and is a member of the Taliban. The detainee chose to participate in the Tribunal process. He called two witnesses, and requested no documents be produced. He made a sworn verbal statement. The Tribunal President found the requested witness reasonably available. The detainee, in his verbal statement, denied being a member of ETIM or any other terrorist organization. His witnesses testified that they knew him as a person who did volunteer work and had never witnessed him with a weapon. The Tribunal President's evidentiary and witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-16.

    b. Testimony of the following persons: Detainees #275 and #289.

    c. Sworn statement of the detainee.

## 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested the following witnesses be produced for the hearing:

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

| Witness | President's Decision | Testified? |
|---------|--------------------|-----------|
| GTMO Detainee #275 | reasonably available | yes |
| GTMO Detainee # 289 | reasonably available | yes |

The Detainee requested no additional evidence be produced; no rulings were required.

## 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

a. The recorder offered Exhibits R-1 through R-3 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Exhibit R-3 is an excerpt of the Terrorist Organization Reference Guide published by the U.S. Department of Homeland Security. It was helpful in that it familiarized the Tribunal Members with two terrorist organizations that were relevant to the Tribunal's decision-making process. For the most part, however, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. The most significant unclassified evidence considered by the Tribunal was the detainee's sworn testimony and the testimony of his two witnesses. A summarized transcript of the detainee's sworn testimony and that of the witnesses is attached as CSRT Decision Report Enclosure (3). In sum, the detainee testified that he was not a member of ETIM, did not receive any military training or engage in any military operations against the coalition, and was never a guard for an al Qaida safe house as alleged in the Unclassified Summary of the Evidence. He denied any affiliation with any terrorist organization and claimed that he was just a businessman with many debts who had traveled to Afghanistan in search of new business opportunities. He further claimed that his only involvement with other Uighurs in Afghanistan was an attempt to set up a business, and later to bring food to a group of Uighurs in a camp. Detainee #275 testified that he knew Detainee #219 as a person that delivered food and not as a fighter. Detainee #275 said that he met Detainee #219 when he was in the hospital in Jalalabad. He said that Detainee #219 brought him food and cared for him during his hospital stay. Later, they traveled through the mountains together and were captured together in Pakistan. Detainee #289 testified that he knew Detainee #219 as a person who brought food to the Uigher people in Afghanistan and never saw him carrying a weapon. He also stated that he traveled through the mountains with Detainee #219 and was captured with him in Pakistan.

UNCLASSIFIED//FOUO

ISN #219
Enclosure (1)
Page 2 of 3

**UNCLASSIFIED//FOUO**

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

## 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed necessary.

b. The detainee understood the Tribunal proceedings. He actively participated in the hearing and stated that he understood the procedure.

c. The detainee is properly classified as an enemy combatant and is a member of, or affiliated with, the East Turkestan Islamic Movement (ETIM), which is associated with al Qaida. The Tribunal would like to emphasize, however, that while this detainee meets the minimal requirements to be classified as an enemy combatant, he appears to be an excellent candidate for early review by the Administrative Review Board. The Tribunal believes that the classified evidence strongly supports this conclusion.

## 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

███████████████████

███████████, Col, USAF
Tribunal President

**UNCLASSIFIED//FOUO**

**UNCLASSIFIED / ~~FOUO~~**

**Summarized Sworn Detainee Statement**

When asked by the Tribunal President if the detainee understood the CSRT process, the Detainee answered, "Yes."

When asked by the Tribunal President if the detainee had any questions concerning the Tribunal process, the Detainee answered, "No."

[As the recorder was reading the unclassified summary the detainee interrupted.]

Detainee: Can I ask a question about what he just said?

Tribunal President: There will be a time shortly for you to provide answers to each.

Detainee: Are you going to read all the accusations first and then I can answer?

Tribunal President: Yes.

[After the Tribunal President spoke about the detainee's request for witnesses and mentioned their names, the detainee interrupted.]

Detainee: I requested some one else.

Tribunal Member: What was the name of the other person?

Detainee: One is Sabet and the other is Abdu Supur.

Tribunal President: I have his number is ISN 275. Do you understand him by his number?

Detainee: Yes.

Tribunal President: He may have another name.

Detainee: Yes. Okay I don't know his secret name.

Tribunal President: The other witness is ISN 289, is that who you asked for?

Detainee: Yes.

Tribunal President: Would you like to provide statements on the unclassified evidence first and then witnesses or would you like the witnesses to provide information first?

Detainee: I feel that I have been waiting; I don't want the witnesses to wait. But I have a question.
Tribunal President: That's fine.

ISN #219
Enclosure (3)
Page 1 of 16

**UNCLASSIFIED / ~~FOUO~~**

UNCLASSIFIED / ~~FOUO~~

Detainee:  They accuse me of being an enemy combatant.  I want you to explain this.  Nothing I have said or my actions in the past do not make me an enemy combatant.

Tribunal President:  The unclassified summary that was provided to you is the reason for your classification as an enemy combatant.  You may want to provide statements or answers on each point.

Detainee:  They claim that I am an enemy combatant but I was not captured in a combat zone.  I was captured in Pakistan.

Tribunal President:  Before you make any more statements, would like to make your statements under oath?

Detainee:  Yes taking the oath is not a big deal.  We have to tell the truth about everything.

Tribunal President:  Recorder please administer the oath.

Tribunal President:  Please repeat everything he says for your oath.

[After the Recorder began citing the oath to the Detainee, the detainee interrupted.]

Detainee:  It is hard to memorize and say those things.  I am not afraid to take the oath.  I will take the oath.  I believe in god.  God is watching me and I am telling you the truth.

Tribunal President:  That is fine with us.

Tribunal President:  Again, it sounds like you would like to address all the unclassified evidence first.  If you would like to proceed you may.  Your Personal Representative may assist you.

Detainee:  I will answer the first question myself.

Tribunal President:  That is fine.

Personal Representative:  I think the detainee thinks you are going to ask him questions now.

Tribunal President:  Not questions, he may speak.

Personal Representative:  But if I may, tell him that we discussed each point and I have his statement and I can read them out loud and then he can add more.  Just as we talked about.

Detainee:  We did not discuss much about the accusation of me as an enemy combatant.

**UNCLASSIFIED / ~~FOUO~~**

Personal Representative: I believe he is stuck on this definition of an enemy combatant.

Tribunal President: I believe he is.

Tribunal Member: Why don't you just let him say what he wants to?

Tribunal President: Yes, you can describe why you don't think you are an enemy combatant.

Personal Representative: Would you like me to read him the definition of an enemy combatant again?

Detainee: The first one said that I belonged to the Islamic Movement.

Translator: Do you want me to explain the definition of an enemy combatant?

Tribunal President: First answer his question. His question was that he belonged to the East Turkestan Islamic Movement. Answer that question, which is yes that is what the government thinks.

Translator: He wants to know what the definition of an enemy combatant is; do you want me to read this to him?

Tribunal President: Actually I will provide that and you can translate.

[The Tribunal President read the definition of an enemy combatant.]

Detainee: Do you have witnesses that say I supported Al-Qaida or the Taliban or say that I fought with the Al-Qaida against the U.S. or coalition forces?

Tribunal President: First piece of evidence. You were part of the East Turkestan Islamic Movement and that group was part of or tied to Al-Qaida.

Detainee: You say the Islamic Movement, which one are you talking about. I have no knowledge about those Islamic Movements. You are telling me they are tied to Al-Qaida.

Tribunal President: The government information says that you admitted to belonging to East Turkestan Islamic Movement.

Detainee: This is the first time I have ever heard of them. I was never asked during interrogations. I never told them I was a member.

Personal Representative: Do you want me to read what you told me about that point?

Detainee: Yes.

**UNCLASSIFIED / ~~FOUO~~**

**UNCLASSIFIED / FOUO**

Personal Representative: 3.a.1. (The detainee admits belonging to the East Turkestan Islamic Movement (ETIM).) I do not know about the ETIM. I am not a member of the ETIM. I left Uzbekistan were I was a businessman. I left because my business selling fabrics and animal skins went down and I had a lot of debt to pay. There was no opportunity to pay back my debts, so I left Uzbekistan and went to Afghanistan.

Personal Representative: Do you want to say more about this or move on to the next one?

Detainee: I have something to say.  The East Turkestan Islamic Movement, I had never heard of them and I don't know them.  Because I didn't check the organizations background, I don't really care what they do.  I was a businessman and looking out for my own interest.  That's why I met with them but I didn't care what they did.

Tribunal President: You met with them?

Detainee: Yes.

Personal Representative: In the next statement you talk about them and make this clear. Do you want me to read it to the Tribunal?

Detainee: In number two I didn't talk about that.

Personal Representative: Yes you do, you start to talk about the people.

Detainee: I have forgot.  I am not finished with the first one.

Tribunal President: That is fine; tell us what you want about this first point.

Detainee: How can I be a member of an organization that I have never heard of?  They accuse me of this.  I have never heard of them or was I a member.

Tribunal President: That is why we are here.  Do you have any other statements you would like to make on any of the unclassified evidence?

Detainee: Yes.

Tribunal President: What else would you like to tell us?

Personal Representative: Are you ready to move on to number two?

Tribunal President: And to help you remember what number two is I'll read it. The detainee participated in military operations against the coalition.

Detainee: I have a paper in my pocket can you take it out for me?

ISN #219
Enclosure (3)
Page 4 of 16

**UNCLASSIFIED / FOUO**

UNCLASSIFIED / ~~FOUO~~

Personal Representative: Sure.

Detainee: Can you read number two?

Personal Representative: I will read 3.a.2. first. (ETIM has ties to Al-Qaida and the Taliban.)

Detainee: Which one is b, the second one can you read it for me?

Tribunal President: Okay, he is asking for you to read b.

Personal Representative: Does he want me to skip two, because we spoke about two.

Tribunal President: He asked for b, read him b.

Tribunal President: Repeat your question please.

Detainee: I am confused now.

Tribunal Member: I have a suggestion. Everybody look at your papers. Cross off all the numbers and letters. Ask him if he wants to talk about "ETIM has ties to Al-Qaida and the Taliban" or has he said everything he wanted to say about that?

Detainee: I don't care that the East Turkestan Islamic Movement has ties to Al-Qaida or Taliban or America, it doesn't interest me.

Personal Representative: Now would you like me to repeat what you said in our meeting?

Detainee: Yes.

Personal Representative: 3.a.2. (ETIM has ties to Al-Qaida and the Taliban.) I met with some Uighur people in Afghanistan in Kabul. I was looking for some money to start a carpet or possibly an animal skins business. They told me I would have to work for them to earn a monthly salary. I went to the market to buy food products for the people and also clothing. I did not stay there long, I did not live with those people, I would get money from them, go get what they wanted and leave. I did not know what these people did. I didn't know if they were ETIM or associated with the Al-Qaida or Taliban. I only knew about the Taliban government from being in Afghanistan. But never heard of the Al-Qaida until I got here to Cuba.

Personal Representative: Do you want to say more about this or move on to the next one?

Detainee: I want to think about it.

UNCLASSIFIED / ~~FOUO~~

**UNCLASSIFIED / ~~FOUO~~**

Detainee: Are you all writing down everything?

Tribunal President: So we can remember what you say.

Detainee: Thank you.

Tribunal President: And we record so we can go back and help ourselves understand what you have told us.

Detainee: Thank you.

Detainee: I can't think of anything.

Personal Representative: I recommend that we continue on and address these accusations for the record.

Detainee: Can you wait a minute?

Detainee: We can go to the next one.

Personal Representative: 3.b.1. (The detainee received training in an Al-Qaida sponsored camp two hours North or Northwest of Jalalabad, Afghanistan in 2001.) I was worrying about how to conduct business, making a living. I remember once or twice bringing food to Uighur people to a place outside of Jalalabad. I never stayed there long and never saw any military training.

Personal Representative: Do you want to say more about this or move on to the next one?

Detainee: Are they saying that I was training at the camp provided by Al-Qaida?

Tribunal President: That's what this information says you did. You were trained and I am interpreting it that you received military training in a camp.

Detainee: I didn't know this place. I just brought the food for them once or twice. I *never trained there*. If I wanted the training I would get it to fight against the Chinese Government. America has never hurt my family or my nationality, why would I train to go against the U.S. Government? I had no plan for my family or my nation to fight against Chinese Government. The only thing on my mind was the business. I had no plan to train. Throughout history the American Government never hurt my country. We had heard about America but just the name. I never knew what they looked like. The first time I saw an American was in Kandahar in prison. They never did anything bad to me. How could I take training to go against those people?

Tribunal President: The next part is about travel.

**UNCLASSIFIED / ~~FOUO~~**

**UNCLASSIFIED /** ~~FOUO~~

Personal Representative: 3.b.2. (The detainee traveled to the mountain training camp in Tora Bora and fled when U.S. forces began bombing that location.) I was in Jalalabad when the fighting began. I felt I should go with the Uighur people to the mountains. A different place from where I was bringing food. It was not a training camp we stayed in old houses. The bombing began either before or after we arrived, then I left the mountains. I didn't know what Tora Bora was or meant. I left the mountains to go to Pakistan. I passed the border and the people treated me nice and fed me. They told me they would take me to the city. We left in the middle of the night and traveled to some place where there were different people. There was a big block door and I was told I would be interrogated. When they interrogated me I was afraid I would be sent back to Turkistan where I owed money. So I told them I was from Afghanistan. They took me to another place, a prison in Pakistan for fifteen days. Different people other than Pakistanis took my picture and asked me questions. They then took me to another cell with other Arabs and all of us were turned over to the Americans.

Personal Representative: Do you want to say more about this or move on to the next one?

Detainee: Are all the mountains in Afghanistan called Tora Bora?

Tribunal President: I don't know. I think Tora Bora is a place, not all mountains, a part of the mountains.

Detainee: If they call all the mountains in Afghanistan Tora Bora, I have no objections to that statement because I just walked through the mountains to Pakistan. If a specific mountain is called Tora Bora, then I didn't know this. Is all the mountains called Tora Bora or just part of the mountains?

Tribunal President: Traveling is not a concern of ours. Going to a military training camp in Afghanistan is a concern. And your previous statement was, you never went to a camp, is that correct?

Detainee: Yes.

Personal Representative: 3.b.3. (The detainee carried a weapon while guarding an Al-Qaida safe house in Jalalabad.)

Detainee: Do you have a witness or proof?

Tribunal President: Not now. Not during this session. All we know is this [referring to the Unclassified Summary of the Evidence].

Personal Representative: He said this point is not true. He never carried a weapon or guarded a house in Jalalabad. I was trying to do business in Jalalabad. I never guarded a house or received weapons training.

ISN #219
Enclosure (3)
Page 7 of 16

**UNCLASSIFIED /** ~~FOUO~~

UNCLASSIFIED / F̶O̶U̶O̶

Detainee: Shouldn't a guard be fully trained and know how to use the weapons?

Tribunal president: That would make sense to us.

Detainee: I was just a businessman, how could I be qualified as a guard? If I wanted to be a guard or guarding a house, I would want to know who is in there. I didn't guard any house.

Tribunal President: Does the Personal Representative have any additional information?

Personal Representative: Sir that is all he covered with me.

Tribunal Member: Your Personal Representative told us a lot of information. Was it accurate and do you want us to consider it?

Detainee: Yes.

Detainee: About the first accusation were they accused me of being an enemy combatant. What kind of evidence do you have?

Tribunal President: I would like you to review your notes to see if we have answered all your questions so far.

Detainee: When you accuse me as an enemy combatant. Do you have any evidence? And I have a question for you?

Tribunal President: We have provided you all the evidence that we can at this time. We are here to look at all the evidence and determine that. You have all the information you may see now. We will see more information later but you are not permitted to see it. Do you understand?

Detainee: Why can't I be at that session?

Tribunal President: Because of our national security and our authority does not permit us to provide that to you.

Detainee: If this is a court, I should be able to defend myself. I am innocent.

Tribunal President: This is not a criminal court. This is an administrative government review. We are independent, we are checking to ensure the information supports the government's decision that you are an enemy combatant. That is our job. Have you concluded or finished providing us the information you wanted on the unclassified summary?

Detainee: There is something I would like to talk about.

ISN #219
Enclosure (3)
Page 8 of 16

UNCLASSIFIED / F̶O̶U̶O̶

**UNCLASSIFIED / ~~FOUO~~**

Tribunal President: Okay. I would like to remind you that you have called two witnesses to support what you told us before.

Detainee: You accused me of being an enemy combatant. Did you get me from a combat zone or from another country, Pakistan?

Tribunal President: It doesn't matter in our definition. Location of the capture is not part of our definition.

Detainee: There should be a connection between location and capture.

Tribunal Member: To help you understand a little bit more. Before we walked in here today we didn't know anything about your case. The government says that you are an enemy combatant. We think you are going to say you are not an enemy combatant. The Recorder gives us evidence and you give us evidence. We will look at all the evidence and decide whether you should be an enemy combatant or not. We might look at the evidence and say you were caught in Pakistan and therefore you may not be an enemy combatant. Or me might say that you are an enemy combatant. We don't know yet because we haven't looked at all the evidence. So, the best thing you can do this morning is tell us why you feel you are not an enemy combatant. And then we will look at everything and make a decision.

Detainee: I am asking this because did you catch me in a combat zone or in Pakistan. I am defending myself.

Tribunal President: We will consider that.

Detainee: You didn't catch me in a combat zone in Afghanistan. When I was captured I didn't have any weapons or any medal or wood that could be used as a weapon.

Tribunal President: We will consider that.

Detainee: When you captured me I didn't have any identification as a soldier. The Pakistan soldiers captured me and turned me over to you. American soldiers did not capture me, Pakistani soldiers did. I do not have a plan to fight against the U.S. or your coalition forces. The reason I left Afghanistan has nothing to do with the U.S. You said I admitted that I was a member of the East Turkestan Islamic Movement. I have never been a member of any organization. The Uighur people I met were not members of the East Turkestan Islamic Movement. There were only a few of them and I never heard them talk about being a part of any organization. I would have refused to be a part of the organization because I have a lot of debts to pay.

You say that I participated in operations against the U.S. and their coalition forces. I was just a small businessman. How could I have done this? America never hurt me, why would I join against them. If I wanted military training it would have been to fight the

**UNCLASSIFIED / ~~FOUO~~**

Chinese Government. There have never been problems between the Americans and the Uighurs we support America.

You say that I was guarding an Al-Qaida house. What is Al-Qaida? Are they a government? I had never heard of them until I was interrogated. I didn't guard their house I am not qualified. I have never been trained. I don't have the same culture, as Al-Qaida and I don't come from their country. They are strangers to me; I wouldn't guard their house.

They say I went to the Tora Bora Mountains to a camp and left when the bombing started. It is true I went to some mountains but I didn't know what they were called. The place I went to was called Urhurl. The Uighurs stayed there. I only heard the name Tora Bora from you.

Tribunal President: Does that conclude your statement?

Detainee: Probably.

Tribunal President: Personal Representative do you have any questions for the Detainee?

Personal Representative: No sir.

Tribunal President: Recorder do you have any questions for the Detainee?

Recorder: No sir.

Tribunal President: Does the board have any questions for the Detainee?

Tribunal Members: We would like to hear what the witnesses have to say first.

Tribunal President: At this time we will take a short recess to bring in the first witness, number 275 first.

[GTMO Detainee #275 was brought into the Tribunal Room]

Tribunal President: Before we begin the witness is asked to affirm that what he says will be the truth, would you take an oath that you will tell the truth?

Witness 275: The information I am given will apply to his case?

Tribunal President: Yes.

Witness 275: What kind of issues?

Tribunal President: The questions will be asked shortly. Will you promise to tell the truth if we ask you a question?

**UNCLASSIFIED / ~~FOUO~~**

**UNCLASSIFIED / ~~FOUO~~**

Witness 275: Yes.

Tribunal President: Personal Representative, why has the Detainee asked for this witness?

Personal Representative: The Detainee asked for this witness so that he could give a statement that he was not a fighter and that he brought food to the Uighur people.

Witness 275: Yes, I will testify that he was only delivering food.

Tribunal President: Anything else Personal Representative?

Personal Representative: Yes sir when I met with the witness he gave me a statement. Can I ask the witness if I can read it aloud and he can confirm that he said that?

Witness 275: Will he read it for me and then I can verify that it is true or not?

Tribunal President: That is correct.

Witness 275: Yes.

Personal Representative: The witness said he met 219 in a hospital in Jalalabad. They introduced him to me because he was Uighur. He brought me food and brought me to the bathroom and anything I needed when I was sick. Before my hospitalization I did not know him nor I had never seen him.

Personal Representative: Would he like to add more to this statement?

Witness 275: If you ask me questions about his case I will answer. Then if you give me permission I will talk about our cases.

Tribunal President: At this time we are only concerned with 219.

Witness 275: Okay

Tribunal President: Any further comments Personal Representative?

Personal Representative: No sir.

Witness 275: If I don't get permission for that then I have no more.

Tribunal President: Okay. I now want to ask the Detainee if he has any questions for the witness:

Detainee: No.

**UNCLASSIFIED / ~~FOUO~~**

## UNCLASSIFIED / ~~FOUO~~

Tribunal President:  Recorder do you have any questions for the witness?

Recorder:  No sir.

Tribunal President:  Does the Tribunal have any questions for the witness?

**Summarized Answers in Response to Questions by the Tribunal Members**

Q.  Just so I have this straight, you were sick and the detainee was working at the hospital helping you?

A.  He was not an employee for the hospital.

Q.  Okay.  I was confused about who was sick.

A.  I was sick.

Q.  Was the time you were in the hospital the only time you had contact with the Detainee?

A.  Yes.

Q.  You never saw him again until you were here?

A.  Until we were captured.

Translator:  I would like to explain your question to him.

Tribunal Member:  Yes.

A.  We left the hospital together and came here together also.

Q.  When were you in the hospital?  Was it before or after you were detained?

A.  Before I was detained.

Q.  How long were you in the hospital with the help from the Detainee?

A.  About a month.

Q.  Did you travel to the mountains together?

A.  Yes.

Q.  And then into Pakistan?

## UNCLASSIFIED / ~~FOUO~~

## UNCLASSIFIED / ~~FOUO~~

A.    Yes.

Q.    And then you were captured together in Pakistan?

A.    Yes, at the same time.

Q.    When you were traveling through the mountains on your way to Pakistan, can you tell me what you were doing? Were you just getting away from the fighting or caring for others? What were you doing?

A.    We just walked together to Pakistan.

Tribunal President: We will take a short recess to bring in the next witness.

[GTMO Detainee#289 was brought into the Tribunal Room]

Tribunal President: I would like to enter for the record that this witness is known as 289. Is that correct?

Witness 289: Yes.

Tribunal President: I want to confirm with the Detainee that this is the correct witness that he requested.

Detainee: Yes.

Tribunal President: I want to ask the witness if he will take an oath that he will tell the truth?

Witness 289: What do you want me to take an oath about?

Tribunal President: The Detainee wants you to provide testimony or a statement to support his claim.

Witness 289: I will listen and if it is necessary for me to take an oath I will take it.

Tribunal President: We do require you to promise to tell the truth.

Witness 289: I will tell the truth.

Tribunal President: Personal Representative asks the witness the questions.

Personal Representative: The Detainee asked for this witness so that he could give a statement that he was not a fighter and that he brought food to the Uighur people.

UNCLASSIFIED / ~~FOUO~~

Witness 289: Yes.

Personal Representative: During our meeting the witness did not want to give a specific statement to me but said he would be prepared to answer questions.

Witness 289: That is correct I told him I would answer the questions.

Tribunal President: Detainee do you have any questions for the witness?

Detainee: No.

Tribunal President: Recorder do you have any questions for the witness?

Recorder: No sir.

Tribunal President: Does the Tribunal have any questions for the witness?

**Summarized Answers in Response to Questions by the Tribunal Members**

Q.    Where did you meet the Detainee?

A.    He brought food twice to the place where the Uighur people were staying.

Q.    Was this in Afghanistan?

A.    Yes.

Q.    Was this a Uighur camp or village? What sort of place were they staying?

A.    The area belonged to some village. It is like a farm area.

Q.    Were those two times the only times you saw Detainee 219?

A.    Yes.

Q.    Did you ever see him with a weapon?

A.    No.
Q.    He only had food when you saw him?

A.    Yes, food.

Q.    Did you travel with the Detainee to the mountains?

A.    When?

ISN #219
Enclosure (3)
Page 14 of 16

UNCLASSIFIED / ~~FOUO~~

## UNCLASSIFIED / ~~FOUO~~

Q.    Anytime?

A.    When we went to Pakistan we walked through mountains.

Q.    So you were arrested together in Pakistan?

A.    Yes.

Tribunal President:  We are recessed to have the witness removed.

Tribunal President:  Personal Representative do you have any question for the Detainee?

Personal Representative:  No sir.

Tribunal President:  Recorder do you have any questions for the Detainee?

Recorder:. No sir.

Tribunal President:  Does the board have any questions for the Detainee?

### Summarized Answers in Response to Questions by the Tribunal Members

Q.    Do you know what job the two witnesses did while in Afghanistan?

A.    No, I don't know.

Q.    Did you ever see either witness with a weapon?

A.    No.

Tribunal President:  Do you have any other evidence to present to this Tribunal?

Detainee:  If it were permitted I would have called my family and requested them to be witnesses.

Tribunal President:  I permit witnesses to this Tribunal that have information concerning this evidence.  So if your family was with you in Afghanistan I would have permitted it.

Detainee:  The reason I asked my family to be witnesses was because they could have proved I was a businessman and have a lot of debts.  My parents are probably suffering now because of my debts.

Tribunal President:  I appreciate your reasons for leaving your country but this Tribunal is concerned about a different matter.

## UNCLASSIFIED / ~~FOUO~~

UNCLASSIFIED / ~~FOUO~~

Detainee:  Every issue is different.  But everything starts with the end and is always connected.  My parents know why they sent me out.  Did they send me to fight or to do business, they know why.

Tribunal President:  We will consider that.

[While the Tribunal President was reading the decision instructions the Detainee commented.]

Detainee:  I do not want to go back to my country.

Tribunal President:  We understand that.  Arrangements will be made to find a place where you can go safely if you are determined not to be an enemy combatant.

Detainee:  If they say I am an enemy combatant will they look at my case further?

Tribunal President:  Yes.  I have more instructions to provide.

Detainee:  How can you determine me to be a threat?

Tribunal President:  That is a question for the next board.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Col, USAF
Tribunal President

UNCLASSIFIED//FOUO

## DETAINEE ELECTION FORM

Date: 16-Oct-04

Start Time: 0800

End Time: 1000

ISN#: 219

Personal Representative: ███████████
(Name/Rank)

Translator Required? YES          Language?          UIGHUR

CSRT Procedure Read to Detainee or Written Copy Read by Detainee?  YES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Detainee Election:**

[X]    **Wants to Participate in Tribunal**

[ ]    **Affirmatively Declines to Participate in Tribunal**

[ ]    **Uncooperative or Unresponsive**

**Personal Representative Comments:**

Detainee has elected to participate in Tribunals. He has two-witness request:

#1. Adusupur. ISN 275 ██████████████████
#2 Sabet.  ISN 289 █████

They both can testify that all he did was bring food out to the Uighur people and was not a fighter.

Personal Representative: ████████████████ ████████

UNCLASSIFIED//FOU █

Exhibit D-A

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (05 October 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – RAZAK, Abdul

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is an Enemy Combatant.

    a. The detainee is an Enemy Combatant:

        1. The detainee admits belonging to the East Turkestan Islamic Movement (ETIM).

        2. ETIM has ties to al Qaida and the Taliban.

    b. The detainee participated in military operations against the coalition.

        1. The detainee received training in an al Qaida sponsored camp two hours North or Northwest of Jalabat, Afghanistan in 2001.

        2. The detainee traveled to the mountain training camp in Tora Bora and fled when US forces began bombing that location.

        3. The Detainee carried a weapon while guarding an al Qaida safe house in Jalabat.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

Exhibit: R-1

*1 of 1*

**Memorandum**     UNCLASSIFIED



To    :    Department of Defense            Date  09/15/2004
           Office of Administrative Review
           for Detained Enemy Combatants,
           Col. David Taylor, OIC, CSRT

From  :    FBI GTMO
           Counterterrorism Division,
           Office of General Counsel,
           Asst. Gen. Counsel ▮▮▮▮▮▮

Subject    REQUEST FOR REDACTION OF
           NATIONAL SECURITY INFORMATION
           ▮▮▮▮▮▮▮▮▮▮

          Pursuant to the Secretary of the Navy Order of 29
July 2004, Implementation of Combatant Review Tribunal
Procedures for Enemy Combatants Detained at Guantanamo Bay
Naval Base, Cuba, Section D, paragraph 2, the FBI requests
redaction of the information herein marked[1].  The FBI makes
this request on the basis that said information relates to the
national security of the United States[2].  Inappropriate
dissemination of said information could damage the national
security of the United States and compromise ongoing FBI
investigations.

   CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
   DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

          The FBI certifies the aforementioned redaction
contains no information that would support a determination
that the detainee is not an enemy combatant.

          The following documents relative to ISN 219 have
been redacted by the FBI and provided to the OARDEC, GTMO:

FD-302 dated 10/28/2002

---

   [1]Redactions are blackened out on the OARDEC provided FBI
document.

   [2]See Executive Order 12958

                    UNCLASSIFIED

                                        Exhibit ▮▮

                                            ▮▮▮

UNCLASSIFIED

Memorandum from ████████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 09/15/2004


        If you need additional assistance, please contact
Assistant General Counsel ████████████████████████████,
███████████████████████████ or Intelligence Analyst ████████

-2-

UNCLASSIFIED

282



**U.S. Department of Homeland Security**
**U.S. Customs and Border Protection**
**Office of Border Patrol**

# Terrorist Organization
# Reference Guide

**January 2004**

Exhibit *R3*

*185*

# U. S. BUREAU OF CUSTOMS AND BORDER PROTECTION

**Purpose:** The purpose of the Terrorist Organization Reference Guide is to provide the Field with a who's who in terrorism. The main players and organizations are identified so the CBP Officer and BP Agent can associate what terror groups are from what countries, in order to better screen and identify potential terrorists.

**Limitations** *(Gaps in Data)*: This Guide is based upon the information available to this office at the time that the report was prepared.

> **NOTE:** This report is based upon information obtained from various open sources. No classified information was used in the preparation of this report.

For corrections, amendments, and suggestions, notify:

> Office of Border Patrol
> Bldg. 11624 SSG Sims Road,
> Biggs AAF,
> El Paso, TX 79908
> Mailing Address: Attn. BPSCC P.O. Box 6017
> El Paso, Texas 79906
> POC Kent D. Thew
> Tel: (915) 724-3218

**External Aid**

Receives financial, training, weapons, explosives, political, diplomatic, and organizational aid from Iran and diplomatic, political, and logistic support from Syria.

## 13.    Islamic Movement of Uzbekistan (IMU)

### Description

Coalition of Islamic militants from Uzbekistan and other Central Asian states opposed to Uzbekistani President Islom Karimov's secular regime. Although the IMU's primary goal remains to overthrow Karimov and establish an Islamic state in Uzbekistan, IMU political and ideological leader Tohir Yoldashev is working to rebuild the organization and appears to have widened the IMU's targets to include all those he perceives as fighting Islam. The IMU generally has been unable to operate in Uzbekistan and thus has been more active in Kyrgystan and Tajikistan.

### Activities

The IMU primarily targeted Uzbekistani interests before October 2001 and is believed to have been responsible for five car bombs in Tashkent in February 1999. Militants also took foreigners hostage in 1999 and 2000, including four US citizens who were mountain climbing in August 2000, and four Japanese geologists and eight Kyrgyz soldiers in August 1999. Even though the IMU's rhetoric and ultimate goals may have been focused on Uzbekistan, it was generally more active in Kyrgystan and Tajikistan. In Operation Enduring Freedom, the counterterrorism coalition has captured, killed, and dispersed many of the IMU's militants who were fighting with the Taliban in Afghanistan and severely degraded the movement's ability to attack Uzbekistani or Coalition interests in the near term. IMU military leader Juma Namangani was killed during an air strike in Afghanistan in November 2001; Yoldashev remains at large.

### Strength

Probably fewer than 1,000 militants.

### Location/Area of Operation

Militants are scattered throughout South Asia, Tajikistan, and Iran. Area of operations includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, and Uzbekistan.

### External Aid

Support from other Islamic extremist groups and patrons in the Middle East and Central and South Asia.

14

*385*

## 46.    Continuity Irish Republican Army (CIRA)

### Description

Terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein (RSF), which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original IRA goal of forcing the British out of Northern Ireland. Cooperates with the larger Real IRA.

### Activities

CIRA has been active in Belfast and the border areas of Northern Ireland where it has carried out bombings, assassinations, kidnappings, hijackings, extortions, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets include British military, Northern Ireland security targets, and loyalist paramilitary groups. Unlike the Provisional IRA, CIRA is not observing a cease-fire. CIRA continued its bombing campaign in 2002 with an explosion at a Belfast police training college in April and a bombing in July at the estate of a Policing Board member; other CIRA bombing attempts in the center of Belfast were thwarted by police.

### Strength

Fewer than 50 hard-core activists. Eleven CIRA members have been convicted of criminal charges and others are awaiting trial. Police counterterrorist operations have reduced the group's strength, but CIRA has been able to reconstitute its membership through active recruiting efforts.

### Location/Area of Operation

Northern Ireland, Irish Republic. Does not have an established presence on the UK mainland.

### External Aid

Suspected of receiving funds and arms from sympathizers in the United States. May have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

## 47.    Eastern Turkistan Islamic Movement (ETIM)

### Description

The Eastern Turkistan Islamic Movement (ETIM), a small Islamic extremist group based in China's western Xinjiang Province, is one of the most militant of the ethnic Uighur separatist groups pursuing an independent "Eastern Turkistan," which would include Turkey, Kazakhstan, Kyrgyzstan, Pakistan, Afghanistan, and Xinjiang. ETIM and other

overlapping militant Uighur groups are linked to the international mujahidin movement -
and to a limited degree al-Qaeda - beginning with the participation of ethnic Uighur
mujahidin in the Soviet/Afghan war.

### Activities

US and Chinese Government information suggests ETIM was responsible for terrorist
acts inside and outside China. Most recently, in May 2002, two ETIM members were
deported to China from Kyrgyzstan for plotting to attack the US Embassy in Kyrgyzstan
as well as other US interests abroad.

### Strength

Unknown. Only a small minority of ethnic Uighurs supports the Xinjiang independence
movement or the formation of an East Turkistan.

### Location/Area of Operation

Xinjiang Province and neighboring countries in the region.

### External Aid

ETIM is suspected of having received training and financial assistance from al-Qaeda.

## 48.    First of October Antifascist Resistance Group (GRAPO)

### a.k.a. Grupo de Resistencia Anti-Fascista Primero de Octubre

### Description

Formed in 1975 as the armed wing of the illegal Communist Party of Spain during the
Franco era. Advocates the overthrow of the Spanish Government and its replacement
with a Marxist-Leninist regime. GRAPO is vehemently anti-US, seeks the removal of all
US military forces from Spanish territory, and has conducted and attempted several
attacks against US targets since 1977. The group issued a communique following the
11 September attacks in the United States, expressing its satisfaction that "symbols of
Primero de Octubre imperialist power" were decimated and affirming that "the war" has
only just begun.

### Activities

GRAPO did not mount a successful terrorist attack in 2002. GRAPO has killed more
than 90 persons and injured more than 200. The group's operations traditionally have
been designed to cause material damage and gain publicity rather than inflict
casualties, but the terrorists have conducted lethal bombings and close-range

545

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on 29 October 2004 I was provided the opportunity to review the
record of proceedings for the Combatant Status Review Tribunal involving ISN #219.

✓ I have no comments.

___ My comments are attached.

███████████ LCDR, NC, USN
**Name**

███████████
**Signature**

29 OCT 04
**Date**

UNCLASSIFIED//~~FOUO~~